**NON–PUBLIC DOCKET (Clerk's Office Only) FOR**

**Eighth Circuit Bankruptcy Appellate Panel**

| | |
|---|---|
| **Bankruptcy Appellate Panel Docket #:** 15–6022 | **Docketed:** 05/05/2015 |

Joseph E. Sarachek v. Luana Savings Bank
**Appeal From:** U.S. Bankruptcy Court for the Northern District of Iowa – Dubuque
**Fee Status:** waived

---

**Case Type Information:**
   **1)** Bankruptcy Appellate Panel
   **2)** Chapter 7 Business – Adversary
   **3)** null

---

**Recusals:**

  None

---

**Originating Court Information:**
  **District:** 0862–2 : 10–09234                         **Adversary Proceeding:** 08–02751
  **Trial Judge:** Thad J. Collins, U.S. Bankruptcy Judge
  **Date Filed:** 11/03/2010

| **Date Order/Judgment:** | **Date NOA Filed:** | **Date Rec'd BAP:** |
|---|---|---|
| 04/20/2015 | 05/01/2015 | 05/05/2015 |

---

**Prior Cases:**
  None

**Current Cases:**
  None

---

**Panel Assignment:**    Not available

In re: AgriProcessors, Inc.
            Debtor

_____


Joseph E. Sarachek
            Plaintiff – Appellant

Dan Childers
Direct: 319–362–2137
Email: dchilders@elderkinpirnie.com
[NTC Retained]
ELDERKIN & PIRNIE
Firm: 319–362–2137
Suite 124
316 Second Street, S.E.
Cedar Rapids, IA 52401

Paula L. Roby
Direct: 319–362–2137
Email: plroby@elderkinpirnie.com
Fax: 319–362–1640
[NTC Retained]
ELDERKIN & PIRNIE
Firm: 319–362–2137
Suite 124
316 Second Street, S.E.
Cedar Rapids, IA 52401

v.


Luana Savings Bank
            Defendant – Appellee

Erik W. Fern
Direct: 563–382–2984
Email: efern@putlaw.com
Fax: 563–382–8810
[NTC Retained]
PUTNAM & FERN.
801 Commerce Drive
P.O. Box 70
Decorah, IA 52101

Dale L. Putnam
Direct: 563–382–2984
Email: putlaw@putlaw.com
Fax: 563–382–8810
[NTC Retained]
PUTNAM & FERN.
Suite 1
801 Commerce Drive
P.O. Box 70
Decorah, IA 52101

Case 2:15-cv-01015-LRR   Document 1   Filed 05/15/15   Page 2 of 63
Docket as of 05/14/15 14:31:46                page 2 of 4                Non–public (Clerk's Office Only)
Appellate Case: 15-6022   Page: 2   Date Filed: 05/14/2015 Entry ID: 4275386

In re: AgriProcessors, Inc.

       Debtor

_____

Joseph E. Sarachek

       Plaintiff – Appellant

v.

Luana Savings Bank

       Defendant – Appellee

| 05/05/2015 | | | Bankruptcy Appellate Panel Case Docketed. [4272124] [15–6022] (Cindy Harrison) |
| 05/05/2015 | | | Originating court document filed consisting of notice of appeal, docket entries, memorandum and order 4/20/15, judgment 4/20/15. [4272144] [15–6022] (Cindy Harrison) |
| 05/05/2015 | | | RECORD FILED – TRANSCRIPTS of 3/31/14, 4/1/14, 4/2/14 and 4/3/14. [4272149] [15–6022] (Cindy Harrison) |
| 05/05/2015 | | | BRIEFING SCHEDULE: Appellant brief of Joseph E. Sarachek due 06/04/2015. Appellee's brief due 30 days following service of appellant's brief. Reply brief due 14 days following service of appellee's brief. [4272151] [15–6022] (Cindy Harrison) |
| 05/13/2015 | | | APPEARANCE filed by Dale L. Putnam for Appellee Luana Savings Bank w/service 05/13/2015 [4274972] [15–6022] (Putnam) |
| 05/13/2015 | | | Election filed by Mr. Dale L. Putnam for Luana Savings Bank to transfer this case to the district court. w/serivce ,05/13/2015 [4274981] [15–6022] (Putnam) |

Case 2:15-cv-01015-LRR   Document 1   Filed 05/15/15   Page 4 of 63

Docket as of 05/14/15 14:31:46                    page 4 of 4                    Non–public (Clerk's Office Only)
Appellate Case: 15-6022      Page: 4      Date Filed: 05/14/2015 Entry ID: 4275386

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Chapter 7** |
| **AGRIPROCESSORS, INC.,** | ) | |
| | ) | |
| Debtor. | ) | **Bankruptcy No. 08-02751** |
| | ) | |

| | | |
|---|---|---|
| | ) | |
| **JOSEPH E. SARACHEK,** | ) | |
| **In his capacity as** | ) | |
| **CHAPTER 7 TRUSTEE ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Adversary No. 10-9234** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LUANA SAVINGS BANK** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Chapter 7 Trustee brought this case against Defendant, Luana Savings Bank ("the Bank"), alleging that the Bank received preferential transfers from Agriprocessors, Inc. ("Debtor") totaling $5,134,582.68. The matter came before the Court for trial. Dan Childers, Desiree Kilburg, and Paula Roby appeared on behalf of Plaintiff, Joseph E. Sarachek, Chapter 7 Trustee. Dale Putnam and Eric Fern appeared on behalf of the Bank. The Court took the matter under advisement. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

## STATEMENT OF THE CASE

Trustee seeks to recover preferential transfers under § 547(b).  Trustee argues that Debtor overdrafted its account and when Debtor made deposits at the Bank that covered overdrafts, those payments were preferential transfers.  The Bank asserts there is no recovery available under the facts or the law.

There were several issues for trial.  The first involved how to correctly calculate the amount of overdrafts for determining the amount of antecedent debt or issue.  Debtor and the Bank disagree about whether Debtor's second account at the Bank should be considered to determine when overdrafts occurred and their value.  The parties also disagree about whether errors that the Bank made when processing Debtor's account ("posting errors") should be accounted for in the overdraft calculation.

The Bank argued even if Trustee could prove a prima facie case under § 547(b), the affirmative defenses to preference liability under § 547(c) apply. The Bank argues that all payments Trustee seeks to recover qualify as contemporaneous exchanges for new value under § 547(c)(1).  The Bank argues that its continuing relationship with the Debtor was new value that Debtor received in exchange for repaying the overdrafts.  The Bank argues that any preferential payments are protected by the ordinary course of business defense under

2

Appellate Case: 15-6022   Page: 6   Date Filed: 05/14/2015 Entry ID: 4275386

§ 547(c)(2). The Bank believes the record shows the repayments on overdrafts were made in the ordinary course.

The Bank also argues that any recovery of preferential transfers against the Bank would constitute an improper double recovery by Trustee of the preferences under § 550(d). The Bank argues that because Debtor wrote checks on its bank account that Trustee has already recovered as preferential transfers in other cases, an award of preference liability against the Bank in this action would result in double recovery for Plaintiff.

After a careful review of the trial record, the Court finds Trustee may recover $1,556,782.89 of preferential transfers from Debtor to the Bank. The Court also concludes the Bank's defenses are not supported by the record.

## GENERAL BACKGROUND

Debtor owned and operated one of the nation's largest kosher meatpacking and food-processing facilities in Postville, Iowa. On November 4, 2008, Debtor filed a Chapter 11 petition in the Bankruptcy Court for the Eastern District of New York. Debtor's bankruptcy petition and accompanying documents recited that its financial difficulties resulted from a raid conducted by U.S. Immigration and Customs Enforcement. A total of 389 workers at the Postville facility were arrested. The raid led to numerous federal criminal charges, including a high-

profile case against Debtor's President, Sholom Rubashkin.[1]  Debtor's Petition also

stated it had over 200 creditors and assets and liabilities in excess of

$50,000,000.00.

The Bankruptcy Court for the Eastern District of New York eventually

approved the appointment of Joseph E. Sarachek as the Chapter 11 trustee.  The

Court concluded that appointing a trustee was necessary in part "for cause,

including fraud, dishonesty, incompetence, or gross mismanagement of the affairs

of the debtor by current management" under § 1104(a)(1).  After hearings in a later

proceeding, the Court transferred the case to this Court on December 15, 2008.

This Court eventually granted the Trustee's motion to convert the case to a Chapter

7 bankruptcy.  The U.S. Trustee for this region retained Mr. Sarachek as the

Chapter 7 Trustee.

## BACKGROUND FOR THIS CASE

On November 3, 2010, Trustee filed this adversary action against the Bank

seeking to set aside preferential transfers under 11 U.S.C. § 547(b).  The Trustee

claimed that in allowing Debtor to make regular overdrafts, the Bank was in fact

giving Debtor a series of short-term loans.  The Trustee claimed that each time a

check was presented for provisional settlement and the settlement resulted in a

---

[1] Rubashkin was convicted on 85 counts of financial fraud.

4

Appellate Case: 15-6022    Page: 8    Date Filed: 05/14/15 Entry ID: 4275386

negative funds balance—an intraday overdraft—the Bank was in fact extending credit to Debtor.

The Trustee then concluded that each time Debtor made a deposit, wire transfer, or transfer from other accounts to cover the intraday overdrafts, Debtor paying on a short-term loan. Trustee argued repayment of these short-term loans was the repayment of an antecedent debt and therefore a preferential transfer to the Bank. The Trustee claimed he could recover the repayment of the day of the greatest overdraft, which totaled $5,134,582.68.

The Bank claimed that none of the transfers were made on account of an "antecedent debt" as a matter of law. The Bank argued that only a "true overdraft" can create an antecedent debt. It argued overdrafts occur only where sufficient covering funds are not deposited before the midnight deadline of the second day of the two-day banking transaction cycle. The Bank argued that the provisional or "intraday" overdrafts were almost always covered by the next day's deposits. The Bank argued that these intraday overdrafts—paid by close of the second day— could not be debts. The Bank argues that, without the antecedent debt, none of the transactions are avoidable as preferential transfers.

The parties brought this issue of whether intraday overdrafts were extension of credit giving rise to antecedent debt for preference purpose. The Court addressed the Bank's Motion for Summary Judgment on this issue in a lengthy

5

ruling.  Sarachek v. Luana Savings Bank (In re Agriprocessors, Inc.), 490 B.R. 852

(Bankr. N.D. Iowa, Apr. 15, 2013).  The Court agreed with the Bank on the

intraday overdraft issue.  The Court found that only "true overdrafts"—overdrafts

allowed to stand past the midnight deadline (when the Bank could no longer

dishonor the checks)—are extensions of credit.[2]  The Court did find in a rare case

that a provisional overdraft may only be an extension of credit, like where the

parties had a written agreement saying so.  The Court incorporates by reference the

entire summary judgment opinion to the extent it is not inconsistent with the

Ruling herein.

The Court identified three main issues for trial:  (1) whether there was a

written agreement between the parties that would transform intraday overdrafts

into extensions of credit; (2) whether there were true overdrafts, and if so, what the

amount of the true overdrafts was; and (3) whether the Bank was entitled to any

affirmative defenses.  The parties agree there is no written agreement to make

intraday overdrafts extensions of credit.  Thus, issues (2) and (3) are the primary

focus of this trial ruling.

---

[2] The Court also found that Trustee's Second Amended Complaint properly added
a claim to recover a setoff under § 553.  The Trustee claimed that "some or all of
the transfers" may be avoidable not simply as preferential transfers under § 547(b)
but may also "constitute improper setoffs pursuant to 11 U.S.C. § 553."

6

# FACTS

In this particular adversary case, there is little dispute about many of the important facts.  The Bank is located in Luana, Iowa, a small town near Postville, Iowa where Debtor conducted its operations.    Debtor banked with the Bank since at least 1999.

## *Debtor's Accounts at the Bank*

Debtor first opened checking account no. 401102 ("account 401102") in 1999.  Account 401102 was used entirely for deposits necessary under the Packers and Stockyard Act.  In early 2000, Debtor opened a second checking account, no. 1430 ("account 1430").  (Def. Ex. B)  The Debtor used account 1430 for daily transactions.  Account 1430 is the primary account at issue here.

From at least November 2007 to mid-May 2008, Debtor regularly incurred intraday overdrafts on account 1430.  These overdrafts never exceeded $400,000.  During that period of time, the account would regularly reach a positive ledger balance.

Starting in mid-May 2008, however, the overdrafts steadily became much more significant.  The account's ledger balance was never positive between May 2008 and November 2008, when the Debtor filed its bankruptcy petition.  Thus, in the 90-day preference period, it is undisputed that account 1430 never had a positive daily ledger balance.

7

The amount of daily ledger overdrafts was very large. Account 1430 reached its largest negative ledger balance of $5,134,582.68 on September 3, 2008. As Debtor's ledger overdrafts increased and were becoming more significant, the Bank sought additional assurances of payment.

At about the same time, Debtor closed its original account 401102 that took care of the Packers and Stockyard Act concerns. In July 2008, Debtor opened a new replacement account with the number 367788 (account 367788). The Bank has noted two different explanations for the new account. One explanation was that it was a new account for the Packers and Stockyards funds. The other explanation was that the Bank needed a "cushion" account that provided additional assurances that overdrafts would get paid. At the end of the trial, counsel for the Bank stated that both explanations were correct—the account was initially for the Packers and Stockyard requirements, but then the account became the cushion of additional funds for "setoff" if needed.

Account 367788 was open with a zero balance in July 2008. On August 1, 2008, Debtor deposited $1,150,000.00 in that account at the Bank's request. On August 7, 2008 the Bank placed a hold on this account. Two weeks later, the Bank asked Debtor to deposit $250,000.00 more in account 367788. Debtor complied.

Account 367788 was not used for daily transactions. Debtor did not have access to the funds in account 367788. The Bank placed a hold on the account

soon after Debtor placed the funds in that account.  The Bank claims that account 367788 provided the Bank a cushion if Debtor wrote checks that exceeded the amount on deposit in account 1430 after the end of the two-day banking day.  In less than two weeks Debtor filed bankruptcy, the Bank transferred the entire $1,400,000.00 in account 367788 to cover "true" overdrafts in account 1430.

### *The Overdrafts*

At some time before the 90-day preference period began, Debtor changed its main bank account for day-to-day transactions to Luana Bank, and account 1430.  Before that, Citizen's Bank had been Debtor's primary bank.  Citizens Bank told Debtor that it would no longer serve as Debtor's bank because Debtor was running way too many overdrafts.  After account 1430 at Luana Bank became Debtor's primary account, overdrafts on that account increased significantly.

In the ninety days before bankruptcy, Debtor wrote hundreds of checks on account 1430 totaling multiple millions of dollars.  There is no dispute that the Bank allowed this heavy volume even though Debtor routinely had insufficient ledger funds in the account.  The Bank acknowledges there was some risk in doing this but took this risk because it believed it had a sufficient plan in place to protect itself.

The Bank had adopted a "pay all" policy for clearing checks for Debtor's account.  When the Debtor's checks were presented by the payee's bank through

9

the automated clearing process, the Bank's pay all policy resulted in an automatic "provisional settlement" (intraday overdrafts) on all those checks.  The morning of the next banking day, the Bank would receive the details of what amounts were provisionally settled (in an NSF position) through the clearinghouse, under the pay all plan.  Only after reviewing that report would the Bank learn which accounts had insufficient account funds or were left with a negative ledger balance from the provisional settlements.  This negative balance is known as an "NSF" position (non-sufficient funds) or an intraday overdraft.[3]

Each morning, Bank president and majority owner, David Schultz, would carefully review the report of all accounts that were overdrawn or had a negative balance.  Schultz believed the Bank had until the customary "midnight deadline"— midnight on the day after a provisional settlement—to decide whether to honor the check or not.  Schultz described several options he believed the Bank had on that second day of the two-day banking day.  The Bank could have immediately dishonored and return the check for insufficient funds—i.e., bounced the check.  The Bank could have immediately honored the check and created a "true overdraft" in the account.  The Bank could also wait on the customer to deposit funds to cover the intraday overdraft before the "midnight deadline."

---

[3] For clarity, the Court will use the term intraday overdraft to describe an overdraft on the second banking day following presentment.  A "true overdraft" creating a debt does not occur until the "midnight deadline" has passed and the provisional settlement has become final.

The Bank chose the last process.  The Bank described that process as follows.  Early on day two, the Bank would generally have a secretary call Debtor to make sure a covering payment was coming before midnight.  If Debtor said money would be coming yet that day to cover the checks, the Bank would wait for the funds before making a decision on honoring the check.  Most days Debtor would make a wire transfer before the "midnight deadline" that satisfied the Bank. This led to the Bank honoring most of the intraday overdraft checks written on Debtor's checking account.  Even a quick examination of the record shows, however, that most days a wire transfer did not come in to bring the ledger balance in account 1430 to zero within the two-day banking cycle.

The Bank admits that these "covering" payments virtually never brought account 1430 back to a positive or even zero balance.  The Bank notes, however, that it considered the funds in account 367788 as part of its computation to determine if there was a "true overdraft."  Thus, if the "covering" amount deposited in account 1430 came in before the midnight deadline and brought it above a balance of negative $1,400,000, then the Bank did not consider this to be a true overdraft.  In the Bank's view, the two accounts were considered together so the $1,400,000 in account 367788 brought the overall picture to a balance.

The Bank admits it had no written agreement with Debtor providing for such a linking of the accounts.  The Bank asserts that "everyone" from the Bank and

11

Debtor knew this was the informal agreement on how they would handle this.  The Bank points out that even Debtor's own former controller, Yomtov "Toby" Bensasson, admitted in his testimony (taken from prison) that this was the agreement.

The Bank also admits, however, that on some days the covering deposit to account 1430, even when adding the $1,400,000 in account 367788, was insufficient to get the account to a positive position.  The Bank, and its own expert, admits these infrequent days resulted in "true overdrafts."  The Bank states that these true overdrafts occurred on only nine days and totaled $1,556,782.89.  The Bank believes that is the absolute maximum Trustee can show was a preferential transfer.

On October 24, 2008, the Bank learned no covering money was coming from Debtor before the midnight deadline.  The Bank then transferred the $1,400,000.00 on hold in account 367788 into account 1430 to cover the negative balance.  Debtor filed bankruptcy on November 4, 2008, less than two weeks after that transfer.

The evidence shows that there was a close relationship between Debtor and the Bank.  There were regular updates and daily communication back and forth about the status of account 1430.  There was no written agreement apart from a

standard account contract.  (Def. Ex. B.)  Debtor was a very big customer for the

Bank.  The Bank also had business with a number of Debtor's related entities.

The Bank more or less admits it had an unusual banking relationship with

Debtor that needed to be viewed in proper context.  The daily communication

between Debtor's officers and the Bank about Debtor's overdrafts and the status of

incoming deposits was only one facet of this relationship.  The Bank elected to

give Debtor tremendous flexibility with its accounts.  The Bank admits it

knowingly took some real risk of not getting sufficient covering deposits and

repayments when it allowed Debtor daily, intraday overdrafting privileges.  The

Bank believed it was providing Debtor with a valuable service by covering some

overdrafts and being patient on repayment.

The Bank did, however, admit that it charged more than $30,000 to Debtor

for fees in the form of "account-management" charges and specific overdraft

charges.  Additionally, findings of fact are provided in the discussion of the issues

where they are relevant.

## DISCUSSION

### I.    Preferential Transfers

Trustee argues this case, in spite of all the complicated facts and facets, is a

straight-forward preference claim.  To establish a preferential transfer the Trustee

must show that the transfer (1) was made for the creditor's benefit; (2) was for a

preexisting debt; (3) occurred while the debtor was insolvent; (4) occurred within

90 days before the petition was filed; and (5) distributed more to the creditor that it

would have received in a Chapter 7 liquidation.  11 U.S.C. § 547(b) (2014).

The second element is the only one in dispute here:  Whether Debtor owed

the Bank a preexisting debt, and if so, how much.  The first portion of this

element—whether Debtor owed the Bank a debt—depends on whether the Bank

can be said to have extended credit to the Debtor.  See Id. § 101(12).  This is

largely a legal question.

If the Court concludes (as it will) that the Bank extended credit when true

overdrafts occurred thus establishing a pre-existing debt, the Court must then

decide the amount of the debt.  Calculating the amount of antecedent debt is a

factual question.  It requires the Court to determine the amount of credit extended

and, thus, the amount repaid by Debtor during the preference period.  While the

counting/calculation question was the real issue at trial, both parties have in post-

trial briefing asked the Court to revisit the first question of whether there can be a

debt.  This is essentially what the Court decided at summary judgment.

## A.  Only True Overdrafts Are Extensions of Credit

Both parties ask the Court to revisit its summary judgment decision that held

only "true overdrafts" can give rise to a debt for the preference claims here.

Trustee again argues intraday overdrafts that result from provisional settlement of

14

checks should be treated as extensions of credit that give rise to the debt. The
Bank argues the Court should extend the rationale of cases it relied upon at
summary judgment and conclude none of the transfers here—not even the true
overdrafts—can give rise to a debt and be preferential transfers.

### 1. Trustee's Argument

In its post-trial briefs the Trustee repeats this argument and asks the Court to
find that intraday overdrafts are extensions of credit as a matter of law. The Court
rejected this argument at summary judgment and also rejects it here. "[R]outine
intraday overdrafts, standing alone, are not extensions of credit provided they are
covered or reversed before the midnight deadline on day two." Sarachek v. Luana
Sav. Bank (In re Agriprocessors, Inc.), 490 B.R. 852, 878 (Bankr. N.D. Iowa
2013). But if these intraday overdrafts "are not cured or zeroed out" by the
midnight deadline, [they] become 'true overdrafts' and thus extensions of credit."
Id. 881. Unless there is an agreement specifying that the Bank is obligated to
honor overdrafts, only true overdrafts are antecedent debts. Id. at 878. ("[A] bank
and its customer [can] explicitly modify their relationship by special agreement to
make the provisional settlements into loans."). Under Iowa law, such an
agreement must be in writing. Id. at 379–80. ("[U]nder Iowa law more than
inferences and indicia of a loan agreement are required. There needs to be a written
agreement.").

15

Here, there is no evidence of a written agreement in which the Bank commits to honor Debtor's overdrafts. The only written agreement between the parties is the Bank's standard account contract. (Def. Ex. B.) This standard account contract does not require the Bank to honor Debtor's overdrafts. The Trustee presented no evidence of a written agreement where the Bank committed to honor Debtor's overdrafts on account 1430. Thus, only true overdrafts on account 1430 are debts. The Court will not revise its Summary Judgment Ruling on the grounds asserted by Trustee.

### 2. The Bank's Argument

The Bank argues the Court should revisit the issue of whether short-term overdrafts—even when they are true overdrafts—can be considered to be preferential transfers under the law. The Bank asks the Court to reconsider its interpretation of the reach of <u>Laws v. United Missouri Bank of Kansas City</u>, 98 F.3d 1047 (8th Cir. 1996) and <u>Bernstein v. Alpha Assoc., Inc.</u> (<u>In re Frigitemps Corp.</u>), 34 B.R. 1000, 1015–16 (Bankr. S.D.N.Y., Nov. 29, 1983), which <u>Laws</u> also interpreted.

The Bank essentially asks the Court to find that the following passage from <u>Laws</u> requires the different result the Bank requests.

> The bank routinely makes uncollected funds available to the depositor, not as a loan, but in recognition of the bank's anticipated debt to the depositor. Because the vast majority of deposits are collected, banks do not see the decision to make advances on

16

uncollected deposits as a credit decision. It is a service decision, driven by laws such as the Expedited Funds Availability Act, and by the financial demands of bank customers. True, a debt will arise if deposited checks are dishonored. But until dishonor, a bank that advances funds in the expectation that deposits will routinely be collected acts as a conduit for the depositor's financial transactions, not as a creditor. See In re Chase & Sanborn Corp., 848 F.2d 1196, 1201 (11th Cir.1988).

Id. at 1051.

The Bank argues it should be treated as a mere "conduit" even when it allowed the nine days of true overdrafts. The Bank argues other cases suggest that virtually all overdrafting, even "true overdrafting" like there is in this case, is protected from preference liability. The Bank believes Laws implies as much.

The Court disagrees and concludes not only that it has properly construed Laws, but that Laws also prohibits extending the law as far as the Bank suggests. In Laws, the Eighth Circuit uses the time of dishonor to make the determination of when debt arises. As Laws specifically notes: "True, a debt will arise if deposited checks are **dishonored**. But **until dishonor**, a bank that advances funds in the expectation that deposits will routinely be collected acts as a conduit for the depositor's financial transactions, **not as a creditor**." Id. at 1051 (emphasis added). The Court has applied Laws to conclude the midnight deadline of the second day of transaction is the decisive point of honor or dishonor. The Court believes—as in Laws—that the time of honor or dishonor determines when a debt arises. Here, the Court concludes the debt arose when the Bank decided to honor

17

the overdrawn check by letting the midnight deadline pass.  In other words, the

time for dishonor expired.

Here, there are several other reasons not to extend Laws beyond its own

terms.  First, Laws specifically agrees that not only would a debt arise at the point

of dishonor, but that if the parties' relationship became more like a line of credit or

other type of arrangement where interest or changes were made on the account, a

debt would or could arise.  Laws at 1051–52, n.4 (actively drawing on a line of

credit and paying interest or charges can "reflect a banking relationship having

many indicia of a loan").  Here, the banking relationship changed at some point

when the Bank started charging significant account management fees and overdraft

charges.  These fees functioned much like interest and the evidence shows the

Bank applied the fees and charges because of the amount and nature of the intraday

and true overdrafting.  The Bank's argument that it functioned merely as a conduit

because it received nothing in return for allowing the overdrafts is entirely belied

by the $30,000 plus of these fees it collected on Debtor's account.  In fact, under

Laws, this fee charging could allow even the provisional/intraday activity to be

treated as lending and creation of a debt relationship.  The Court has given the

Bank the benefit of the doubt by not so extending Laws.

The second, and equally compelling, reason for not further extending Laws

is that § 547 nowhere supports the request the Bank makes.  The Bank asserts there

should be an exception to preference recovery because of the uniqueness or a

banking relationship and because "true overdrafts" provide a valuable banking

service, not a loan.

The Bank is asking the Court to write a special "banking" exception into the

statute that is not currently there.  The Court declines to do so, as it can only

interpret, not rewrite the Code.  The Court thus concludes any attempt to further

Laws or rely on case law outside the Eighth Circuit that is not supported by Laws

or the Code is extremely improper.

The Court thus rejects both parties' arguments to reconsider its summary

judgment ruling.  The net effect is to reiterate that only the transactions the Bank's

own expert referred to as "true overdrafts" an result in a debt for purposes of

§ 547(b).

### B.  Calculating the Amount of True Overdrafts

Because the Court has concluded that true overdrafts are treated as

antecedent debt under § 547(b), the Court must now determine the amount of those

true overdrafts.  The parties strongly disagree about how to calculate the amount of

true overdrafts.  In particular, they disagree about (1) whether it is proper to

consider the balance in account 367788 in making the true overdraft calculation

and (2) whether it is proper in doing the calculation to correct for posting errors

that the Bank made in account 1430 during the 90 days before bankruptcy.

19

The Bank contends that accounts 1430 and 367788 should be added together when calculating the amount of "true overdrafts" involved. The Bank also argues the posting errors it made in account 1430 should be disregarded when calculating the "true overdraft" amount. Trustee disagrees. Trustee argues there is no basis for considering accounts 367788 and 1430 together to determine the amount of "true overdrafts." Trustee also argues posting errors made by the Bank in account 1430 reflect the actual amount that Debtor owed the Bank. Thus, Trustee asks the Court to retroactively correct for those errors and recalculate the true overdrafts from those numbers.

### a.  The Role of Account 367788 in Determining True Overdrafts

The Bank claims that the parties had an agreement to net account 1430 against the funds in account 367788 in order to determine all daily overdrafts— including "true" overdrafts. The Bank argues that this "netting" agreement reduces the maximum number and maximum amount of true overdrafts significantly from numbers Trustee argues. The Bank believes that, under its analysis, there are only nine days of true overdrafts and $1,556,782.89 in true overdrafts total at issue.

Trustee disagrees. He argues there is no evidence of a written or oral agreement between the parties to consider the accounts together or "net" them daily. Trustee thus believes account 1430 was overdrawn almost every day of the preference period, and that the total true overdraft should be $61,435,427.34.

20

Trustee argues that even if there was a "netting" agreement, there were still the same amounts of total true overdrafts because the Bank never actually paid the overdrafts by transferring funds from account 367788.

The parties agree this is essentially a fact question.  While this fact question issue is far from clear in the record, the Court finds the scales tip slightly in favor of the Bank on this issue.  In reaching this conclusion, the Court finds the Bank's position and the facts it relies upon are consistent with informal small-town banking practices that appear in this case.  Collin Cook, Defendant's Chief Financial Officer, worked with Toby Bensasson, Debtor's comptroller on these accounts.  The Court acknowledges up front that Cook's testimony was unclear, if not contradictory, at times.  For example, he testified that in opening account 367788, the Bank "did not ask him to [open the account] for overdraft protection. It was just to replace the other account he [Toby] had."  Likewise, Cook testified the additional $250,000.00 "just came in a wire with the directions to go to that account" and had no other rationale.  Cook later explained—several times—that he actually asked Toby, on behalf of the Bank, for a cushion account, and directed him to deposit the amounts into account 367788.  Bank records and other documents support these as well.

In spite of problems in his testimony, the Court believes him on the key issue—that the Bank and Debtor both believed account 367788 and account 1430

21

Appellate Case: 15-6022   Page: 25   Date Filed: 05/14/15 Entry ID: 4275386

were to be viewed together in determining whether there was a true overdraft each day.  Cook repeatedly emphasized that account 367788 became an account he and Toby both considered in determining how much the daily "covering" deposit had to be.  The weight of the other evidence supports his assertions.

The testimony of David Schultz, the Bank President and majority owner, came in by deposition.  His testimony supports Cook's testimony as well.  Schultz noted that he was not concerned with the ledger overdrafts in account 1430 each day:  "Because we had another account of $1.4 million that we had a hold on to offset this account."  (Schultz Deposition, pg. 18)  In responding to questions about how he calculated the risk with respect to daily overdrafts by Debtor, he stated he looked at "basically the overdraft that day and we had this other account on hold and then we—if there was no shortage that day—then we needed to get a wire in." (Schultz Deposition, pg. 37)  His testimony wholly supports Cook's assertions.

Toby Bensasson's testimony also came in by deposition and largely supports Cook.  Overall, his testimony agrees with the Bank's assertion that Debtor did consider the two accounts as one by the way he matched daily deposits effectively net the accounts.  The Bank points out Bensasson calculated the amount of money that needed to be transferred into account 1430 each day with the amount already in account 367788 in mind.  The Bank's argument is that this evidence added together logically shows Bensasson netted the accounts, and then told his boss,

22

Sholom Rubashkin, how much they needed to scrape together and get deposited. That amount usually was very close to bringing the netted accounts to a positive balance. The Bank highlights three days in particular—August 14th and 28th, and October 7th, 2008—to show this process in action. On all three days, the net balance of the accounts, after Toby's deposits, was just a couple thousand dollars above zero.

Toby Bensasson's testimony—like Cook's—is somewhat confusing or contradictory, but on balance supports the Bank's position. Bensasson did testify that when he was determining how much to deposit into account 1430 each day, he did not consider the balance in account 367788. When asked how he treated the account when doing this calculation, he said, "I didn't. I didn't apply to it. I didn't look at it even." However, this does not show he ignored or forgot about account 367788 or thought it had no application. Bensasson stated the Bank called and gave him a number daily to cover overdrafts. He got them the number they asked for. (Bensasson Deposition, pg. 32). He knew it would not bring account 1430 to zero by itself. He too looked at the balance—often many times a day. Bensasson said the reason account 367788 existed was at the Bank's request for security. (Bensasson Deposition, pg. 39). Bensasson also noted he did not have the ability to use account 367788 because it was security or a cushion for the Bank. (Bensasson Deposition, pg. 40). He reiterated later in relation to the $1.4 million

23

Appellate Case: 15-6022   Page: 27   Date Filed: 05/14/15 Entry ID: 4275386

in account 367788—"that money was supposed to be a cushion against the account we wrote regular checks on." (Bensasson Deposition, pg. 42). The Court believes the totality of the evidence—and in particular the parties' course of conduct—shows they actually did net the accounts or consider them as one.

Trustee also argues that even if there had been an agreement to consider accounts 1430 and 367788 as one account, it would not diminish or reduce the Bank's liability on the true overdrafts. The Bank argues all of the checks still became true overdrafts because the Bank never actually used account 367788 to cover the checks until October 24th. Trustee points out that the Bank is effectively arguing that because it *could have* paid the checks with the funds in account 367788 at the end of each day, the checks are not true overdrafts. The Trustee concludes the fact that a check *could have* been paid means nothing. It is only when the Bank used the funds in account 367788 and *actually paid* them over to cover checks in account 1430 that they could reduce the "true overdraft" amount. In short, the Trustee argues that if checks in account 1430 were not returned or covered by wires or transfers from account 367788 before the midnight deadline, they all became true overdrafts. In summary, Trustee believes the fact that funds may have been available does not matter—what matters is whether the checks were actually paid with those funds.

Again, while the Trustee's argument has great logical and technical appeal, it is inconsistent with the weight of the evidence. The Bank and Debtor had what the Court has referred to a "small town banking relationship." They not only had an informal "netting" agreement, they also appear to have agreed to—and actually implemented— a practical step to effectuate it. That practical step was to remove one of the technical steps of the netting Trustee identifies. Instead of having the Bank transfer funds to cover from account 367788 to account 1430, and then having Debtor replenish account 367788 each day, the Bank and Debtor just left account 367788 alone most days. They functionally agreed to have the wired money from Debtor go right into account 1430. The net effect was the same. In fact, Toby Bensasson was not even sure whether the funds went right to account 1430 or replenished account 367788 after the Bank made a transfer. (Bensasson Deposition, pg. 37, 42). It really did not matter. It was six of one or a half-dozen of the other. The net result was the same.

The Court thus finds that the weight of the evidence ever so slight shows an informal agreement by the Bank and Debtor to "net" account 1430 and account 367788 to determine if there were true overdrafts. The practical implementation of the agreement did not change the amount of true overdrafts on account 1430. Thus, the netting argument supports the Bank's assertion that the "true overdraft"

25

amount is $1,556,782.89—and not the higher number of $61,000,000 plus offered by the Trustee.

### b. The Role of Posting Errors in Determining True Overdraft Amounts

The Bank argues that it made a series of posting errors on the balance for account 1430 in September, October, and November 2008. The Bank essentially claims it credited account 1430 as having additional money that in fact should not have been there. These errors were posted on the bank statements for those months. The Bank corrected these "posting errors" in the December 2008—post-bankruptcy—bank statement.[4] Because the corrections came after the bankruptcy filing, these posting errors were in the account statements during the preference period and resulted in Debtor's balance in account 1430 showing a higher amount than it actually should have. These posting errors thus led to a calculation of "true overdrafts" by the parties at that time that would be different than the one on the account statements corrected after the bankruptcy filing..

The Bank argues those errors should not be retroactively corrected to determine "true overdraft" amounts. It argues the parties relied on the bank statement and posted balance at the time—and it is impossible to know how they would have acted had the bank statement been accurate. For example, the Bank

---

[4] The Bank's expert testified that it is improper to retroactively correct bank statements. Instead, the proper procedure is that, when a bank makes an error, the bank will correct that error on the following bank statement.

26

could have concluded much earlier that it would take the money from account 367788 and close the account. In sum, the Bank believes it would be inequitable to retroactively change a bank statement and balance.

Trustee agrees about the amount of the errors, but disagrees about how they should be treated now when calculating the amount of true overdrafts. Trustee believes the true overdraft calculation should correct for these posting errors. Such a correction would show a higher amount of true overdrafts. In sum, Trustee believes that, if there was in reality less money in account 1430, there were, in reality, higher true overdraft amounts.

The Court finds the Bank's position most persuasive. There is significant evidence that the parties would in fact have acted differently had the account balance been correct instead of containing the errors. The Court concludes it would be inequitable to retroactively account for the posting errors.

Some of the key facts supporting this conclusion are as follows. The Bank and Debtor both tracked the balance in account 1430 very closely. Their actions— transfers, withdraws, and deposits—all show a careful thought process and actions based on what they believed the balance in account 1430 at that time. Debtor relied on the balance shown in account 1430 at that time to determine how much money to wire into account 1430. Bensasson noted he often checked the posted balance in account 1430 three or four times a day during the 90-day preference

27

period.  The Bank similarly relied on that posted balance to determine whether to return checks—and if so, how much.  David Schultz, the Bank's president, carefully reviewed which accounts were overdrawn based on the posted balance and made decisions whether to return checks accordingly.

If the account balance were to be retroactively corrected, it is nearly certain that the parties would have acted differently based on a different, corrected balance.  How they would have acted and how that would have affected the treatment of overdrafts differently is impossible to predict.  Debtor may have been required to deposit more money.  The Bank may have returned many more checks. The Bank may have set off the funds in account 367788 earlier.  Perhaps all of this would have brought on Debtor's bankruptcy much earlier—and even saved some creditors from the large losses they sustained.  Because it is impossible to know the exact effect of these after the fact corrections on an account that the parties followed so closely, it is impossible to truly "correct" the whole case (i.e. Bank and Debtor actions) for the posting errors that occurred.

The Bank also has pointed out that it has filed a claim for the nearly $800,000 of improperly posted funds.  The Bank argues here—and the Court agrees—that the claim for these funds arose at the time the Bank corrected the Bank Statements in December 2008 (after the Bankruptcy), not when the errors allegedly occurred (before the bankruptcy).

28

The Court thus finds that the Bank's computation of the "true overdraft" amount in this case of $1,556,782.89 has greater support in the record.  Stated another way—and perhaps the most proper way—the Court finds the Trustee failed its burden of showing a higher "true overdraft" amount than the $1,556,782.89 the Bank concedes as true overdrafts.[5]  Thus, the amount of "pre-existing debt" for which the Bank was paid during the preference period is $1,556,782.89.  The Trustee has established preference payments in that amount under § 547(b). Trustee may avoid and recover those transfers composing the $1,556,782.89 unless the Bank establishes its affirmative defenses.

## II.    Setoff

The parties and the Court have spent a good deal of time on the priority and avoidability of the Bank's use of funds in account 367788 to setoff overdrafts in account 1430.  Trustee had argued the Bank also received an additional preferential transfer when it setoff the $1.4 million in account 367788 against the overdraft of $840,534.89 in account 1430 on September 24th.  The Bank has asserted this was a proper setoff under § 553(a) such that it is protected from avoidance.[6]

---

[5]   The Court understands the Bank believes there are no avoidable overdrafts under <u>Laws</u>.  However, the Court has rejected that argument.

[6] The Bank also makes a passing argument that it had an automatic perfected security interest in the account.  The Bank asks the Court to extend and apply language from <u>Kentucky Highlands Investment Corp. v Bank or Corbin, Inc.</u>, 217 S.W.3d 851, 856 (Ky. App. 2006)—stating that depository banks receive an automatic perfected interest in their customer's accounts under the UCC—to this

The Court believes its findings and conclusions above largely moot this issue for purposes of calculating the amount Trustee has shown to be preferential. The Court found there was an informal but acceptable "netting" agreement for accounts 1430 and 367788, and the funds actually used for the October 24, 2008 setoff have already been included in—and accounted for—in the netting analysis. In other words, resolving the setoff question does not in fact add to or subtract from the antecedent debt total.  If the Court is wrong on those questions, it would have to reach the setoff as a separate, and possibly additional, claim.  The Court also notes that if it is wrong on the affirmative defenses, then the propriety or setoff on October 24, 2008 may be very relevant.  Thus, the Court will consider the issue and not defer it for another day.

The Court concludes that because there was a hold on the account, the setoff is not protected under § 553(a).  Under both the written account agreement and § 553(a)'s mutuality requirement, the Bank enjoyed a right of setoff only against the funds actually available to Debtor.  The hold on the account prevented them from being available to Debtor.

In general, a setoff that meets the requirements of § 553(a) is protected from avoidance.  Although the Bankruptcy Code does not create a federal right of setoff,

---

case.  The Court declines to do so: <u>Kentucky Highlands</u>, and the relevant UCC provisions, addresses priority among competing interests in the account, not whether a bank has a proper right of setoff.

§ 553(a) preserves whatever right of setoff a creditor may have.  <u>Citizens Bank of Maryland v. Strumpf</u>, 516 U.S. 16, 18 (1995).  Under the account agreement for account 367788, the Bank expressly asserted a right to setoff the funds in account 367788 against account 1430, but only to the extent that the Debtor was able to withdraw from the account.[7]

Here, the Bank placed a hold on account 367788 on August 7, 2008 early in the preference period.  Collin Cook and Toby Bensasson both testified the hold meant Debtor could not withdraw any of the funds in account 367788 or write checks on account 367788.  The agreement for account 367788 specifically states that a right of setoff is only allowed to the extent that Debtor can withdraw funds.  The hold prevents withdrawal of the funds making the setoff improper.  The Bank did not have a right to setoff the funds in account 367788 against account 1430 because of the hold on account 367788.

Even if the setoff provision in the account agreement was not so limited, the Bank's setoff would be improper because the debts were not mutual obligations.  Setoff under nonbankruptcy law is subject to § 553(a).  <u>Bank of Am. v. Lehman Bros. Holdings Inc.</u> (<u>In re Lehman Bros. Holdings Inc.</u>), 439 B.R. 811, 823–24 (Bankr. S.D.N.Y. 2010).  To be entitled to setoff under § 553(a), a creditor must

---

[7] The account agreement states, "We may (without prior notice and when permitted by law) setoff the funds in this account against any due and payable debt you owe us now or in the future, by any of you having the right of withdrawal, to the extent of such person's or legal entity's right to withdraw."

31

show: (1) the debtor owes the creditor a debt that arose before the bankruptcy; (2) the creditor owes the debtor a debt that arose before the bankruptcy; and (3) both debts are mutual obligations.  United States v. Gerth, 991 F.2d 1428, 1431 (8th Cir. 1993).  If these elements are not met, then the setoff is not allowed by § 553(a). The amount of setoff is then avoidable as a preferential transfer.

At the time of this setoff, Debtor owed the Bank a prepetition debt, and the Bank owed Debtor a prepetition debt.  On October 24th, Debtor had a true overdraft of $840,534.89 on account 1430—this was a debt that Debtor owed to the bank.  Debtor also had a balance of $1.4 million in account 367788.  Because "[a] bank account balance constitutes a debt owed by the bank to the depositor," Cain v. Mappa, (In re Pineview Care Ctr., Inc.), 152 B.R. 703, 707 (D.N.J. 1993), this was a debt that the Bank owed to Debtor.  Debtor filed its petition on November 4th.  Thus, the only element in controversy is the requirement that the debts be mutual obligations.

"As a general rule, for mutuality to exist, each party must own his claim in his own right severally, with the right to collect it in his own name against the debtor in his own right and severally."  Va. Block Co. v. Va. Mut. Ins. Agency, Inc. (In re Va. Block Co.), 16 B.R. 771, 774 (Bankr. W.D. Va. 1982).

> The classic case of setoff on a mutual debt arises when a creditor bank applies funds held in a debtor's general deposit account to the depositor's indebtedness to the bank.  Such an account is a mutual debt to the extent that the funds are held by the bank subject to

32

> withdrawal by the depositor, and subject to the bank's obligation to
> honor checks drawn upon it.  The essential element of mutuality
> inheres in the tension between the debtor-depositor's right to the use
> of the money on the one hand, and the creditor-bank's right to
> repayment on the other.
>
> Such is not the case here.  The monies deposited in the Savigs'
> collateral account were not subject to withdrawal at will by the debtor,
> nor could the Savigs write checks against that account.

Savig v. Am. State Bank of Danube (In re Savig), 50 B.R. 1003, 1005 (D. Minn.

1985).  "The mutuality requirement is strictly construed. . . . The right to setoff

under § 553 is permissive, not mandatory."  Farrell v. Wurm (In re Donnay), 184

B.R. 767, 787 (Bankr. D. Minn. 1995).

Here, account 367788 was not subject to withdrawal at Debtor's will.  The

Bank had a hold on the account.  Debtor could not write checks on the account.  As

a result, even if the Bank had right of setoff in account 367788, it would not satisfy

§ 553(a)'s mutuality requirement.

The Lehman Brothers case also rejected a similar argument in finding setoff

improper.  439 B.R. at 823–24.  There, the court found the account which the bank

attempted to setoff was a "special purpose" account which is normally not

available to setoff against regular bank accounts.  Id. at 833.  The unavailability of

the funds for Debtor's use also favored denial of setoff.

33

Case 2:15-cv-01015-LRR   Document 1   Filed 05/15/15   Page 37 of 63
Appellate Case: 15-6022   Page: 37   Date Filed: 05/14/2015 Entry ID: 4275386

Here, like <u>Savig</u> and <u>Lehman Brothers</u>, the transfer was not a proper setoff because there was a hold on account 367788 and the right of setoff under the account agreement was limited to Debtor's ability to withdraw.

The Court, however, does not add any of the improper setoff amount to its analysis here because that amount—the funds in account 367788—has already been accounted for in its analysis above.[8]

### III.    Affirmative Defenses under § 547(c)

There are statutory defenses to preferential transfers.  11 U.S.C. § 547(c).  If the defenses apply to a transfer, that transfer will not be avoidable as a preference. <u>Id.</u>  The Bank asserts two of these statutory affirmative defenses to the preferential transfers here.  The Bank argues that each transfer was a part of a contemporaneous exchange for new value.  <u>Id.</u> § 547(c)(1)(A)–(B).  The Bank also argues that the transfers were in the ordinary course of business.  <u>Id.</u> § 547(c)(2).

The Trustee argues neither of these exceptions applies.  Trustee notes that the only statutory exception that could even possibly apply is the subsequent advance of new value.  <u>Id.</u> § 547(c)(4).  While the Bank pleaded the § 547(c)(4) subsequent new value defense, it did not pursue it at trial.  In fact, the Bank

---

[8] The Court also again notes that the setoff analysis may also have real effect if the Court's conclusions on the affirmative defenses are incorrect.  The setoff may not qualify as a contemporaneous exchange for new value because the Bank has indicated it provided no new value after this setoff.  The setoff also might not be properly considered to be in the ordinary course of business of the parties.

34

affirmatively disavowed any reliance on it at trial and in post-trial briefs.[9]  The

Court will address only the two defenses raised.

### A.  Contemporaneous Exchange for New Value—§ 547(c)(1)

The Bank argues that deposits Debtor made to pay off the true overdraft

cannot be avoided because they were a "contemporaneous exchange for new

value" under § 547(c)(1).  Specifically, the Bank argues that in exchange for those

payments, the Bank continued to do business with Debtor by immediately

continuing to allow Debtor intraday overdrafting privileges.

At the end of the trial, the Court pointed out it was skeptical of this defense

because the Bank had not actually identified what new value it provided, how

much it provided, and how it was tied to the payments the Bank received on the

true overdrafts.  Trustee reiterated this point in his comments and post-trial brief.

The Bank addressed this issue in its post-trial brief and acknowledged it was

required to provide a specific amount of the new value.

The Bank now argues that, after each of the nine true overdrafts, the Bank

continued to provisionally posted checks in account 1430.  The Bank claims that

after receiving $1,556,782.89 in total payments, it almost immediately posted

---

[9] The Court notes that, if it had considered the § 547(c)(4) analysis, the ultimate
result in this case may have been different.  See  Sarachek v. Crown Heights House
of Glatt, Inc. (In re Agriprocessors), 521 B.R. 292 (Bankr. N.D. Iowa Oct. 22,
2014).

35

$9,785,477.40 of Debtor's checks.  The Bank believes this shows both the

contemporaneous exchange and the new value provided.

This Court recently addressed analytically similar arguments in another case

involving this Debtor.  There, the Court laid out the standard as follows:

> Defendant argues that the short-term loan arrangement was intended
> to be, and was in fact, a contemporaneous exchange for new value.
> Section 547(c)(1) provides:
>
>> (c) The trustee may not avoid under this section a transfer—
>>
>>> (1) to the extent such a transfer was—
>>>
>>>> (A) intended by the debtor and the creditor to or for
>>>> whose benefit such transfer was made to be a
>>>> contemporaneous exchange for new value given to the
>>>> debtor; and
>>>>
>>>> (B) in fact a substantially contemporaneous exchange.
>
> (emphasis added). "New value" includes providing new unsecured
> credit. 11 U.S.C. § 547(a)(2). Thus, Defendant must show that both
> Debtor and Defendant intended that the exchange be
> contemporaneous, that the exchange was in fact substantially
> contemporaneous, and that it was for new value. Tyler v. Swiss Am.
> Sec. (In re Lewellyn & Co., Inc.), 929 F.2d 424, 427 (8th Cir.1991).
>
> "The purpose of [this] defense[ ] is to protect transactions that do not
> adversely affect other creditors because the estate has received new
> value." Rocin Liquidation Estate v. Alta AH & L (In re Rocor Int'l,
> Inc.), 352 B.R. 319, 330 (Bankr.W.D.Okla.2006). "[T]ransactions that
> appear at first glance to be a contemporaneous exchange for new
> value will not be ... absent a showing that the parties actually intended
> the exchange to be contemporaneous." 5 Collier on Bankruptcy
> § 547.43 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012).
> "The critical inquiry in determining whether there has been a
> contemporaneous exchange for new value is whether the parties

36

intended such an exchange." Id. at 428. (quoting In re Spada, 903 F.2d 971, 975 (3d Cir.1990)) (internal quotation marks omitted). A credit transaction, however short-term, is "inherently not contemporaneous [and so] cannot be intended to be contemporaneous." Feltman v. City Nat'l Bank of Fla. (In re Sophisticated Commc'ns, Inc.), 369 B.R. 689, 704 (Bankr.S.D.Fla.2007) (opinion clarified on denial of reconsideration, Bankr.No. 00–17635–BKC–RAM, Adv. No. 02–1526–0BKC–RAM–A, 2007 WL 2257604 (Bankr.S.D.Fla. Aug. 1, 2007)).

Sarachek v. Crown Heights House of Glatt, Inc. (In re Agriprocessors), 521 B.R.

292, 311–312 (Bankr. N.D. Iowa Oct. 22, 2014).  See also Silverman Consulting,

Inc. v. Canfor Wood Prods. Mktg. (In re Payless Cashways, Inc.), 306 B.R. 243,

249 (B.A.P. 8th Cir. 2004).

The Eighth Circuit also recently reiterated the standards for this defense:

**Contemporaneous new value** exchanges are excepted from avoidance because they "encourage creditors to continue doing business with troubled debtors who may then be able to avoid bankruptcy altogether," and "because other creditors are not adversely affected if the debtor's estate receives **new value**." Id. To qualify for this exception, the creditor transferee must prove that an otherwise preferential transfer was "(A) intended by the debtor and the creditor ... to be a **contemporaneous** exchange for **new value** given to the debtor; and (B) in fact a substantially **contemporaneous** exchange." § 547(c)(1).

Dietz v. Calandrillo (In re Genmar Holdings, Inc.), 776 F.3d 961, 963 (8th Cir.

2015).  Thus, the Bank must show the parties intended a contemporaneous

exchange of new value, and the exchange was in fact contemporaneous.

37

## 1. The Bank and Debtor Did Not Intend a
## Contemporaneous Exchange

The Bank argues that the exchange was intended to be contemporaneous and for new value. The Bank argues Debtor's payments of the true overdrafts usually came only a day or two after the banking day closed. The Bank then additionally argues it immediately continued to honor Debtor's checks—at least provisionally. The Bank believes this shows a contemporaneous exchange. The Court disagrees.

"[T]ransactions that appear at first glance to be contemporaneous exchange for new value will not be . . . absent a showing that the parties actually intended the exchange to be contemporaneous." Collier on Bankruptcy 547-43 (Alan N. Resnick, Henry J. Sommer, eds. 16th 2009). "The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." Genmar, 776 F.3d at 964 (quoting In re Gateway PAC Corp., 153 F.3d 915, 918 (8th Cir. 1998)). Lack of knowledge of the other party's "immediate plans shows absence of . . . intent to create a contemporaneous exchange." Saracheck v. Chitrik (In re Agriprocessors, Inc.), BR 08-02751, 2011 WL 3033710 (Bankr. N.D. Iowa July 22, 2011). Simply anticipating payment does not satisfy the intent requirement. Feltman v. City Nat'l Bank of Fla. (In re Sophisticated Commc'ns, Inc.), 369 B.R. 689, 703–04 (Bankr. S.D. Fla. 2007).

38

Here, first and foremost, the Bank's arguments seem to suggest that payment of the short-term loan within 1-2 days indicates a contemporaneous exchange. This argument, however, misses the mark entirely. It does not show in any way that "new value" was provided contemporaneously with the payment. It just shows the short-term loan was repaid quickly.

Moreover, the Court has recently rejected nearly the identical argument the Bank makes here:

> Moreover, even if the loans were initially intended to be for only one day, it was still a credit arrangement and therefore cannot be viewed as a contemporaneous exchange. This issue is precisely the issue the court addressed in <u>Sophisticated Communications, Inc.</u>, and found that "delivering a cashier's check, essentially cash, on day 1 in anticipation of repayment on day 2—is a short-term open credit transaction" and so "is inherently not contemporaneous and, therefore, cannot be intended to be contemporaneous." <u>In re Sophisticated Commc'ns, Inc.</u>, 369 B.R. at 703–04. Like <u>Sophisticated Communications</u>, this case also involves "short-term open credit transactions." And because the transfers were a part of a credit arrangement, however short-term, the parties by definition did not intend them to be contemporaneous. As a result, the preferential transfers are not protected by the contemporaneous exchange for new value defense.

<u>Sarachek v. Crown Heights House of Glatt</u>, 521 B.R. at 312. The Court's ruling on the Summary Judgment in this case similarly noted:

> "New value means money, or money's worth in goods, services, or credit, or release by transfer of property previously transferred to such transferee ... but does not include an obligation substituted for an existing obligation." 11 U.S.C. § 547(c)(2). **A debtor who pays funds to a creditor to pay an antecedent debt has not received new value.** <u>Manchester v. First Bank & Trust Co. (In re Moses)</u>, 256 B.R.

641, 652 (10th Cir. BAP 2000). "**[T]he mere satisfaction of an antecedent debt is not 'new value' under § 547(c)(2).**" Id.

Sarachek v. Luana Savings Bank (In re Agriprocessors, Inc.), 490 B.R. 852, 883

(Bankr. N.D. Iowa Apr. 15, 2013) (emphasis added).

The Bank's argument fails for additional reasons. The Bank provides insufficient evidence of when—not to mention what—it provided contemporaneously as the new value. The Bank argues that it continued to allow the intraday overdrafting privilege and provisionally cleared lots of checks. The Bank entirely fails to show, however, that the parties **intended** this to be new value and that they intended it to be linked to paying "true overdrafts" contemporaneously. Quite to the contrary, the Bank never communicated such an intent to Debtor and Debtor never indicated any such understanding. The Bank sought to avoid intraday overdrafts whenever it could and to avoid more true overdrafts entirely. All "overdrafts"—in the words of David Schultz—were "unexpected" or "unplanned." The Bank entirely fails to demonstrate it took the payments on the "true overdrafts" in exchange for an agreement to provide anything new at all—let alone provide it contemporaneously.

The Bank offers no evidence at all that it and Debtor intended that the Bank would provisionally honor future checks as a part of a mutually intended exchange for Debtor paying true overdrafts. The Bank had already provisionally honored checks virtually every day through the preference period. It did this not because it

40

received payment on the true overdrafts amounts.  Instead, the Bank did this

anticipating that Debtor would wire in money the following day—not do more true

overdrafting.  Schultz, the Bank's president, testified that even the intraday

overdrafts were "unplanned" and that he did not know for sure whether Debtor

would even make the covering deposit.  He took the risk based on the procedures

in place from the beginning.  He provided no testimony at all that the intraday

overdrafts were part of an agreed contemporaneous exchange for payment of true

overdrafts.  The Bank was simply following its "pay all" policy each day and that

never changed to be a part of an agreement with Debtor to pay true overdrafts.  The

Bank's expectation that Debtor would deposit money to cover true overdrafts in

exchange for "new" intraday privilege was not based on a mutually intended

exchange.  It was—at best—simply a continuation of its "long standing

relationship" with Debtor and no new contemporaneous exchange was agreed to or

intended.

Even if the Bank and Debtor did intend to exchange a continued provisional

crediting for payment of the existing true overdrafts, their intent was not to make a

*contemporaneous* exchange.  Debtor certainly did not have that intent.  Debtor

specifically intended to get as much time as it could before it wired the payment of

the true overdraft to the Bank.  Debtor was kiting checks and trying to pick up to

get the extra days of float between the checks clearing.  Debtor did not intend the

exchange to be contemporaneous—quite the opposite.  Toby Bensasson testified as much:

> [T]he way the system worked is that the main account got the actual wire and then the—the main two general accounts were funded by the money that came in from the wire, and then checks were written to the smaller account to—you know, to supplement, and *this way you picked up another day*.

(Emphasis added).  Bensasson admitted that this "system" to "pick up another day" to further the check-kiting and buy more time.  His testimony shows that Debtor did not intend a contemporaneous exchange with the Bank and provided no testimony at all that this payment of true overdrafts led to a new agreement that intended to get contemporaneous results.

The Bank, on the other hand, never intended any contemporaneous exchange for true overdraft payments at all.  It intended to avoid true overdrafts entirely—not fund them in return for payment and future true overdraft or even intraday overdraft funding.  Thus, neither the Bank nor Debtor intends to make an exchange for any new value.  Even if they did, it was not intended to be *contemporaneous*.

## 2.  New Value

While this element is included in the discussion above, it will also be addressed here.  The Bank has made many changing arguments about what new value was intended in the alleged contemporaneous exchange.  For reasons similar

to those above, and additional reasons, the Court finds the Bank has failed to prove

any of those arguments.

### a. The Bank's "Forbearance" From Returning the Checks for NSF Was Not New Value

The Bank has attempted to argue that Debtor's payments of true overdraft

were made so that the Bank would not return the checks for NSF.  The Bank points

to Toby Bensasson's testimony that Debtor had to cover its overdrafts—deposit

money into the account—or risk having its checks returned by the Bank:

> Q.  Okay. You were aware that if money didn't come in to Luana
> Savings Bank, they weren't going to continue doing business; is that
> correct?
> A.  Yes.
> Q.  They weren't going to advance or allow the overdraft checks to
> stay in place; you had to make those good, correct?
> A.  Yes.
> Q.  So you were sending money in to keep Luana Savings Bank from
> returning those checks as NSF?
> A.  Yes.

Based on this testimony the Bank argues that Debtor's payments of the true

overdrafts were in exchange for or somehow linked to the Bank not returning the

checks NSF.

Forbearance from returning provisionally honored checks is not new value.

Section 547(a)(2) of the Bankruptcy Code defines new value here.  "New value

means money, or money's worth in goods, services, or credit, or release by transfer

of property previously transferred to such transferee . . . but does not include an

obligation substituted for an existing obligation." 11 U.S.C. § 547(a)(2). The

contemporaneous exchange for new value defense is intended "to protect

transactions that do not adversely affect other creditors because the estate has

received new value." Sarachek v. Crown Heights House of Glatt, 521 B.R. at 811

(quoting Rocin v. Alta AH & L, (In re Rocor Int'l, Inc.), 352 B.R. 319, 330 (Bankr.

W.D. Okla. 2006)). "Forbearance from exercising a preexisting right does not

constitute new value under 11 U.S.C. § 547(a)(2)." Official Plan Comm.  v.

United States  (In re Valley Steel Products Co., Inc.), 214 B.R. 202, 208 (E.D. Mo.

1997); see also Burner Servs. & Combustion Controls Co., Inc. v. Pipefitters Union

Local No. 455 (In re Burner Servs. & Combustion Controls Co., Inc.), BKY 4-87-

1104, 1989 WL 126487 (Bankr. D. Minn. Oct. 25, 1989) ("Forbearance of one's

contractual remedies does not constitute new value within the meaning of Section

547(c)(1) as defined in Section 547(a)(2)."). The Bank's evidence all shows it had

a system in place to deal with Debtor's account. That system already included

forbearance—and intraday overdrafting—linked to payment by wire transfer

within the day. This forbearance and the Bank's system never changed because of

the "true overdrafting" and certainly were never linked to it.

      The Bank's forbearance from dishonoring the overdraft checks is simply not

new value. As noted above, the case law states that forbearance of an existing

right is not new value. The Bank's forbearance was simply not money, or money's

worth in goods, services, or credit.  The Bank's forbearance did not fulfill the

policy behind the exception because it did not provide the estate with anything for

other creditors.[10]

### b. The Bank's Decision to Continue Honoring Debtor's Overdrafted Checks Was Not New Value

The Bank also argued at another point that it was providing Debtor with new

value that came from honoring Debtor's overdrawn checks.  The Bank seems to be

implicitly arguing that when it agreed to allow true overdrafts, it was giving Debtor

new value by providing credit to pay the true overdraft.  This, however, does not

address what "new value" Debtor received in return for paying the debts already

existing from "true overdrafts."  The Bank never even acknowledges that it agreed

to allow true overdrafts, let alone that it intended to fund more true overdrafts in

exchange for immediate repayments of the existing true overdrafts.  The fact that

the Bank ended up haphazardly and, almost inadvertently, providing short-term

loans for the overdraft, was hardly an agreement to provide new value.  The Bank

simply received repayment of the largely inadvertent true overdraft and hoped it

would not happen again.  It did not agree to give more lending rights to get paid on

the true overdrafts.

---

[10] The Bank's briefing at one point argued for the application of the "Garland" rule
of § 547(c)(4) in this § 547(c)(1) argument.  No case has applied the Garland rule
that way.  The Court here declines to do so.

Here, Debtor simply repaid the Bank on the short-term "true overdraft" loan.

As the Court stated in the Summary Judgment Ruling:

> "New value means money, or money's worth in goods, services, or
> credit, or release by transfer of property previously transferred to such
> transferee ... but does not include an obligation substituted for an
> existing obligation." 11 U.S.C. § 547(c)(2). A debtor who pays funds
> to a creditor to pay an antecedent debt has not received new value.
> Manchester v. First Bank & Trust Co. (In re Moses), 256 B.R. 641,
> 652 (10th Cir. BAP 2000). "[T]he mere satisfaction of an antecedent
> debt is not 'new value' under § 547(c)(2)." Id.

Sarachek v. Luana Savings Bank (In re Agriprocessors, Inc.), 490 B.R. 852, 883

(Bankr. N.D. Iowa Apr. 15, 2013).

## B. Ordinary Course of Business

The Bank also argues that the debts were incurred, and Debtor's transfers on

account of those debts were made, in the ordinary course of business.  A trustee

may not avoid a transfer made for a debt (1) "incurred by the debtor in the ordinary

course of business," and (2) paid "in the ordinary course of business" of the debtor

and transferee or "according to ordinary business terms."  Saracheck v. Crown

Heights House of Glatt, Inc. (In re Argriprocessors, Inc.), 521 B.R. at 312 (quoting

11 U.S.C. § 547(c)(2)).  The Bank must show that the debt was "ordinary for both

parties."  Hanrahan v. Grundy Cnty. Farm Serv. Agency (In re Walterman

Implement, Inc.), Bankr. No. 05-07284, Adv. No. 07-09039, 2007 WL 4224041, at

*2 (Bankr. N.D. Iowa Nov. 27, 2007).  "[A] debt will be considered not incurred in

the ordinary course of business if creation of the debt is atypical, fraudulent, or not

46

Appellate Case: 15-6022   Page: 50   Date Filed: 05/14/2015 Entry ID: 4275386

consistent with an arms-length commercial transaction." <u>Sarachek v. Crown Heights House of Glatt</u>, 521 B.R. at 313.  This exception is "intended to protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the debtor and the transferee." <u>Montgomery v. Third Nat'l Bank in Nashville</u> (<u>In re Montgomery</u>), 123 B.R. 801, 813 (Bankr. M.D. Tenn. 1991) (quoting <u>Waldschmidt v. Ranier</u> (<u>In re Fulghum Constr. Corp.</u>), 872 F.2d 739, 743 (6th Cir. 1989)) (internal quotation marks omitted).  "The ordinary course of business defense should be narrowly construed." <u>Sarachek v. Crown Heights House of Glatt</u>, 521 B.R. at 313.

The Eighth Circuit has also recently addressed this defense to a preference action. <u>Cox v. Momar Incorp.</u> (<u>In re Affiliated Foods Southwest</u>), 750 F.3d 714 (8th Cir. 2014).  There, the Court first noted that that the BAPCPA amendments of 2005 altered some language in the defense but "the preferred creditor must still prove that the *debt* was incurred in the ordinary course of the debtor's business...." <u>Id.</u> at 718.  The Court went on to note the following standards (similar to those recited above) apply:

> "[t]here is no precise legal test" to determine whether a preferential transfer was made in the ordinary course of business between the debtor and the creditor; "rather, the court must engage in a peculiarly factual analysis." <u>Lovett</u>, 931 F.2d at 497 (quotations omitted). As we explained in Lovett, and as the plain meaning of the statute suggests, "the cornerstone" of the inquiry is that the creditor must demonstrate "some consistency with other business transactions between the debtor and the creditor." <u>Id.</u> Other factors may be relevant in a

47

particular case, such as whether the preferential transfer involved an unusual payment method or resulted from atypical pressure to pay. See In re Spirit Holding Co., 153 F.3d 902, 905–06 (8th Cir.1998).

Id. at 719–20.

Here, the debt was not incurred in the ordinary course of business between the parties.  The Bank repeatedly noted that the true overdrafts were exceptional, not ordinary.  Moreover, the type of true overdraft here—almost forcing credit from the Bank—falls outside the customary relationship for these parties and the Bank's standard practices.

The Bank noted several times that even the intraday overdrafts were unplanned.  The Bank admitted its policies discouraged even intraday overdrafters. The Bank offered no evidence that it was ordinary, usual, or customary for it to allow true overdrafts.  The evidence here, in fact, shows there were only nine days of true overdrafting in this 90-day time period.

The Bank pointed to Exhibit U, the expert report of Jolene Topinka, to show that this was not unusual in the Debtor-Bank relationship.  The Exhibit, in fact, shows just the opposite.  It shows only four overdrafts in the entire year before the 90-day preference period—and there was not even a cushion account (account 367788) to consider during that time.   Moreover, the amount of the four overdrafts was much smaller in both average overdraft and total.  Finally, the first seven months of that one year before bankruptcy show only one overdraft of $31,680.

48

The other three overdrafts Topinka identified occurred nearer in time to the beginning of the preference period. This shows the overdrafts were very unusual, not ordinary course debts, and started to happen only as Debtor slid toward bankruptcy.

The Bank has raised great concern that the Trustee's charts showing a dramatic increase in the frequency of intraday overdrafts could be used improperly against the Bank. The Bank notes the increased intraday overdrafts were simply a result of Debtor's increased use of the Bank's services. The Bank points out that the increased intraday overdrafts coincide with Debtor moving its primary account to the Bank. Debtor had to stop banking with Citizen's Bank and move its primary account to the Bank because Debtor was running too many overdrafts at Citizen's Bank.

The Bank cites ContinentalAFA Liquidation Trust v. Human Resource Staffing (In re ContinentalAFA Dispensing Co.), 451 B.R. 888 (E.D. Mo. 2011) to support its argument that the increase in overdrafting alone should not be determined. The case notes increased use of a creditor's services does not preclude the ordinary course of business exception. Id. The Bank argues that this explains Debtor's increased overdrafts at the Bank and that this "increased use of services" applies here, such that the increased frequency does not preclude the ordinary course of business exception. The Court agrees the Trustee's argument on

49

frequency of intraday overdrafts has little value here.  The key issue here is the true

overdrafts.  It is undisputed the Bank tried very hard to avoid them.  The ordinary

system between the parties allowed for intraday overdrafts with a full covering

wire transfer from Debtor before the end of the banking day.  The system was

designed to cover the intraday provisional credit and **avoid** true overdrafts.  The

parties' normal course of business thus avoided true overdrafts.  Those true

overdrafts were simply not normal or an ordinary part of their relationship.

The Court need not address the second part of the ordinary course of

business test—whether the debts were paid in the ordinary course of business

between the parties or on ordinary business terms.  The debts were not incurred in

the ordinary course of business between the two parties is dispositive.  Were the

Court to reach the second part of the test, it would likely conclude that Debtor did

not pay the debts in the ordinary course of business with the Bank or according to

ordinary business terms.  Nothing about the transfers in this case indicates these

were customary credit transactions.  Moreover, and more importantly, the nine true

overdrafts came in the midst of thousands of transactions by Debtor with the Bank

in various accounts.  The transfers were the result of atypical credit that was

reluctantly issued by the Bank and inadvertently helped further a check-kiting

scheme.  The Court finds the transfers were not made in the ordinary course of

business.

50

## IV.    Double Recovery

The Bank argues that some portion of a preference recovery in this case would be an impermissible double recovery.  It argues that the Trustee has previously sued and settled with—or obtained judgments from—defendants who received checks from account 1430.  According to the Bank, this means that the value of these checks has already been recovered, and that any recovery against the Bank would result in double recovery.

The Bank has attempted to prorate the settlement amount from the sum of the checks drawn on account 1430.  It argues in the end that this means that the Bank's preference liability would be reduced by $1,102,585.00.  The Court rejects the Bank's argument for lack of proof.

The Bank is correct that "[t]he trustee is entitled to only a single satisfaction under subsection(a)."  11 U.S.C. § 550(d).  As a result, "the trustee cannot obtain more than the full value of an avoided transfer by recovering that value from both the initial transferee and a subsequent transferee."  Hanrahan v. Cmty. Sav. Bank (In re Ovel), No. 06-01150, 2008 WL 2368285, at *2 (Bankr. N.D. Iowa June 10, 2008) (citing Dzikowski v. Northner Trust Bank of Fla. (In re Prudential of Florida Leasing, Inc.), 478 F.3d 1291, 197 (11th Cir. 2007)).  "After Trustee establishes the value to which the estate is entitled, she can determine whether additional recovery is necessary to make the estate whole."  In re Ovel, 2008 WL 2368285, at *2.

51

While the Bank's double-recovery concept is supported to a degree by the law, the Bank's arguments are not supported by the facts. The Bank noted only that significant recoveries were made by the Trustee in other preference cases and that a part of those recoveries related to checks drawn on Debtor's account 1430. The Bank did not establish which checks drawn on account 1430 had a relationship to the true overdraft repayments the Trustee seeks to avoid here. In short, the Bank fails to recognize that Trustee has a separate preference claim against the Bank itself for the Bank's own transactions with Debtor. Trustee is not seeking to recover a preference claim or judgment against another party from the Bank—either as a subsequent or initial transferee. The mere fact the Trustee has some other claims that involved checks from 1430 does not mean that the Bank gets credit for the amount of the settlement. To find that settlements offset and limit future liability would "discourage settlements and create a windfall to otherwise liable parties fortunate enough not to be a party to the settlement." In re Prudential of Florida Leasing, Inc., 478 F.3d 1291, 1302 (11th Cir. 2007).

Even so, the Bank has entirely failed to point to any evidence the Trustee would in fact be receiving a double recovery—or any greater recovery than he is entitled to. The Bank offered no proof at all that the Trustee had fully recovered on any of the avoidance actions that had a check from account 1430. Collin Cook admitted he had no idea how much the Trustee collected on any of these actions.

52

He knew only that there was a judgment.  He also had no proof at all that the

Trustee was attempting to collect any of these debts from the Bank.  Thus, the

Bank cannot show in any way the Trustee has gotten a full recovery and is trying

to get more than a single satisfaction.  In short, the Bank failed to prove its defense.

### Conclusion

For the reasons stated above, Trustee is entitled to avoid and recover from

the Bank preferential transfers in the amount of $1,556.782.89.

Judgement shall enter accordingly.

Dated and Entered:
 April 20, 2015

**THAD J. COLLINS**
**CHIEF BANKRUPTCY JUDGE**

53

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In Re: | Bankruptcy No: |
| Agriprocessors, Inc. | 08–02751 |
| | |
| Debtor(s). | Chapter 7 |
| | |
| Joseph E Sarachek | Adversary No. 10–09234 |
| *Plaintiff(s)* | |
| | |
| vs. | |
| | |
| Luana Savings Bank | |
| *Defendant(s)* | |

## JUDGMENT

The issues of this proceeding having been duly considered by the Honorable Thad J. Collins, United States Bankruptcy Judge, presiding, and the issues having been duly tried and heard and a decision having been rendered,

IT IS ORDERED AND ADJUDGED:

that Trustee is entitled to avoid and recover from the Bank preferential transfers in the amount of $1,556.782.89.

JEAN L. HEKEL
Clerk, Bankruptcy Court
by:

*Leanne Waite*

Date of Issuance: April 20, 2015

Deputy Clerk
United States Bankruptcy Court
Northern District of Iowa
111 Seventh Avenue SE Box 15
Cedar Rapids, IA 52401–2101

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>AGRIPROCESSORS, INC.,<br><br>     Debtor. | Chapter 7<br>Bankruptcy Case No. 08-2751 |
| JOSEPH E. SARACHEK, in his capacity<br>as Chapter 7 Trustee,<br><br>     Plaintiff/Appellant,<br><br>vs.<br><br>LUANA SAVINGS BANK,<br><br>     Defendant/Appellee. | Adversary Case No. 10-09234<br><br>**TRUSTEE'S NOTICE OF APPEAL** |

Plaintiff Joseph E. Sarachek, in his capacity as Chapter 7 Trustee, hereby enters his Notice of Appeal in this adversary proceeding from the Court's April 20, 2015 Memorandum and Order (Doc. # 193), attached as Exhibit A, pursuant to Fed. R. Bankr. P. 8001.

The Defendant Luana Savings Bank's attorneys are Dale L. Putnam and Erik W. Fern, Putnam Law Office, 801 Commerce Drive, Suite 1, P.O. Box 70, Decorah, IA 52101; phone: (563) 382-2984.

Dated:  May 1, 2015

/s/ Dan Childers
Dan Childers          LI0007535
Paula L. Roby         LI1442523
ELDERKIN & PIRNIE, P.L.C.
316 2nd Street SE, Suite 124; P.O. Box 1968
Cedar Rapids, IA 52406-1968
Phone: 319-362-2137; Fax: 319-362-1640
dchilders@elderkinpirnie.com

ATTORNEYS FOR PLAINTIFF/APPELLANT
CHAPTER 7 TRUSTEE

# U.S. BANKRUPTCY APPELLATE PANEL
## FOR THE EIGHTH CIRCUIT

## APPEAL BRIEFING SCHEDULE

Appeal No.    15-6022   Joseph E. Sarachek v. Luana Savings Bank

Date:        May 05, 2015

     This schedule has been established in conformity with Fed.R. Bankr.P. 8015 and 8016. Extensions of time will not be routinely granted.

## FILING DATES:

Transcript. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**FILED**

Appellant Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**06/04/2015**

Appellee Brief. . . . . . . . . . . . . . . . . . . . . . . . . . . . .**30 days from service of Appellant Brief**

Reply Brief (optional) . . . . . . . . . . . . . . . . . . . . . . .**14days from service of Appellee's Brief**

# IMMEDIATELY

### APPEARANCE
## UNITED STATES BANKRUPTCY APPELLATE PANEL
## FOR THE EIGHTH CIRCUIT

NO. _____15-6022_____

Joseph E. Sarachek
_____

**VS.**

Luana Savings Bank
_____

**The Clerk will enter my appearance as Counsel for the following party(s):**
**(please specify)** Luana Savings Bank
_____

_____

s/ Dale Lee Putnam
_____
**ATTORNEY NAME**

Putnam, Fern & Thompson Law Office, PLLC
_____
**FIRM NAME**

801 Commerce Drive, Suite 1, PO Box 70
_____
**STREET or P.O. BOX**

Decorah, Iowa 52101
_____
**CITY, STATE, ZIP**

(563) 382-2984
_____
**OFFICE PHONE NUMBER**

(563) 382-8810
_____
**FACSIMILE NUMBER**

putlaw@putlaw.com
_____
**E-MAIL ADDRESS**

## CERTIFICATE OF SERVICE

[✔] I hereby certify that on May 12, 2015 , I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

[ ] I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

_____

_____ .

s/ Lynnette Krueger
_____

IN THE UNITED STATES BANKRUPTCY APPELLATE PANEL
FOR THE EIGHTH CIRCUIT

|                                      |   |                                      |
|--------------------------------------|---|--------------------------------------|
|                                      | * |                                      |
| IN RE:                               | * | CHAPTER 7                            |
|                                      | * | No. 08-02751                         |
| AGRIPROCESSORS, INC.                 | * | BAP Appeal No. 15-6022               |
|                                      | * |                                      |
| Debtor.                              | * |                                      |
|                                      | * |                                      |
| JOSEPH E. SARACHEK, in his           | * |                                      |
| Capacity as CHAPTER 7 TRUSTEE        | * |                                      |
|                                      | * |                                      |
| Plaintiff/Appellant.                 | * | APPELLEE'S ELECTION THAT APPEAL      |
|                                      | * | BE HEARD BY THE UNITED STATES        |
| vs.                                  | * | DISTRICT COURT                       |
|                                      | * |                                      |
| LUANA SAVINGS BANK                   | * |                                      |
|                                      | * |                                      |
| Defendant/Appellee.                  | * |                                      |

The Appellee, Luana Savings Bank, hereby elects, pursuant to 28 U.S.C. § 158(c)(1)(B) and L.R. BAP 8th Cir. 8001A(a)(1), to have this appeal heard by the United States District Court for the Northern District of Iowa. Notice of Appeal was served on the undersigned on May 1, 2015.

**DATED** this 13th day of May, 2015.

PUTNAM, FERN & THOMPSON
LAW OFFICE, P.L.L.C.


   /s/Dale L. Putnam_____
Dale L. Putnam     AT0006463
801 Commerce Drive, Suite 1
P. O. Box 70
Decorah, IA 52101
Tel. (563) 382-2984
Fac. (563) 382-8810
putlaw@putlaw.com
ATTORNEY FOR LUANA SAVINGS BANK,
DEFENDANT/APPELLEE/CROSS-APPELLANT

1

CERTIFICATION OF SERVICE

I, Lynnette A. Krueger, of Putnam Law Office, 801 Commerce Drive, Suite 1, P. O. Box 70, Decorah, Iowa 52101, certify:

That I am, and at all times hereinafter mentioned was, more than 18 years of age;

That on the 13th day of May, 2015, I served a copy of the foregoing instrument, to which this Certificate is attached, via CM/ECF, email and facsimile as follows:

Dan Childers
Paula Roby
Elderkin & Pirnie, PLC
115 First Avenue SE
PO Box 1968
Cedar Rapids, IA 52406-1968

I certify under penalty of perjury that the foregoing is true and correct.

Executed on May 13, 2015        /s/Lynnette A. Krueger

2