# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | |
|---|---|
| In re: Agriprocessors, Inc., | Case No.: 15-CV-01015-LRR |
| Debtor. | Bankruptcy No. 08-02751 |
| JOSEPH E. SARACHEK, in his capacity as Chapter 7 Trustee, | Adversary No. 10-09234 |
| Plaintiff-Appellant/Cross-Appellee, | **PLAINTIFF-APPELLANT/CROSS APPELLEE JOSEPH E. SARACHEK'S BRIEF** |
| vs. | |
| LUANA SAVINGS BANK, | |
| Defendant-Appellee/Cross-Appellant. | |

COMES NOW Plaintiff-Appellant/Cross-Appellee Joseph E. Sarachek, in his capacity as Chapter 7 Trustee, and submits the following Brief on appeal of this matter.

## Table of Contents

Statement of Issues Presented for Review .......................................................................... ii

Table of Authorities ......................................................................................................... iii

Background ......................................................................................................................... 1

Summary of Argument ....................................................................................................... 3

Argument ............................................................................................................................ 4

I. Jurisdictional Statement ................................................................................................ 4

II. Standard of Review ...................................................................................................... 4

III. The Bankruptcy Court committed clear error in calculating the Defendant's preference exposure by failing to include posting errors that increased the size of the overdraft and thus the antecedent debt. .................................................................................... 4

IV. The Bankruptcy Court erred in calculating Defendant's preference exposure by allowing the "netting" of two separate accounts when it correctly determined setoff would have been inappropriate under 11 U.S.C. § 553(a). ................................................. 8

    A. The parties never agreed to net the two accounts. ................................................. 9

    B. Even if the parties had agreed to net accounts, that would not control the legal matter of whether Luana received transfers in payment of antecedent debt. ........................ 10

C.  The Bankruptcy Court correctly found the defense of setoff was not available to Luana, but erred in calculating judgment in favor of the Trustee by failing to include the attempted $1.4 million setoff from account 367788 as a preferential transfer. .................... 11

V.  The Bankruptcy Court erred by adopting Luana's notion of a "true overdraft" and declining to include intraday overdrafts in the preference calculations. ................................................. 13

A.  Congress intended to provide the broadest possible definition of "debt" under the Bankruptcy Code. ........................................................................................................ 13

B.  The notion of "true overdrafts" does not exist at law, and intraday overdrafts should be considered antecedent debt for preference purposes. ......................................... 14

Conclusion ...................................................................................................................... 17

## Statement of Issues Presented for Review

1.  Whether the Bankruptcy Court committed clear error in calculating the Defendant's preference exposure by failing to include posting errors that increased the size of the overdraft and thus the antecedent debt.

2.  Whether the Bankruptcy Court erred in calculating Defendant's preference exposure by allowing the "netting" of two separate accounts when it correctly determined setoff would have been inappropriate under 11 U.S.C. § 553(a).

3.  Whether the Bankruptcy Court erred by adopting Luana's notion of a "true overdraft" and declining to include intraday overdrafts in the preference calculations.

## Table of Authorities

### Cases

*In re Bridge Info. Sys., Inc.*, 474 F.3d 1063 (8th Cir. 2007) ........................................................ 15

*In re Chase & Sanborn Corp.*, 848 F.2d 1196 (11th Cir. 1988) ............................................... 16-17

*In re Coleman*, 426 F.3d 719 (4th Cir. 2005) .................................................................................. 6

*In re Foushee*, 283 B.R. 278 (Bankr. N.D. Iowa 2002) ................................................................. 14

*In re Iowa Premium Serv. Co., Inc.*, 695 F.2d 1109 (8th Cir. 1982) .......................................... 13

*In re Kaplan*, 104 F.3d 589 (3d Cir. 1997) ....................................................................................... 6

*In re LGI Energy Solutions, Inc.*, 482 B.R. 809 (B.A.P. 8th Cir. 2012) ................................. 13, 14

*In re LGI Energy Solutions, Inc.*, 746 F.3d 350 (8th Cir. 2014) ................................................. 13

*In re M & S Grading, Inc.*, 526 F.3d 363 (8th Cir. 2008) .............................................................. 4

*In re Morales*, 403 B.R. 629 (Bankr. N.D. Iowa 2009) ................................................................ 14

*In re Sophisticated Commc'ns, Inc.*, 00-17635-BKC-RAM, 2007 WL 2257604 (Bankr. S.D. Fla.
    Aug. 1, 2007) ................................................................................................................................. 16

*In re Sophisticated Commc'ns, Inc.*, 369 B.R. 689 (Bankr. S.D. Fla. 2007) .............................. 16

*In re Tanner Family, LLC*, 556 F.3d 1194 (11th Cir. 2009) ......................................................... 14

*Laws v. United Missouri Bank of Kansas City, N.A.*, 98 F.3d 1047 (8th Cir. 1996) ........ 14, 15, 16

*McSherry v. Trans World Airlines, Inc.*, 81 F.3d 739 (8th Cir. 1996) ........................................ 14

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988) ........................................................... 6

### Statutes

11 U.S.C. § 101(12) .......................................................................................................................... 13

11 U.S.C. § 101(5)(A) ...................................................................................................................... 13

11 U.S.C. § 547(b) ............................................................................................................................ 15

11 U.S.C. § 547(b)(2) ....................................................................................................................... 13

11 U.S.C. § 553(a) ..................................................................................................................... 8, 11-12

28 U.S.C. § 158 (a)(1) ........................................................................................................................ 4

## Background

This appeal is from a judgment in an adversary proceeding that arose out of the insolvency of Agriprocessors, Incorporated ("Agri" or "Debtor"). In the ninety days before Agri filed for bankruptcy, it wrote checks against its Luana Savings Bank ("Luana") checking account ("account 1430") that caused the account to be overdrawn every day during that ninety-day period.

Much of the activity in Agri's Luana checking account, the primary subject of this adversary proceeding, shows evidence of the check kiting and fraudulent invoice scheme devised and executed by Agri's chief executive, Sholom Rubashkin. Uncontroverted evidence at trial showed Agri wrote over two hundred checks totaling more than $20 million from account 1430 to itself during the ninety-day preference period, and deposited them into its Decorah Bank & Trust account reserved exclusively for incoming customer payments. This, in turn, allowed Agri to borrow more from its primary commercial lender, increasing its debt load.

On most business days during the preference period, Agri wired funds into account 1430 that reduced, but never fully eliminated, the amount of the overdraft. Each night, new checks were posted against account 1430, further increasing the size of the overdraft. Once deposits into account 1430 ceased, Luana seized the funds in another Agri account at Luana, account 367788.

Additionally, after Agri filed for bankruptcy, Luana discovered it had failed to properly post several checks, causing account 1430 to show almost $800,000 more than its true balance during the preference period. Luana filed a proof of claim for this amount in the bankruptcy.

Chapter 7 Trustee Joseph E. Sarachek ("Trustee") did not allege wrongdoing on Luana's part, but the Bankruptcy Court did conclude Luana "… inadvertently helped further a check-kiting scheme." Memorandum and Order (herein "Order"), doc. no. 193 at 50. The Trustee did, however, seek to recover from Luana the amounts wired into account 1430 each day, because those amounts

1

constituted repayment of antecedent debt Agri owed Luana as a result of the continuously-overdrawn account.

Luana argued Agri's account was not always overdrawn because checks posted to the account, *i.e.*, deducted from the account's balance, on a given day (what Luana termed "day one") should not be considered as part of the overdraft until midnight of the next day ("day two"), when Luana's right to return those checks expired. Luana referred to this calculation as the "true overdraft" amount, a term not found in the Bankruptcy Code or used in banking practice. Luana also argued the amount in account 367788, should be "netted" against the deficit in account 1430 each day in order to calculate the "true overdraft" in account 1430. Trustee argued that because these two "theories" were contrary to law, they should not be adopted.

Ultimately, the Bankruptcy Court adopted the "true overdraft" and "netting" theories, but found there were still times when account 1430 was overdrawn based on bank records presented at trial and the testimony of Luana's expert.

Luana admitted deposits into account 1430 on days when there were "true overdrafts" would constitute repayment of a debt. The Bankruptcy Court, adding together the amounts for each day the account was overdrawn, after applying the "true overdraft" and "netting" theories, concluded Luana received repayment of antecedent debt in the amount of $1,556,782.89 and awarded the Trustee a judgment for that amount, and determined none of the defenses Luana asserted to offset or reduce this amount were applicable. Despite finding Luana's attempt to set off the debt in account 1430 by seizing the funds in account 367788 was not allowable under the Bankruptcy Code or applicable case law precedent, the Bankruptcy Court did not include the $1.4 million from that account in the judgment.

## Summary of Argument

The Trustee alleges three errors by the Bankruptcy Court affecting the calculation of the amount of the preference the Trustee may recover from Appellee Luana. None of the facts affecting the calculation of the preference amount are in dispute: the Trustee argues only that the Court failed to use the proper standard and failed to take account of undisputed facts.

First, the Bankruptcy Court erred by adopting the "true overdraft" concept Luana suggested. That term, invented by Luana for this case, is contrary to the definition of "debt" set forth in the Bankruptcy Code and case law, and involved the introduction of a standard unsupported by precedent.

The Bankruptcy Court then compounded this initial error by accepting the concept of "netting" accounts Luana urged. "Netting" necessarily implies a setoff of one account against another. The Bankruptcy Court specifically and correctly determined a setoff of accounts 367788 and 1430 was improper. Allowing "netting" was, therefore, contrary to the Bankruptcy Court's own findings regarding setoff.

Finally, even if applying the "true overdraft" and "netting" theories was proper, the Bankruptcy Court erred in two different respects regarding its calculation of the amount the Trustee could recover.

First, it was clear error for the Bankruptcy Court to ignore the posting errors Luana made in the monthly bank statements—errors Luana admitted and now seeks to have repaid through the claim it filed against the bankruptcy estate. Accounting for those errors provides the undisputed actual amount of debt repaid, rather than what Luana and Agri thought it to be. Luana's accounting expert calculated the total preference exposure, including the posting errors, to be $3,353,190.53. *See* Luana's Exhibit JJ. Despite this uncontroverted evidence of actual debt repaid, the Bankruptcy Court ruled it would be inequitable to allow the Trustee to recover that amount because Luana and

3

Agri had wrongly assumed the amount was less. This determination was unsupported by equity, law, or the facts of this case.

Second, the Bankruptcy Court failed to account for the $1.4 million transfer from account 367788 to account 1430 on October 24, 2008. It is clear the Bankruptcy Court simply awarded judgment to the Trustee based on the amount of the overdraft repayment stated in Luana's Exhibit JJ without taking into account the posting errors. Even if posting errors are ignored, the Court certainly should have included the October 24 transfer in its calculation. On that day, the bank statements admitted as Trial Exhibit 1 show $1.4 million was deposited into account 1430. That $1.4 million was not included in the calculations that resulted in Exhibit JJ because that exhibit explicitly states that it includes only the deposits through October 17. The Court simply failed to add the $1.4 million to the Trustee's recovery. If Luana's posting errors are properly considered, the entire $1.4 million should be added. If the posting errors are ignored, then $1.05 million would be added to the preference exposure as the negative balance shown on the bank statement when the $1.4 million was taken from account 367788 on October 24.

## Argument

### I.   Jurisdictional Statement

The Court has jurisdiction over this appeal under 28 U.S.C. § 158 (a)(1).

### II.   Standard of Review

District courts review a bankruptcy court's factual findings for clear error, and its conclusions of law *de novo*. *In re M & S Grading, Inc.,* 526 F.3d 363, 367 (8th Cir. 2008).

### III.   The Bankruptcy Court committed clear error in calculating the Defendant's preference exposure by failing to include posting errors that increased the size of the overdraft and thus the antecedent debt.

In its Order, the Bankruptcy Court concluded the Trustee was entitled to avoid and recover preferential transfers from Agri to Luana totaling $1,556,782.89. Order, doc. no. 193 at 53. In

4

calculating this amount, the Bankruptcy Court declined to include a number of posting errors in account 1430 from September through November of 2008. *Id.* at 26, 29. Declining to include the posting errors required the Bankruptcy Court to ignore the facts in favor of the parties' mistaken beliefs. Mistaken beliefs, however honest, cannot alter reality.

Luana's Exhibit JJ shows the results of a computation of the preference exposure arising from "true overdrafts" depending on whether the posting errors are ignored (column 1) or included (column 2), and the figures reflected there include all the "true overdraft" amounts from column L of the report of Luana's expert, Jolene Topinka. *See* ex. C to Topinka report, Defendant's trial ex. U. Thus, Exhibit JJ provides the running totals of both the parties' belief and the actual state of affairs in account 1430. The numbers presented in Exhibit JJ include only the amounts in column L through October 17, 2008, however, and exclude the transfer from account 367788.

Of course, the calculations by Ms. Topinka of "true overdraft" amounts are based on Luana's notion the $1.4 million in account 367788 should be added to the negative balance in account 1430 each day (the "netting" Luana advocates), meaning only on the days when the resulting sum is negative would there be a "true overdraft." The Trustee continues to dispute the propriety of this accounting tactic. The second column on Exhibit JJ reflects the balance in account 1430, accounting for the posting errors. Even netting the accounts, the number of "true overdraft" days is substantially increased in that column, rising from nine days to fifteen, and the amount repaid on "true overdraft" days—which even Luana concedes is the amount of its preference exposure—increases to $3,353,190.53.

The Bankruptcy Court declined to include the posting errors in its calculation of the preference amount, however, believing there was "significant evidence that the parties would in fact have acted differently had the account balance been correct instead of containing the errors",

5

and concluding "it would be inequitable to retroactively account for the posting errors." Order at 27. A resort to equitable principles to override the result dictated by the plain language of the Bankruptcy Code, even with the best of intentions, is never appropriate. *In re Kaplan*, 104 F.3d 589, 598-99 (3d Cir. 1997) (stating that even in equitable proceedings, a court does not have "… free floating discretion to redistribute rights in accordance with … personal views of justice and fairness, however enlightened those views may be.") (Internal citations omitted). Bankruptcy courts may not grant equitable relief to reduce the amount a trustee is entitled to recover based on the plain text of the Bankruptcy Code. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("… whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."); *In re Coleman*, 426 F.3d 719, 727 (4th Cir. 2005) (explaining bankruptcy court's equitable powers may not be used to disregard the language and meaning of the Bankruptcy Code).

Even assuming *arguendo* the Bankruptcy Court could properly invoke equitable principles to override the result dictated by the statute, Luana would not be entitled to such relief under basic principles of equity. The Bankruptcy Court accepted Luana's formulation of how to calculate when account 1430 was or was not overdrawn, even though that formulation conflicts with the statutory definition of "debt", as discussed below, and the Court also gave Luana the benefit of "netting" Agri's accounts to further reduce its exposure to preference liability, despite voicing serious misgivings (in its summary judgment ruling) about the propriety of the concept and the clear conflict with its ruling on Luana's setoff attempt. Despite giving Luana the benefit of two questionable theories reducing its exposure, the Bankruptcy Court invoked equity to relieve Luana of the statutory requirement of repaying the actual amount of preferential payments received

because Luana, by virtue of its own accounting errors, thought the amount was less and may have acted differently if it had not made those errors.

The Trustee suggests it would be inequitable to tell Agri's innocent creditors they must suffer the consequence of Luana's errors—a diminished recovery to the estate—so Luana, who made the errors, may pay less than the law demands. Taking the posting errors into account is a mathematical necessity arising from Luana's own formula: it contrived the "true overdraft" theory, and the Bankruptcy Court accepted that approach to calculate the amount of debt repaid. The beginning point each day for the "true overdraft" calculation is the balance in account 1430. Once the Court knows, as Luana has admitted, that the account balance on and after September 26 was incorrect because a posting error occurring that day was not discovered until December, it is necessary to calculate the "true overdraft" amount by correcting the balance in account 1430 to reflect the truth. What would be inequitable, and ironic, would be to use a number *known* to be incorrect as the starting point for a calculation intended to result in a "true overdraft" number. The assertion the parties might have acted differently had they known of the errors is irrelevant to a calculation of the preferential transfers actually made.

Equity would be far better served in this case by not allowing an error to work to the advantage of the party who caused it while prejudicing those innocent of the error. The simple arithmetic is that the actual negative balance in account 1430 is the amount shown on the bank statement, plus or minus any bank errors. The facts are undisputed: account 1430 was overdrawn every day during the preference period, even after credit was given—sometimes wrongly so—for checks returned and deposits wired into the account. Cook, tr. vol. II 87:14-88:1; Exh. 1. If, however, the Court accepts the notion of "true overdrafts" and the "netting" of accounts to arrive at a "true overdraft" amount, it must necessarily look at the balance in each account. Once Luana

7

acknowledges the bank statements for account 1430 were in error because of faulty posting, the only way the Court can arrive at an accurate assessment of the "true overdraft" amount is to adjust the statements to reflect the posting errors. That calculation was done by Luana's accounting expert and is set out in Exhibit JJ that was admitted into evidence at Luana's request. Therefore, utilizing the "true overdraft" amount that results from reflecting the posting errors could have been accomplished by resort to uncontested evidence in the record. Refusing to do so resulted in a false "true overdraft" amount.

The Bankruptcy Court thus erred in declining to award the Trustee the amount of the preferential transfers taking into account the posting errors, and this Court should reverse the Order below and direct entry of judgment in the Trustee's favor for at least that amount, $3,353,190.53.

## IV. The Bankruptcy Court erred in calculating Defendant's preference exposure by allowing the "netting" of two separate accounts when it correctly determined setoff would have been inappropriate under 11 U.S.C. § 553(a).

At the outset, the Bankruptcy Court stated Luana and the Trustee agree the question of how account 367788 should be treated in considering the overdrafts in account 1430 "is essentially a fact question." Order, doc. no. 193 at 21. The Trustee respectfully disagrees: while it is an issue of fact whether the parties agreed to net the amounts in accounts 1430 and 367788, such an agreement would not control the outcome of the legal issue of whether Luana received transfers on account of antecedent debt. Netting the accounts for purposes of preference exposure would effectively set off the funds in account 367788 *each day*, as though Luana had taken the funds and the account had magically replenished the next morning. This finding conflicts with the Bankruptcy Court's well-reasoned holding that Luana's attempt to set off the $1.4 million in account 367788 against overdrafts in account 1430 when it seized the $1.4 million on October 24, 2008 was an improper setoff under the Bankruptcy Code. Therefore, the Bankruptcy Court's ruling on the netting issue should be reversed. Further, the Bankruptcy Court's finding on the issue of netting erroneously

8

omitted that $1.4 million preferential transfer in calculating the award to the Trustee. Even if "netting" is found not to be contrary to the Bankruptcy Court's ruling on setoff, the $1.4 million should have been added to the judgment. Therefore, this Court should enter judgment adding the $1.4 million.

### A. The parties never agreed to net the two accounts.

In contrast to Luana's claims and the Bankruptcy Court's finding, the evidence presented at trial demonstrated the parties never agreed to net the balances in accounts 1430 and 367788. For this reason, the Bankruptcy Court's finding they had was clear error, and should be reversed.

On direct examination, Collin Cook stated account 367788 was not opened for overdraft protection, but merely to replace another of Debtor's accounts. Cook, tr. vol. II 90:5-10. He also initially testified regarding this alleged agreement, and the alleged new value provided by Defendant, making up its claims of contemporaneous exchange. *Id.* at 79-84. Immediately afterward, however, Mr. Cook admitted the agreement was not in writing, tr. vol. II 87:2-9; that he did not make the alleged agreement on Luana's behalf, and was not sure when it began, *id.* at 87:10-88:5; that he did not know who made the alleged agreement on Debtor's behalf, *id.* at 88:6-9; and that his knowledge of it was only what someone else had told him, *id.* at 88:16-18. On this basis, the Trustee's motion to strike Mr. Cook's testimony regarding his knowledge of the alleged agreement as hearsay was sustained. *Id.* at 89:14-17

Further, the testimony of both parties' expert witnesses at trial made clear netting the two accounts was improper, and would not prevent account 1430 from being in an overdrawn position. The Trustee's banking expert, George Watts, specifically clarified this impropriety from the perspective both of the industry as a whole and Luana specifically:

> Q [by Mr. Fern] Now, specifically referring to the fallacy of Topinka true overdraft theory, do I understand correctly, it's your position that it's improper within the banking industry to net the two accounts?

A [by Mr. Watts] It is.

…

Q The question I have, there's nothing preventing Luana Savings Bank and Agriprocessors from having an agreement to net two accounts.

A Except for the fact that it goes contrary to the bank's own policy against overdrafting because the netting of the account did not prevent the overdraft.

Tr. vol. IV 68:25-69:4; 74:1-6. He agreed *considering* the $1.4 million in account 367788 was different than actually *applying* it to account 1430, and that while Luana *could* have applied the amount anytime an overdraft occurred, it chose not to do so. Tr. vol. IV 57:7-19. When asked if he had seen whether the parties had a netting agreement, he was explicit on the absence of evidence in favor of such an agreement: "I was asked to examine the documents furnished in evidence on the case, which I did, and there was nothing in the evidence that showed that there was an agreement to such effect." *Id.* at 75:10-12.

Even had Luana applied the funds to account 1430 earlier, however, "the 1.4 million would have been used up within a period of a week or maybe ten days." *Id.* at 62:25-63:2. He explained relying on the funds in account 367788 to cover overdrafts in account 1430 was inappropriate banking practice because the overdrafts significantly outweighed the available funds[1] and left Luana "exposed to nearly $4 million." *Id.* at 63:3-64:10.

The Bankruptcy Court's finding a netting agreement existed and was proper in light of banking practices, even at the local level, was clear error, and should be reversed.

**B. Even if the parties had agreed to net accounts, that would not control the legal matter of whether Luana received transfers in payment of antecedent debt.**

Even if the Bankruptcy Court did not commit clear error in finding the parties had agreed to net the accounts, this would not be controlling on the issue of whether Luana had received the

---

[1] Exhibit 3 provides a graphical—and graphic—display of the imbalance between the overdrafts in account 1430 and the funds available in account 367788. At one point, the intraday overdrafts in account 1430 rose to over $5.1 million, far outweighing any funds in account 367788.

10

wire transfers from Agri on account of antecedent debt. As the Bankruptcy Court characterized the Trustee's position, "the fact that funds may have been available [in account 367788 to net with overdrafts in account 1430] does not matter—what matters is whether the checks [from account 1430] were actually paid with those funds." Order at 24.

Luana's expert, Paul Carrubba, admitted a positive balance in one account would not change Luana's ability to seek redress on the basis of a negative balance in another account:

> A [by Mr. Carrubba] Now, if the question you are asking me when you say the bank's legal rights, if one account has a negative $400,000 in it and the other has a million four, does the bank have legal rights against the customer for the negative 400,000? Then the answer would be yes.
> Q [by Mr. Childers] And the same answer would be given if there was no money in the other account. Isn't that true?
> A Yeah. Yeah.

Tr. vol. IV 39:8-15. Luana's ability to pursue a remedy against Agri for the overdraft in account 1430, even if a greater amount were present in account 367788, highlights the fact the two accounts should not be netted for purposes of determining whether an overdraft existed in account 1430.

Luana had the ability to pursue action against Agri for the overdrafts in account 1430, whether or not funds were present in account 367788, and whether or not it chose to do so. This ability, along with the lack of evidence supporting the idea of a netting agreement between the parties, and the impropriety of netting the accounts from both a banking perspective and from Luana's own materials, all show the fallacy of the notion of netting the two accounts in determining whether an overdraft existed in account 1430.

## C. The Bankruptcy Court correctly found the defense of setoff was not available to Luana, but erred in calculating judgment in favor of the Trustee by failing to include the attempted $1.4 million setoff from account 367788 as a preferential transfer.

The Bankruptcy Court correctly determined the October 24, 2008 transfer of $1.4 million from account 367788 into account 1430 was not protected from the Trustee's avoidance power under 11 U.S.C. § 553(a). *See* Order at 29-34 ("Under both the written account agreement and §

11

553(a)'s mutuality requirement, the Bank enjoyed a right of setoff only against the funds actually available to Debtor. The hold on the account prevented them from being available to Debtor."). The Bankruptcy Court erred, however, in declining to add the amount of the $1.4 million transfer to the Trustee's recovery, stating merely the amount "has already been accounted for in its analysis" earlier in the Order. *Id.* at 34. The Bankruptcy Court did not, in fact, so account for the transfer, and this Court should reverse and correctly incorporate the transfer from account 367788 into the Trustee's recovery.

On October 24, 2008, the balance of account 1430 was -$2,514,669.71. Ex. 1 at 101. Luana returned a large number of checks that day, which lowered the balance reflected by the statements to -$1,057,282.38. *Id.* at 101-102. That same day, the funds in account 367788, $1.4 million, were transferred into account 1430, paying down the negative balance and leaving account 1430 with a positive statement balance of $342,717.62. *Id.* The actual balance, accounting for the $800,964.38 in posting errors, was -$1,858,246.76. *See* ex. 1 at 102; ex. 5.

Even with the most generous interpretation of the facts and law in this case, the Trustee's recovery should be increased by the amount of account 1430's swing from the negative back to a balance of zero that day, which the Bankruptcy Court correctly found was a preferential transfer. This would increase the Trustee's recovery from $1,556,782.89 (using Luana's own "true overdraft" numbers from ex. JJ) to $2,614,065.27, a growth of $1,057,282.38 (the negative statement balance the day of the transfer). If the Court includes the posting errors in account 1430, however, as the Trustee believes is proper, the initial preference exposure was $3,353,190.53, as discussed above, and the entire $1.4 million transfer on October 24, 2008, should be included, because it failed to bring the negative balance to zero. This would raise the total preference exposure to $4,753,190.53.

12

It was error for the Bankruptcy Court not to include the $1.4 million transfer in its calculation of the Trustee's award, and this Court should reverse and correct that error by directing judgment be awarded to the Trustee in the amount of $4,753,190.53, or at least in the amount of $2,614,065.27.

## V. The Bankruptcy Court erred by adopting Luana's notion of a "true overdraft" and declining to include intraday overdrafts in the preference calculations.

In its Order, the Bankruptcy Court reaffirmed its summary judgment ruling, holding that intraday overdrafts were not "debt" for purposes of the Bankruptcy Code, and adopted Luana's notion of a "true overdraft" occurring only after the deadline for Luana's decision whether to return checks overdrawing the account. Order, doc. no. 193 at 19. This decision by the Bankruptcy Court conflicts with the definition of "debt" under the Bankruptcy Code and applicable case law, and this Court should reverse and rule the intraday overdrafts were antecedent debt for purposes of the preference exposure.

### A. Congress intended to provide the broadest possible definition of "debt" under the Bankruptcy Code.

The Bankruptcy Code does not define when a debtor incurs a debt, but does define a "debt" as "liability on a claim." 11 U.S.C. § 101(12). "Thus, the concept of a debt and a claim are coextensive under the Code, and a debtor incurs a debt to a creditor for purposes of § 547(b)(2) as soon as the creditor would have had a claim against the debtor's estate." *In re LGI Energy Solutions, Inc.*, 482 B.R. 809, 818 (B.A.P. 8th Cir. 2012) *aff'd as modified on other grounds and remanded*, 746 F.3d 350 (8th Cir. 2014). A "claim", in turn, is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, *unmatured*, *disputed*, undisputed, legal, equitable, secured, or unsecured." *In re Iowa Premium Serv. Co., Inc.*, 695 F.2d 1109, 1111 (8th Cir. 1982) (citing 11 U.S.C. § 101(5)(A))

(emphasis added); *see also In re Morales*, 403 B.R. 629, 632 (Bankr. N.D. Iowa 2009); *In re Foushee*, 283 B.R. 278, 283 (Bankr. N.D. Iowa 2002).

The mere fact a debtor had time within which to perform obligations before a creditor could file suit "does not mean that the obligation did not arise until those deadlines were upon them or past, just as the prepayment of a loan before an installment due date or the maturity date constitutes payment on an antecedent debt." *In re LGI Energy Solutions*, 482 B.R. at 818. The definition of "claim" "is broad enough to encompass an obligation on which a civil action would be premature because jurisdictional prerequisites have not been met." *McSherry v. Trans World Airlines, Inc.*, 81 F.3d 739, 740 (8th Cir. 1996). "Accordingly, a debtor incurs a debt to a creditor when the creditor has a claim against the debtor, *even if the claim is unliquidated, unmatured, unfixed, or contingent*." *In re Tanner Family, LLC*, 556 F.3d 1194, 1196 (11th Cir. 2009) (emphasis in original) (citations omitted). Therefore, when Agri wrote NSF checks that were presented to Luana Bank (i.e. Luana's correspondent bank had already paid for Luana), Luana immediately had a claim against Agri for payment of that NSF check. The fact that the deadline for returning the check had not yet passed meant only that Luana had additional options for resolving the NSF status of the account.

**B. The notion of "true overdrafts" does not exist at law, and intraday overdrafts should be considered antecedent debt for preference purposes.**

In the summary judgment ruling initially adopting the "true overdraft" notion, doc. no. 138, the Bankruptcy Court placed great reliance on *Laws v. United Missouri Bank of Kansas City, N.A.*, which held that routine advances against uncollected deposits ("collected funds" overdrafts) do not create debt. 98 F.3d 1047 (8th Cir. 1996). *Laws* involved the extension of provisional overdrafts: credit extended by a bank when a customer has deposited checks in its account, but the funds represented by those checks have not yet reached the bank. *Id.* at 1050. There, the Eighth

Circuit noted three different possible times when "debt" might be incurred for preference purposes: when the bank gives provisional credit in a customer's account for a deposited check; when the customer uses that provisional credit by drawing on the account; or when the deposited check is dishonored. *Id.* The decision in *Laws* dealt with the first and second situations.

This case presents a different and unrelated fourth scenario: rather than having a deposited check in its hands to ostensibly cover the outflows from Agri's account, as in *Laws*, Luana extended intraday overdraft credit, merely waiting on the hope of later wire transfers to replenish the account. Schultz depo., ex. 13 at 23:16—24:13. The Bankruptcy Court, however, found these intraday overdrafts were not "debts" until after Luana's deadline to return checks had passed. Where the date the debt was incurred is at issue, the determination of whether the transfer was made on account of an antecedent debt is a mixed question of law and fact, and is reviewed de novo. 11 U.S.C. § 547(b); *In re Bridge Info. Sys., Inc.*, 474 F.3d 1063, 1067 (8th Cir. 2007) (citation omitted).

Each time Luana received a check written by Agri on account 1430, the account would either go negative or go even further negative. Cook, tr. vol. II 136:21-23. There were no funds "held in Agriprocessors' account" to cover these checks, as Luana claims, and Luana failed to show the funds wired into account 1430 the next day were actually applied to checks Agri had written the day before, or were even linked to these outgoing checks in any sensible way. Instead, the bank statements show that rather than being made available for Agri's use, the transfers *paid down a portion of the negative balance*. *See* ex. 1.

An intraday overdraft is an extension of credit at the moment it occurs, and therefore an antecedent debt:

> Unlike provisional credits against existing deposits, the credit extended by [the bank] . . . was credit extended on *future anticipated deposits*. *This constituted credit*

*extended on a promise to pay*. This credit is properly characterized as a debt. The deposits made on the following day to satisfy and clear the negative ledger balance paid this antecedent debt.

*In re Sophisticated Commc'ns, Inc.*, 369 B.R. 689, 700 (Bankr. S.D. Fla. 2007) (emphasis added), *opinion clarified on denial of reconsideration*, 00-17635-BKC-RAM, 2007 WL 2257604 (Bankr. S.D. Fla. Aug. 1, 2007). Here, Luana likewise extended credit on deposits it anticipated. Further, the next day deposits never fully cleared the negative account balance during the preference period.

The majority of the experts agreed with the characterization of intraday overdrafts created by Agri's checks as debt, including even Defendant's expert Jolene Topinka. Topinka depo., ex. 15 at 55:13-17. The Trustee's expert, George Watts III, explained at trial the reasoning for treating intraday overdrafts as credit in this case, and referred to Luana's departure from its own policies in extending these credits to Agri:

> Well, obviously the bank's being exposed to an inordinate amount of risk by that pattern of dealing that you're looking at. Also, in this particular case with Luana, the bank's own credit policy prohibits that sort of transactioning, states that overdrafts are to be discouraged, and if they persist, it should -- account should be terminated.

Tr. vol. IV 62:15-20. Both the facts and the applicable law align in treating intraday overdrafts ("ledger overdrafts," rather than the "uncollected funds overdrafts" dealt with in *Laws*) as extensions of credit and thus debt under the Bankruptcy Code.

Luana also was not a "mere conduit" for the transfers at issue in this case. When the Eighth Circuit termed the bank in *Laws* to be a mere conduit for the pass-through of funds, it was faced with a situation where a debtor had deposited checks and *then* received a routine advance against the uncollected deposits. 98 F.3d at 1050-51. Here, Luana essentially allowed "naked" advances of credit, trading on the hopes of receiving a deposit later to bring it into comfortable (though, as the bank statements reveal, always negative) territory. Luana merely "honor[ed] the check in the faith that the next day or two's deposits would right the balance." *In re Chase & Sanborn Corp.*,

16

848 F.2d 1196, 1201 (11th Cir. 1988) (interior quotation marks and citation omitted). In Agri's account, the deposits never righted the balance.

Luana repeatedly extended credit to Agri in the form of ledger balance overdrafts of account 1430. The debt incurred thereby varied only in amount, and Agri's deposits into the account functioned as payments on this debt. Under this rubric, and declining Luana's invitation to net accounts 1430 and 367788, the preferential transfers made by Agri into account 1430 total $61,435,427.34. *See* Trustee's Post-Trial Brief Table 1, doc. no. 187 at 35-36. Even applying the "true overdraft" theory (but not "netting") to account 1430, this amount is $51,911,381.81. *See id.* at Table 2, doc. no. 187 at 37-38. This Court should reverse the Bankruptcy Court on the issue of intraday overdrafts, finding they are antecedent debt, and award judgment in the Trustee's favor accordingly.

## Conclusion

For these reasons, the Trustee respectfully requests the Court reverse the ruling below. Because there are multiple parts to this analysis, the Trustee offers the following possible amounts for the judgment to be awarded the Trustee according to the various determinations under the Bankruptcy Court's Order:

- $2,614,065.27 if the Court accepts the notion of "true overdrafts", nets the accounts, and does not include the errors in account 1430, but does include the transfer from account 367788;
- $3,353,190.53 if the Court accepts the notion of "true overdrafts", nets the accounts, and does not include the transfer from account 367788, but does include the errors in account 1430;
- $4,753,190.53 if the Court accepts the notion of "true overdrafts", and nets the accounts, but includes the errors in account 1430 *and* the transfer from account 367788;
- $51,911,381.81 if the Court accepts the notion of "true overdrafts", but does not net the accounts; or
- $61,435,427.34 if the Court determines intraday overdrafts are debts, and does not net the accounts.

The Trustee respectfully requests the Court direct entry of judgment in his favor as the Court deems appropriate under its determination of the facts and law of this case, award him the costs of this appeal, and grant him such further relief as the Court deems appropriate.

Respectfully submitted,

/s/ Paula L. Roby

Paula L. Roby       LI1442523
Dan Childers       LI0007535
Nicholas J. Kilburg  AT0010571
**ELDERKIN & PIRNIE, P.L.C.**
316 2nd Street SE, Suite 124
P.O. Box 1968
Cedar Rapids, IA 52406-1968
T: 319-362-2137 F: 319-362-1640
proby2@elderkinpirnie.com
dchilders@elderkinpirnie.com
nkilburg@elderkinpirnie.com
**ATTORNEYS FOR PLAINTIFF-APPELLANT/
CROSS-APPELLEE JOSEPH E. SARACHEK**

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 17, 2015, this filing has been filed and served electronically through the court's ECF system, which will send notification of such filing to the following ECF system registrants who have appeared in the case:

Dale L. Putnam
Erik W. Fern

U.S. Trustee

U.S. Bankruptcy Clerk—IAND

/s/ Christy White

18