**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

IN RE: AGRIPROCESSORS, INC.,

Debtor.

JOSEPH E. SARACHEK, in his capacity
as Chapter 7 Trustee,

Appellant/Cross-Appellee,

vs.

LUANA SAVINGS BANK,

Appellee/Cross-Appellant.

No. 15-CV-1015-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    JURISDICTION AND STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . **2**

III.   FACTUAL AND PROCEDURAL BACKGROUND  . . . . . . . . . . . . . . . . . **3**

       A.    Debtor Enters Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
       B.    Debtor's Relationship With The Bank  . . . . . . . . . . . . . . . . . . . . **4**
       C.    Sarachek v. Luana Savings Bank  . . . . . . . . . . . . . . . . . . . . . **7**
       D.    The Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

IV.    ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

       A.    Antecedent Debt  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
             1.    Intraday and true overdrafts . . . . . . . . . . . . . . . . . . **12**
             2.    The Bank's conduit theory . . . . . . . . . . . . . . . . . . . **21**
                   a.    The dominion test . . . . . . . . . . . . . . . . . . . . **23**
                   b.    The control test . . . . . . . . . . . . . . . . . . . . . **24**
       B.    The Bank's Affirmative Defenses . . . . . . . . . . . . . . . . . . . . . **26**
             1.    Contemporaneous exchange for new value . . . . . . . . . . . . **27**

2.      *Ordinary course of business* . . . . . . . . . . . . . . . . . . . . . . . **32**
C.   **Damages Calculation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**
      1.      *The 367788 Account* . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**
      2.      *The posting errors* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **39**
      3.      *Double recovery* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **43**
      4.      *The Bank's "darkest day" theory* . . . . . . . . . . . . . . . . . . . **45**
      5.      *Setoff* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **48**

V.   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **55**

## I. INTRODUCTION

This matter comes before the court on appeal from the United States Bankruptcy Court for the Northern District of Iowa ("Bankruptcy Court"). *See Sarachek v. Luana Savings Bank* (In re *Agriprocessors, Inc.*), Bankr. No. 08-02751, Adversary No. 10-9234 (Bankr. N.D. Iowa April 20, 2015).[1] This action stems from application of the Bankruptcy Code's preference law. Generally, the Bankruptcy Code authorizes a bankruptcy trustee to recover, or "avoid," certain transfers made in the ninety days leading up to a debtor's filing for bankruptcy. *See* 11 U.S.C. § 547. The Bankruptcy Court ruled that the Appellant/Cross-Appellee and Trustee Joseph E. Sarachek ("Trustee") was entitled to recover $1,556,782.89 of preferential transfers that the Chapter 7 Debtor Agriprocessors, Inc. ("Debtor") made to the Appellee/Cross-Appellant Luana Savings Bank ("Bank") during the ninety-day preference period. The Trustee appeals. The Bank cross-appeals.

## II. JURISDICTION AND STANDARD OF REVIEW

A district court has jurisdiction to hear appeals from final judgments, orders and decrees of bankruptcy judges. *See* 28 U.S.C. § 158(a) ("The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees . . . ." (formatting omitted)). The Bank elected to have the court, rather than the

---

[1] The Honorable Thad J. Collins, Chief Bankruptcy Judge for the Northern District of Iowa, presiding.

Bankruptcy Appellate Panel for the Eighth Circuit Court of Appeals, hear this appeal pursuant to 28 U.S.C. § 158(c)(1)(A).

On appeal from a decision of a bankruptcy court, the court sits as an appellate court and reviews the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *See* In re *Bowles Sub Parcel A, LLC*, 792 F.3d 897, 901 (8th Cir. 2015) (quoting *Tri-State Fin., LLC v. First Dakota Nat'l Bank*, 538 F.3d 920, 922 (8th Cir. 2008)). "A factual finding is clearly erroneous if, after examining the entire record, [the court is] . . . left with a definite and firm conviction that the bankruptcy court has made a mistake." *Bruess v. Dietz* (In re *Bruess*), 539 B.R. 560, 564 (B.A.P. 8th Cir. 2015) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). For matters committed to the bankruptcy court's discretion, the court reviews such matters for an abuse of discretion. *See Lovald v. Tennyson* (In re *Wolk*), 686 F.3d 938, 940 (8th Cir. 2012). "The bankruptcy court abuses its discretion when it fails to apply the proper legal standard or bases its order on findings of fact that are clearly erroneous." *Id.*

## III. FACTUAL AND PROCEDURAL BACKGROUND

### A. Debtor Enters Bankruptcy

The events precipitating Debtor's slide into bankruptcy have been well-publicized. Debtor owned and operated a kosher meatpacking and food processing facility in Postville, Iowa. At one point, Debtor employed over a thousand people, including a large population of undocumented workers. Sholom Rubashkin, one of Debtor's high-ranking corporate officers, engaged in a massive financial fraud through several of Debtor's bank accounts. In May 2008, Immigration and Customs Enforcement ("ICE") conducted a raid at Debtor's facility. ICE arrested almost 400 of Debtor's employees for immigration violations, most of whom were criminally charged. In November 2008, Rubashkin was arrested and ultimately convicted of multiple counts of financial fraud. *See United States v. Rubashkin*, 655 F.3d 849 (8th Cir. 2011), *cert. denied*, 133 S. Ct. 106 (2012).

On November 4, 2008, Debtor voluntarily filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of New York. Debtor's petition stated that it had over 200 creditors with assets and liabilities in excess of $50,000,000.00. On November 20, 2008, the Bankruptcy Court for the Eastern District of New York approved the appointment of the Trustee as trustee in the Chapter 11 proceedings. On December 15, 2008, the case was transferred to the Bankruptcy Court. On October 8, 2009, the Bankruptcy Court granted the Trustee's motion to convert the case to a Chapter 7 bankruptcy. The United States Trustee for the region retained the Trustee as trustee for the Chapter 7 proceedings.

## B. *Debtor's Relationship With The Bank*

The Bank is a banking institution organized and existing under the laws of the State of Iowa, with its principal place of business in Luana, Iowa. Debtor maintained three relevant accounts with the Bank. The first, bearing the account number 401102 ("401102 Account"), was maintained pursuant to the Packers and Stockyard Act of 1921, 7 U.S.C. § 181, and opened in 1999. The second, bearing the account number 1430 ("1430 Account"), was Debtor's primary banking account with the Bank and was used for daily transactions. Debtor opened the 1430 Account in early 2000. The third, bearing the account number 367788 ("367788 Account"), was not opened until July 2008. The 367788 Account was opened with a zero balance after Debtor closed the 401102 Account. On August 1, 2008, Debtor deposited $1,150,000 into the 367788 Account at the Bank's request. Less than a week later, on August 7, 2008, the Bank placed a hold on the 367788 Account. Two weeks after that, Debtor deposited a further $250,000 in the 367788 Account at the Bank's request. The Bank offers two different purposes for the 367788 Account. The first is that it was intended simply to replace the 401102 Account and hold Packers and Stockyard Act funds. The second is that it was intended to be a "cushion" account, to ensure the repayment of daily overdrafts on the 1430 Account. According to

the Bankruptcy Court, the Bank maintained that both explanations were correct—that the 367788 Account was originally opened to replace the 401102 Account, but then it became a cushion account to provide the Bank assurances on the 1430 Account's fluctuating balance.

Prior to the ninety-day preference period,[2] Debtor regularly incurred so-called "intraday overdrafts" in the 1430 Account. Intraday overdrafts are a function of the Uniform Commercial Code ("U.C.C.") and the two-day check clearinghouse process. Intraday overdrafts occur because of the U.C.C.'s deferred posting procedure. *See* U.C.C. § 4-301(a) (allowing banks to utilize a deferred posting procedure); *see also* Iowa Code § 554.4301(1) (allowing banks in Iowa to utilize a deferred posting procedure). This procedure generally authorizes a bank to provisionally settle a check presented to it but then gives it the option to revoke the settlement prior to the bank's "midnight deadline." *See* U.C.C. § 4-301 cmt. 1 ("'[D]eferred posting' merely allows a payor bank that has settled for an item on the day of receipt to return a dishonored item on the next day before its midnight deadline, without regard to when the item was actually posted."). The "midnight deadline" is midnight on the next banking day after a customer presents a check for settlement. *See* U.C.C. § 4-104(10) (defining the "midnight deadline" as "midnight on [a bank's] next banking day following the banking day on which it receives the relevant item"); *see also* Iowa Code § 554.4104(j) (adopting the U.C.C.'s definition of "midnight deadline").

Functionally, this procedure allows banks to provisionally settle a presented check and create a negative charge on the account holder's account balance. Under the U.C.C. and Iowa law, a check processing through the clearinghouse procedure will generally result

---

[2] The Bankruptcy Code's preference provisions allow the trustee to recover preferential transfers made on or within the ninety days preceding the date the debtor filed its bankruptcy petition. 11 U.S.C. § 547(b)(4)(A). The parties do not dispute that the preference period in this action runs from August 6, 2008 to November 4, 2008.

in a provisional settlement. If the account holder has less money in the account than the value of the check, the provisional settlement places the account into an overdraft position—creating an intraday overdraft. If the customer deposits funds sufficient to cover the intraday overdraft by the midnight deadline, say on the next business day, the payment on the check becomes final and the customer's account will not show an overdraft. On the second day, the bank has three options: it can (1) dishonor, or "bounce," the check; (2) immediately honor it and allow the provisional overdraft to become final, or a "true" overdraft; or (3) do nothing and wait for covering funds, potentially carrying the negative account balance past the midnight deadline and creating a true overdraft on the account.

Prior to July 2008, Debtor's primary bank had been Citizen's Bank. But, after Citizen's Bank informed Debtor that it would no longer allow Debtor to bank there because of the significant overdrafts Debtor was running with it, Debtor switched its primary business account to Luana Savings Bank and the 1430 Account. After this switch, overdrafts in the 1430 Account increased significantly. Debtor incurred significant intraday overdrafts in the 1430 Account throughout the preference period. This stemmed in part from the Bank's "pay all" policy for clearing checks for Debtor's account. This "pay all" policy required the Bank to provisionally settle all checks drawn on the 1430 Account, regardless of whether or not the settlement would result in an intraday overdraft. On the morning of the next banking day, the Bank's president, David Schultz, would review reports and learn which accounts were in an overdraft position. Generally, if Debtor's account showed an intraday overdraft, and after Schultz's review, a Bank representative would contact Debtor to determine whether a covering payment would be forthcoming before the midnight deadline. If Debtor indicated that covering funds were available, the Bank would wait to determine whether to honor the checks. Usually, Debtor would wire in covering funds and the Bank would then honor most of the checks written on the 1430 Account.

However, even after Debtor wired in covering funds, the account balance in the 1430 Account always remained below zero during the preference period. To determine whether the covering funds transferred by Debtor were sufficient to avoid a true overdraft then, the Bank considered the funds in the 367788 Account. In other words, the Bank would net the account balances of the 1430 Account and the 367788 Account, which carried a balance of $1.4 million, with the covering funds. If those amounts combined yielded a zero or positive balance, the Bank would not consider the 1430 Account overdrawn and would allow final payment on the checks. However, there were several days during the preference period in which the covering funds were not sufficient, even considering the funds in the 367788 Account, to bring the 1430 Account to a positive or zero balance. On those days, Debtor would incur a true overdraft in the 1430 Account.

On October 24, 2008, the Bank learned that no covering funds were coming from Debtor to eliminate the intraday overdrafts on the 1430 Account. The Bank immediately transferred the $1.4 million from the 367788 Account into the 1430 Account to set off the negative balance. Less than two weeks later, Debtor filed its Chapter 11 petition.

## *C.* Sarachek v. Luana Savings Bank

On November 3, 2010, the Trustee filed an adversary action against the Bank in the Bankruptcy Court, seeking to characterize certain payments made by Debtor to the Bank as preferential transfers, and thereby avoid them pursuant to 11 U.S.C. § 547. On June 29, 2011, the Trustee filed a Second Amended Complaint, alleging, in addition to the preferential transfer allegations contained in the initial complaint, that the October 24, 2008 transfer of the funds from the 367788 Account to the 1430 Account constituted an improper setoff. In the Second Amended Complaint, the Trustee sought to avoid at least $5,134,582.68 in allegedly preferential transfers and the improper setoff. On October 27, 2011, the Bank filed a Third Amended and Substituted Answer and Affirmative Defenses

denying that it was the recipient of any preference payments and raising various affirmative defenses.

On April 15, 2013, the Bankruptcy Court denied the Bank's motion for summary judgment. The Bankruptcy Court agreed with the Bank that only true overdrafts—those overdrafts that were allowed to stand past the midnight deadline—constituted "debt" under preference law, and thus only true overdrafts were avoidable. The Bankruptcy Court proceeded to trial on two primary issues: (1) whether, and in what amount, the Bank received transfers to pay down any true overdrafts in the 1430 Account and (2) whether the Bank was entitled to any affirmative defenses. On April 20, 2015, the Bankruptcy Court ruled that the amount of true overdrafts had to be calculated with respect to the funds in both the 1430 Account and the 367788 Account due to the informal netting agreement between the Bank and Debtor. The Bankruptcy Court also determined that it would not retroactively correct certain posting errors which artificially inflated the amount of money that showed in the 1430 Account during the preference period. The Bankruptcy Court determined that the posting errors should not be included in the true overdraft analysis because there was significant evidence that the parties would have acted differently had they known about the errors at the time and that to retroactively correct the errors would be inequitable. The Bankruptcy Court further held that the Bank's October 24, 2008 setoff was improper and denied the Bank's affirmative defenses. Finally, the Bankruptcy Court found that the Bank had not advanced sufficient evidence to demonstrate that the Trustee was receiving an improper double recovery.

### D. The Appeal

On May 1, 2015, the Trustee appealed. On May 13, 2015, the Bank cross-appealed. On that same date, the Bank elected to have the court hear the appeal pursuant to 28 U.S.C. § 158(c)(1)(A). On June 17, 2015, the Trustee filed "Plaintiff-Appellant/Cross Appellee Joseph E. Saracheck's Brief" ("Trustee Brief") (docket no. 8).

On July 1, 2015, the Bank filed "Appellee's/Cross-Appellant's Appeal Brief" ("Bank Brief") (docket no. 9). On July 15, 2015, the Trustee filed a Reply Brief ("Trustee Reply") (docket no. 13). On July 28, 2015, the Bank filed a Reply Brief ("Bank Reply") (docket no. 15). On August 31, 2015, the Iowa Bankers Association ("IBA") filed a brief as amicus curiae ("IBA Brief") (docket no. 18). *See* Aug. 31, 2015 Order (docket no. 17) (permitting IBA to appear as amicus curiae). On February 18, 2016, the court heard oral argument on the appeal. *See* February 18, 2016 Minute Entry (docket no. 21). The matter is fully submitted and ready for decision.

On appeal, the Trustee argues that the Bankruptcy Court erred in several ways: (1) excluding the posting errors the Bank made during the preference period; (2) netting the funds in the 1430 Account and the 367788 Account and (3) adopting a distinction between true overdrafts and intraday overdrafts for establishing antecedent debt. The Bank argues that the Bankruptcy Court erred as follows: (1) finding that the Bank did not qualify for the ordinary course of business defense; (2) finding that the Bank was not entitled to invoke the contemporaneous exchange for new value defense; (3) misinterpreting *Laws v. United Mo. Bank of Kan. City, N.A.*, 98 F.3d 1047 (8th Cir. 1996) and holding that the Bank was not acting as a mere "conduit" for Debtor's funds; (4) rejecting the Bank's claims that any recovery in the instant action would constitute improper double recovery for the Trustee and (5) failing to limit the total amount of recovery to the "darkest day" of overdrafts. The Bank also indicates that it believes it had a right to set off the overdraft in the 1430 Account with the cushion funds from the 367788 Account.

## IV. ANALYSIS

The purposes of preference law are "to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equity of distribution to creditors in bankruptcy." *Jones Truck Lines, Inc. v. Cent. States, S.E. & S.W. Areas Pension Fund* (In re *Jones Truck Lines, Inc.*), 130 F.3d 323, 326 (8th Cir. 1997). To

9

prove that a creditor has received a preferential transfer, a trustee must establish that a transfer: (1) benefitted a creditor; (2) was made "for or on account of an antecedent debt owed by the debtor before such transfer was made;" (3) was made while the debtor was insolvent; (4) was made on or within ninety days before the date the debtor filed its bankruptcy petition (the "preference period"); and (5) allowed the creditor to obtain more than it would have in a Chapter 7 proceeding. 11 U.S.C. § 547(b)(1)-(5). The dispute in the instant action centers around the second element—that is, whether Debtor's transfers to the Bank during the preference period were made on account of antecedent debt Debtor owed to the Bank. The other elements of the Trustee's preference claim have not been raised by the parties on appeal, and the court declines to address them.

The Bankruptcy Code defines "debt" simply as "liability on a claim." 11 U.S.C. § 101(12). The term "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 101(5)(A). "A debt is 'antecedent' if it was incurred before the allegedly preferential transfer." *Peltz v. Edward C. Vancil, Inc.* (In re *Bridge Info. Sys., Inc.*), 474 F.3d 1063, 1066-67 (8th Cir. 2007) (quoting In re *Jones Truck Lines, Inc.*, 130 F.3d at 329). "The date a debt is incurred is 'the date upon which the debtor first becomes legally bound to pay.'" *Id.* (quoting *Iowa Premium Serv. Co., Inc. v. First Nat'l Bank in St. Louis* (In re *Iowa Premium Serv. Co., Inc.*), 695 F.2d 1109, 1111 (8th Cir. 1982)).

The court will first determine whether the Bankruptcy Court erred in finding that the incoming wire transfers into the 1430 Account to cover intraday overdrafts did not constitute a transfer "on account of antecedent debt." The court will then consider whether the Bankruptcy Court erred in denying the Bank's affirmative defenses. Finally, the court will consider whether the Bankruptcy Court erred in calculating the proper measure of avoidable preferences.

## *A. Antecedent Debt*

The Bankruptcy Court concluded that only true overdrafts constitute extensions of credit and, therefore, constitute antecedent debt for purposes of the Bankruptcy Code. *See* Record II at 1398.[3]  The Bankruptcy Court relied on *Laws v. United Mo. Bank of Kan. City, N.A.* for the proposition that the Eighth Circuit Court of Appeals determines the point at which debt arises by reference to the time of dishonor of a check. *Id.* (citing *Laws*, 98 F.3d at 1051).  The Bankruptcy Court observed that "the midnight deadline of the second day of transaction is the decisive point of honor or dishonor" and, therefore, "the debt arose when the Bank decided to honor the overdrawn check by letting the midnight deadline pass.  In other words, the time for dishonor expired." *Id.* at 1398-99.  The Bankruptcy Court employed similar reasoning in its order denying the Bank's motion for summary judgment. *See id.* at 633-36.  In denying summary judgment, the Bankruptcy Court also reasoned that no debt arose from an intraday overdraft, because Debtor did not become legally bound to pay the Bank until the Bank made a "transfer" to Debtor on account of the checks that placed the 1430 Account into an intraday overdraft position, which does not occur until final settlement of the checks—i.e., until the Bank honors or dishonors them. *Id.* at 638-44 (citing *Barnhill v. Johnson*, 503 U.S. 393 (1992)).

On appeal, there are two central issues to determining whether and in what amount the relevant wire transfers constituted transfers on antecedent debt: (1) whether the Bankruptcy Court erred in holding that only true overdrafts, rather than both intraday and true overdrafts, constitute antecedent debt under the Bankruptcy Code, as the Trustee

---

[3] The record for this proceeding has been filed in two separately paginated parts. Each such part has been consecutively paginated, and the court shall use such consecutive pagination to reference the record in this order.  For the purposes of this order, "Record I" shall refer to that portion of the record filed at docket nos. 6-1, 6-2 and 6-3.  "Record II" shall refer to that portion of the record filed at docket nos. 6-4, 6-5 and 6-6.

argues, and (2) whether the Bankruptcy Court erred in finding that the Bank was not a "mere conduit" for Debtor's funds, as the Bank argues.

### 1.     *Intraday and true overdrafts*

The Trustee argues that the Bankruptcy Court's interpretation of "antecedent debt" with relation to intraday overdrafts "conflicts with the definition of 'debt' under the Bankruptcy Code and applicable case law." Trustee Brief at 16. The Trustee argues that the term "debt" should be construed broadly under the Bankruptcy Code, focusing on the language that describes a claim as a "right to payment," regardless of the "contingent," "unmatured" or "disputed" nature of the right. *Id.* (quoting 11 U.S.C. § 101(5)(A)). According to the Trustee, the mere fact that the Bank could no longer choose whether to honor a check after the midnight deadline does not mean the overdraft did not create a debt until that point. Rather, the right to payment arose immediately when Debtor wrote non-sufficient funds ("NSF") checks that were presented to the Bank for settlement. *Id.* at 17. "The fact that the deadline for returning the check had not yet passed meant only that [the Bank] had additional options for resolving the NSF status of the account." *Id.* In response, the Bank relies on the Bankruptcy Court's application of *Laws* and its interpretation of antecedent debt. Bank Brief at 8. The Bank argues that the Bankruptcy Court's findings on this issue are consistent with other courts addressing the same question. *Id.* at 9. The Bank maintains that "[t]he approach taken by the Bankruptcy Court in relation to the intraday overdrafts is the sensible, sound decision and follows normal banking procedures." *Id.*

In *Laws*, the Eighth Circuit considered whether provisional credits the United Missouri Bank of Kansas City ("UMB") extended to the debtor, Kroh, before actually collecting Kroh's deposits were antecedent debts under the Bankruptcy Code. 89 F.3d at 1048. The typical situation at issue in *Laws* would arise as follows: Kroh would deposit a check drawn on another local bank with UMB on day one. UMB would provisionally

credit Kroh's account in the amount of the check, allowing Kroh to write checks on those provisional credits. The next day, on day two, UMB would send the check to the clearinghouse for collection. The clearinghouse would present the check to the drawee bank for honor or dishonor and provisionally credit UMB's account at the clearinghouse. The drawee bank had until midnight of day three to decide whether to honor the check. If the drawee bank honored the check, UMB's provisional credits at the clearinghouse, and Kroh's provisional credits at UMB, would become final. If the drawee bank dishonored the check, the clearinghouse and UMB would reverse the credits. *Id.*

The Eighth Circuit found that routine advances against uncollected deposits did not create antecedent debt under the Bankruptcy Code. The Eighth Circuit observed that "[t]he bank routinely makes uncollected funds available to the depositor, not as a loan, but in recognition of the bank's anticipated debt to the depositor." *Id.* at 1050-51. It reasoned that banks do not see the decision of whether to make uncollected deposits available to their customers as a credit decision, but rather as a service decision, "driven by . . . the financial demands of bank customers." *Id.* at 1051. "True, a debt will arise if deposited checks are dishonored. *But until dishonor, a bank that advances funds in the expectation that deposits will routinely be collected acts as a conduit for the depositor's financial transactions, not as a creditor.*" *Id.* (emphasis added). The Eighth Circuit expounded upon the policy reasons underlying its analysis:

> Although the issue is not free from doubt, we conclude that routine advances against uncollected deposits do not create a "debt" to the bank. A contrary rule would be inconsistent with the parties' expectations and their view of the banking relationship. A contrary rule would pin banks between the strong federal policy in favor of expedited funds availability and the Bankruptcy Code that treats advances as loans and their reduction as preferences.

*Id.* (footnote omitted). The Eighth Circuit expressed concern that adopting a rule characterizing these advances as debt "might cause banks to terminate a service that is

invaluable in today's economy." *Id.* (citing *Bernstein v. Alpha Assocs., Inc.* (In re *Frigitemp Corp.*), 34 B.R. 1000, 1020 (Bankr. S.D.N.Y. 1983)).

The Bankruptcy Court for the Southern District of New York considered whether a bank's use of deposited checks to pay down an overdraft balance in a debtor's account were preferential transfers in In re *Frigitemp*, 34 B.R. at 1018. The In re *Frigitemp* court recognized that a bank's willingness to allow a debtor to consistently run large negative account balances bore many indicia of a loan or extension of credit. *Id.* at 1019. However, it strongly indicated that attaching preference liability to such overdrafts would lead to adverse consequences, contrary to the goals of the Bankruptcy Code. It observed that, "[i]f each routine deposit occurring when a company's account is in the overdraft position were voidable as a preference, banks would potentially . . . discontinu[e] the useful practice of permitting overdrafts." *Id.* at 1020.

> Like the termination of basic utilities, premature termination of such essential payment and collection services at the first suggestion of insolvency would turn many a lean spell for companies into sure bankruptcy. In the end, such a rule would hurt more creditors than it would help, "would in many cases make banks hesitate to honor checks given to third persons, would precipitate bankruptcy and so interfere with the course of business as to produce evils of serious and far reaching consequence."

*Id.* (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 529 (1913)).

The Trustee attempts to distinguish *Laws* from the instant action by arguing that they dealt with different factual situations—*Laws* dealt with routine advances against uncollected deposits, while this case deals with routine intraday overdrafts. Trustee Reply at 6; *see also* Trustee Brief at 18. The Trustee argues that this distinction is critical because the Bank here made "naked" advances against the "mere promise of later funds" rather than on funds deposited but not yet collected. Trustee Reply at 6. The Trustee argues that "'credit extended on future anticipated deposits . . . constitute[s] credit

extended on a promise to pay. This credit is properly characterized as a debt.'" Trustee Brief at 18 (quoting In re *Sophisticated Commc'ns*, 389 B.R. at 700).

The Bank argues that the Bankruptcy Court interpreted *Laws* too narrowly to create preference liability even where true overdrafts occurred. The Bank argues that its willingness to allow true overdrafts to occur is indicative not of a creditor-debtor relationship, but of its provision of a valuable banking service to Debtor in the form of overdraft protection. Bank Brief at 18. The Bank views the act of balancing debits due to the overdraft and credits from the covering wire funds as "activities directly connected with the maintenance of a deposit account. Fundamentally, the Bank is not creating a 'debt' that it then 'collects' by recovering the overdraft and the overdraft fee from the account." *Id.* (quoting Office of the Comptroller of the Currency, Interpretive Letter #1082, at 6 (May 17, 2007)). The Bank suggests that this is a fact-intensive inquiry, but that the facts in this case demonstrate that the Bank is providing a service rather than extending credit. *Id.* The Bank argues that In re *Frigitemp* and *Laws* espouse a policy that banks should be given "extraordinary protections to credit exposure incurred in the performance of necessary banking services." *Id.* at 17 (quoting In re *Frigitemp*, 34 B.R. at 1020).

The court finds that the Bankruptcy Court correctly interpreted and applied *Laws* to this case. In *Laws*, the Eighth Circuit considered the fact that UMB allowed the debtor to write the checks because of an expectation that the debtor's deposit would clear through the clearinghouse, not because it hoped to be repaid in the form of a loan. *Laws*, 89 F.3d at 1051. The same is true here. The record reflects that the Bank's pay all posting policy resulted in an automatic provisional negative balance in the 1430 Account essentially without the Bank's knowledge, and certainly without the Bank's express approval on day one of the two-day banking cycle. The Bank's expert, Paul Carrubba, explained as much in his report explaining the different posting procedures employed by banks.

> Posting is the automatic process of adding deposits to the account ledger balance and subtracting checks and other withdrawals. A financial institution's electronic posting system performs the function of processing all transactions from all presenting sources for all transaction types.
>
> …
>
> Luana Savings Bank used the widely accepted [p]ay [a]ll system in processing checks presented for payment on Agriprocessor's [sic] checking account, DDA 1430. The process used by Luana Savings Bank in processing checks is in accordance with usual and customary processes used by other financial institutions. *All checks presented for payment were posted to the account ledger balance and were reviewed the following day at which time a pay or return decision was made by the bank.*

Record I at 558-59 (emphasis added); *see also* Exhibit T. Schultz's testimony in his deposition confirmed the same. *See* Record II at 109 (describing how he did not see an account with an intraday overdraft until the next morning).

The parties do not appear to dispute that, until day two in the two-day banking cycle, the Bank would customarily take no action on the intraday overdraft at all. Once a Bank representative called Debtor to check whether a covering wire transfer was coming in and Debtor confirmed, the relationship between the bank and Debtor substantially mirrored that of the parties in *Laws*. The Bank allowed the account to remain, provisionally, in an overdraft position "in recognition of the bank's anticipated debt to the depositor." *Laws*, 98 F.3d at 1051. Similar to *Laws*, and as the Bank here argues, the Bank did not view its toleration of the intraday overdrafts as a credit decision, but as a service decision to ensure expedited funds availability. It was a decision to honor what appears to be the normal course of business between the Bank and Debtor on reasonable assurances of covering payments based on past practices. *See* Record II at 115-16 (Schultz testifying that the Bank was not concerned when it saw the intraday overdrafts, nor was

it concerned that it did not know if covering funds would be forthcoming because of the parties' long standing relationship).

A fair reading of *Laws* suggests that it is not the time of posting that creates debt because, if that were the case, the collected funds balance overdrafts in *Laws* would likely have constituted debt. Rather, it is the time of honor or dishonor that determines whether debt arises or not. As the Bankruptcy Court held, "the midnight deadline of the second day of transaction is the decisive point of honor or dishonor" and that time, therefore, "determines when a debt arises." Record II at 1398. The court finds that a careful reading of *Laws* indicates that debt only arises when the Bank decides to honor the check by allowing the midnight deadline to expire, thereby relinquishing its right to dishonor the check and avoid the provisional overdraft becoming a true overdraft. Furthermore, contrary to the Bank's argument that it was providing a service and did not create a debt, the *Laws* court did not view the fact that a bank may be providing a banking service as preventative of the simultaneous creation of debt. *See Laws*, 98 F.3d at 1051 (impliedly recognizing that allowing the debtor to write checks on deposited but uncollected funds was a service but that it could result in debt). The court also notes that the Bank's interpretation of *Laws* would be akin to writing a special "banking exception" into the Bankruptcy Code, which the court, like the Bankruptcy Court, declines to do. *See* Record II at 1400.

The court's interpretation of *Laws* is supported by an examination of the Bankruptcy Code and its interpretation. A debt is not incurred until the debtor is legally bound to pay. *See* In re *Bridge Info. Sys., Inc.*, 474 F.3d at 1067. In its order denying summary judgment, the Bankruptcy Court discussed the Supreme Court's decision in *Barnhill v. Johnson*, 503 U.S. 393 (1992), and its application to this case. *See* Record II at 639-44. In *Barnhill*, the Supreme Court determined that a check was transferred not on the date of the payee's receipt of the check, but rather on the date the check is honored. *Barnhill*, 503

at 399-400. The Court reasoned that mere "receipt of a check gives the recipient no right in the funds held by the bank on the drawer's account." *Id.* at 399. The Court noted that there were many events that could occur between delivery and presentment to cause the check to be dishonored and that "until the moment of honor the debtor retains full control over disposition of the account and the account remains subject to a variety of actions by third parties." *Id.* at 401. The Court viewed the recipient of the check as having "received no interest in debtor's property" by mere virtue of receiving the check. *Id.* Under the U.C.C., a check is "finally paid" if the payor bank, among other things, immediately makes payment on the check or makes a provisional settlement for the check and fails to revoke the settlement in a timely manner. *See* U.C.C. § 4-215(a)(1), (3). The U.C.C. further provides that provisional settlement does not constitute final payment and that check clearinghouse credits or debits do not become final until final payment. *Id.* § 4-215(c). The deferred posting procedure and § 4-215 dictate that "honor" occurs when final payment on the check is made and that final payment is made when the bank either makes payment on the check or can no longer revoke provisional settlement. *Id.* §§ 3-502, 4-215, 4-301. In turn, *Barnhill* states that, until honor, no transfer has been made and no debt can be said to have arisen.

Reading the U.C.C. and *Barnhill* together, the court finds that there is support for concluding that intraday overdrafts do not give rise to antecedent debt. Thus, as opposed to the Trustee's view that the Bank's right to revoke the checks merely gave it "additional options for resolving the NSF status of the account" and the debt caused by such NSF status, the court believes that the U.C.C. and *Barnhill* provide reasoned authority for finding that the moment of honor is the moment that debt arises. Until the midnight deadline, the Bank was free to revoke the provisional settlement, thereby preventing any transfer or payment and ultimately preventing debt from arising.

The court is not alone in finding that intraday overdrafts do not give rise to debt. Several courts have confronted this issue and determined that intraday overdrafts do not constitute antecedent debt. *See Nordberg v. Societe Generale* (In re *Chase & Sandborn Corp.*), 848 F.2d 1196, 1200-02 (11th Cir. 1988) (holding that a wire transfer on account of an intraday overdraft was not a transfer on antecedent debt because the bank "functioned as a conduit, receiving the funds and depositing them into the [debtor's] account"); *Jacobs v. State Bank of Long Island* (In re *AppOnline.com*), 296 B.R. 602, 619 (Bankr. E.D.N.Y. 2003) ("To treat the NSF position in the [account] as an extension of credit flies in the face of banking law and practices, as well as common sense."); In re *Frigitemp*, 34 B.R. at 1020; *Pioneer Liquidating Corp. v. San Diego Trust & Sav. Bank* (In re *Consolidated Pioneer Mortg. Entities*), No. 97-56238, 1999 WL 23156, at *1 (9th Cir. Jan. 13, 1999) (citing *Laws* and noting that, "[w]hen the Bank allowed Pioneer to write checks from accounts with insufficient funds, and then make covering deposits, it was offering a service to a customer, rather than establishing a creditor-debtor relationship"), *aff'g in part, rev'g in part* 211 B.R. 704 (S.D. Cal. 1997). *But see Feltman v. City Nat'l Bank of Fla.* (In re *Sophisticated Commc'ns, Inc.*), 369 B.R. 689, 700 (Bankr. S.D. Fla. 2007) ("Unlike provisional credits against existing deposits, the credit . . . [in question] was extended on future anticipated deposits. This constituted credit extended on a promise to pay. This credit is properly characterized as a debt."); In re *Prescott*, 805 F.2d 719, 729 (7th Cir. 1986) (holding that transfers into an account with a negative account balance were transfers on account of antecedent debt because the debtor had no right to use the money deposited and the mere fact that "the bank had earlier allowed [the debtor] to maintain overdrafts does not mean that [the debtor] had a right to continue the practice"). The Bankruptcy Court thoroughly reviewed these cases in its order denying summary judgment and the court declines to replicate that discussion. *See* Record II at 664-57. However, the court has reviewed the relevant case law and agrees with the Bankruptcy Court that those cases

finding that intraday overdrafts do not constitute antecedent debt are more persuasive and more in line with the Eighth Circuit's reasoning in *Laws*.

The court is further guided by the policy considerations underlying *Laws* and In re *Frigitemp*. While the court recognizes that the definition of "debt" under the Bankruptcy Code is quite expansive, construing the definition to encompass the situation currently at hand could very well lead to the adverse consequences that the In re *Frigitemp* court feared. *See* 34 B.R. at 1020; *see also* In re *AppOnline.com*, 296 B.R. at 619 ("If the concept of provisional settlement as between the bank and its customer were eliminated, stop payment orders, garnishments and set-offs would all be ineffective if they arrived at the payor bank after forward settlement had been made with its presenting bank but before the payor bank has determined whether or not to honor the check, and the concept of the midnight deadline would, in effect, cease to exist."). In his report, Carrubba suggests that preventing a bank from provisionally posting an NSF check to a customer's account would render the U.C.C.'s provisions regarding the deferred posting procedure meaningless. Record I at 560.

The court agrees and, while it recognizes that finding in favor of the Trustee on this issue would not necessarily preclude banks from actually utilizing the deferred posting procedure, it would undoubtedly have an impact on a bank's relationship with a customer as the customer slides toward bankruptcy. If a bank that routinely allows a customer to provisionally overdraft its account and make covering payments perceives a customer as entering financial troubles, under the Trustee's rule, the bank would certainly terminate the customer's ability to use the intraday overdrafts out of fear that it would be forced to repay all the covering payments in bankruptcy. A bank's termination of this service would exacerbate the customer's financial troubles and turn what may have been temporary cashflow issues into dire financial straits for the company, precipitating bankruptcy in a case where it need not have occurred. This view is also supported by the amicus in this

case, IBA. IBA argues that a conclusion contrary to the one reached by the court "would be catastrophic for the banking industry." IBA Brief at 5.

> Without the ability to make a provisional settlement that may be made final at or prior to the bank's [m]idnight [d]eadline, a bank would be required to verify that collected funds are available to cover each check at the time presented or run the risk that provisional settlement for that check would be a voidable preference.

*Id.* IBA further warns of the potential that "banks would be forced to be far more restrictive in permitting overdrafts, customers and creditors would be unable to use checks as a reliable method of payment, and the free flow of funds would be materially and aversely affected." *Id.* The court seriously doubts Congress intended such a result. Thus, in addition to cases such as *Laws* and In re *Frigitemp* that support the court's interpretation of the Bankruptcy Code, good policy dictates the same result.

## 2. *The Bank's conduit theory*

The Bank further argues that it was acting as a mere conduit for debtor's funds pursuant to the check clearing process under *Laws* and, therefore, received no transfers on account of antecedent debt. Bank Brief at 21. The Bank argues that the covering wire transfers it received were not repayment of a loan it made to Debtor but rather were funds "to pay on checks written by [Debtor] to third parties." *Id.* Therefore, "[r]egardless of whether there were provisional or non-provisional overdrafts, [the Bank] was acting as a conduit for payment to the third parties" and, therefore, received no benefit as a creditor of Debtor. *Id.* The Trustee argues that the Bank is not a "mere conduit" for Debtor's funds but instead actively facilitated a creditor-debtor relationship. Trustee Reply at 19-20.

If a party is a "mere conduit" in an avoidable transfer, it is not considered an initial transferee under the Bankruptcy Code and, therefore, is not liable for the avoidable transfer. *See Luker v. Reeves* (In re *Reeves*), 65 F.3d 670 (8th Cir. 1995). In *Reeves*, the

Eighth Circuit noted that "[a]t least seven other circuits have held that, to be an initial transferee, a party must have dominion and control over the transferred funds." *Id.* at 676. Courts have interpreted "dominion" and "control" differently and have formulated two separate approaches to determining a party's conduit status. *See Sarachek v. Wahls* (In re *Agriprocessors, Inc.*), 490 B.R. 374, 384-86 (Bankr. N.D. Iowa 2013) (collecting cases and explaining the distinction between the two approaches). The "dominion test," which arises out of the Seventh Circuit's decision in *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988), focuses on whether the party "has legal title to [the funds] and the ability to use them as [it] sees fit." *Universal Serv. Admin. Co. v. Post-Confirmation Comm. of Unsecured Creditors of Incomnet Commc'ns Corp.* (In re *Incomnet, Inc.*), 463 F.3d 1064, 1071 (9th Cir. 2006). The "control test" derives from the Eleventh Circuit's decision in In re *Chase & Sandborn Corp.*, 848 F.2d at 1199, and "takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question." In re *Incomnet, Inc.*, 463 F.3d at 1071. The control test is a more lenient standard than the dominion test. *Id.* The Eighth Circuit has not clearly articulated whether it views the dominion test or control test as the proper determinant of a party's initial transferee status or whether the proper test is some combination of the two.[4] *Wahls*, 490 B.R. at 385. Lower courts are split as to which test applies. *Id.* at 385-86.

The court need not determine which test, or combination of tests, is correct in this instance because, with respect to the true overdrafts, the Bank has not demonstrated that it is a mere conduit under either test.

---

[4] The Bank utilizes the dominion test in its Brief. *See* Bank Brief at 21. Neither party argues in favor of the control test. However, the court will analyze the transactions in question under both the dominion test and control test.

### a.    The dominion test

The dominion test focuses on whether an entity had legal authority over the money and the right to use the money for its own purposes.  *See Bonded*, 838 F.2d at 893; *see also Sullivan v. Gergen* (In re *Lacina*), 451 B.R. 485, 492 (Bankr. D. Minn. 2011) (applying the dominion test and questioning whether the alleged transferee "had legal authority to do what she liked with the funds" (quoting *Taunt v. Hurtado* (In re *Hurtado*), 343 F.3d 528, 535 (6th Cir. 2003))).   One of the seminal cases discussing this test is particularly instructive in the instant action.  In *Bonded Fin. Servs., Inc. v. European Am. Bank*, the Seventh Circuit held that a bank was a mere conduit when it deposited money into a customer's account with a note specifically directing the bank to do so.  383 F.3d at 891.   About a week and a half later, the customer instructed the bank to debit his account in the amount of the check and apply it to an outstanding loan.  *Id*.  The Seventh Circuit found that, in this instance, the bank acquired no benefit via the transaction and acted as a mere "financial intermediary."  *Id*. at 893.  "The [b]ank was . . . no different from a courier or an intermediary on a wire transfer; it held the check *only for the purpose of fulfilling an instruction* to make the funds available to someone else."  *Id*. (emphasis added).  Once the customer instructed the bank to debit the account, however, the bank obtained dominion over the funds.  *Id*. at 894.

The court finds that, with respect to the intraday overdrafts, the Bank passes the dominion test and was functioning as a mere conduit.  When the Bank received wire transfers on account of the intraday overdrafts, such wire transfers were specifically made to cover the checks written the day prior which had provisionally placed the account into an overdraft position, as confirmed earlier that day.  The court agrees that the Bank "was receiving regular wire transfers from Agriprocessors *to pay on checks written by Agriprocessors to third parties*.  [The Bank] was not receiving wire transfers from Agriprocessors to cover loans it had made to Agriprocessors, as there were no loans."

Bank Brief at 21 (emphasis added). In this case, the Bank was acting in a manner "no different from a courier or an intermediary on a wire transfer"—it was simply facilitating the payment of checks to third parties through the deferred posting procedure provided in the U.C.C. *Bonded*, 383 F.3d at 893.

However, with respect to true overdrafts, the court finds that *Bonded* dictates a different result. Unlike transfers for intraday overdrafts, true overdraft transfers were not made specifically to cover provisional debits on Debtor's account, nor did they arrive with a specific directive as to their use. In these instances, the Bank did not merely pass the funds along to a third party or hold them for some special purpose at the behest of Debtor. Instead, the Bank received and applied the funds to pay down the negative balance in Debtor's account. The court has already determined that true overdrafts constitute debt, and the transfers Debtor made to the Bank on account of true overdrafts are therefore repayment on that debt. Thus, the funds do not flow through the Bank as a "financial intermediary" in such an instance; they stop with the Bank as repayment on the overdrawn account. At this point, the funds become the Bank's and it has legal dominion over them. This analysis is supported by the Seventh Circuit's treatment of the funds in *Bonded*. *See Bonded*, 838 F.2d at 894 ("The [b]ank had no dominion over the $200,000 until January 31, when Ryan instructed the [b]ank to debit the account to reduce the loan . . . ."). Accordingly, under the dominion test, the court finds that the Bank was not functioning as a mere conduit when it received transfers on true overdrafts in the 1430 Account.

### b. The control test

The control test departs from rigid classifications of legal rights and attempts to bring the initial transferee analysis in line with concepts of "basic fairness as well as policy considerations." *Leonard v. First Commercial Mortg. Co.* (In re *Circuit Alliance, Inc.*), 228 B.R. 225, 233 (Bankr. D. Minn. 1998). This stems from a concern that "the broadest application of the concept of 'transferee' under [the Bankruptcy Code] would

inappropriately subject mere stakeholders, bailees, and intermediaries to liability, where they had never stood to gain personally from the funds momentarily in their possession." *Id*. In essence, the control test "evaluate[s] the defendant's status in light of the entire transaction" to ensure that a court's conclusions are "logical and equitable." In re *Chase & Sanborn Corp.*, 848 F.2d at 1199. Though neither party requests the court to apply the control test, the Bank does argue that the Bank "received no benefit from the checks," making it a mere conduit rather than an initial transferee. Bank Brief at 21. The Trustee argues that, at least as to transfers for true overdrafts, such payments "were not being routed to third parties; they were used to pay down [Debtor's] debt to [the Bank]." Trustee Reply at 13.

The court's analysis of intraday overdrafts is the same under either test. As to true overdrafts, however, the court finds that the equities tip decidedly in the Trustee's favor. The relationship between the Bank and Debtor changed once the provisional overdrafts became final. By the time Debtor repaid the Bank for the overdrawn account, the transactions causing the provisional overdraft (the checks written on the 1430 Account) were final—the Bank had already honored the checks and the provisional credits and debits had become final. The Bank was no longer acting as a facility permitting Debtor's funds to pass through it to the third-party payees of the checks. The Bank received the funds and retained them, using them to pay down the negative balance in the overdrawn account. In those instances, the Bank was the intended payee of the funds, not the third-party payees of the checks. This view of the parties' relationship is supported by *Laws*, which implies that the point of honor cuts off the Bank's ability to claim it is a mere conduit in related circumstances. *See Laws*, 98 F.3d at 1051 ("[*U*]*ntil dishonor*, a bank that advances funds in the expectation that deposits will routinely be collected acts as a conduit for the depositor's financial transactions, *not as a creditor*." (emphasis added)).

In any case, because the court has determined that debt arose when the provisional overdrafts became final, the proper lens through which to view the transfers on account of the true overdrafts is as a payment on a debt, which does not give rise to conduit status. *See, e.g.*, *Menotte v. United States* (In re *Custom Contractors, LLC*), 745 F.3d 1342, 1350 (11th Cir. 2014) ("We have consistently found that when an initial recipient receives funds as payment of an existing debt, the recipient exercises sufficient control to be held liable as an initial transferee."); *Andreini & Co. v. Pony Express Delivery Servs.* (In re *Pony Express Delivery Servs., Inc.*), 440 F.3d 1296, 1301 (11th Cir. 2006) ("[E]ven entities that have special legal relationships with the debtor-transferor can be initial transferees when they do, in fact, take legal control of an avoidable transfer; for example when they receive assets directly from the debtor-transferor as compensation for services or *in payment of a genuine debt*." (emphasis added)). Accordingly, the court finds that the Bank was not acting as a mere conduit when it received transfers on account of true overdrafts in the 1430 Account. Insofar as the Bankruptcy Court's opinion rests on a rejection of the Bank's conduit theory, the court shall affirm.

## B. The Bank's Affirmative Defenses

The Bankruptcy Code provides certain affirmative defenses to preferential transfers. *See* 11 U.S.C. § 547(c). "[Section] 547(c) has three distinct exceptions that 'share common goals,': § 547(c)(1) excepts contemporaneous exchanges for new value; § 547(c)(2) excepts payments in the ordinary course of business . . . and § 547(c)(4) excepts payments for antecedent debts to the extent subsequent new value was given." *Stoebner v. San Diego Gas & Elec. Co.* (In re *LGI Energy Sols., Inc.*), 746 F.3d 350, 356 n.4 (8th Cir. 2014) (citation omitted). If the transferee can establish any of these three defenses, the trustee may not avoid the transfer. 11 U.S.C. § 547(c).

At trial, the Bank asserted that the transfers in question were contemporaneous exchanges for new value and/or were made in the ordinary course of business.[5] The Trustee argued that neither of the defenses applied. Ultimately, the Bankruptcy Court found that the Bank had not established the defenses. *See* Record II at 1415-31. On appeal, the Bank argues that the Bankruptcy Court erred in finding that the transfers were not contemporaneous exchanges for new value and were not made in the ordinary course of business. The court will address each of these defenses separately.

### 1. *Contemporaneous exchange for new value*

"Contemporaneous new value exchanges are excepted from avoidance because they 'encourage creditors to continue doing business with troubled debtors who may then be able to avoid bankruptcy altogether,' and 'because other creditors are not adversely affected if the debtor's estate receives new value.'" *Dietz v. Calandrillo* (In re *Genmar Holdings, Inc.*), 776 F.3d 961, 963 (8th Cir. 2015) (quoting *Jones Truck Lines, Inc. v. Cent. States, S.E. & S.W. Areas Pension Fund* (In re *Jones Truck Lines, Inc.*), 130 F.3d 323, 326 (8th Cir. 1997)). The party seeking to invoke the contemporaneous exchange for new value defense bears the burden of establishing that an otherwise preferential transfer was: (1) "intended by the debtor and the creditor . . . to be a contemporaneous exchange for new value given to the debtor;" (2) was "in fact a substantially contemporaneous exchange;" and (3) actually provided new value to the estate. 11 U.S.C. § 547(c)(1); *see also* In re *Genmar Holdings, Inc.*, 776 F.3d at 964 (listing the elements for establishing the contemporaneous exchange for new value defense).

"'[N]ew value' means money or money's worth in goods, services, or new credit, or release by transfer of property previously transferred to such transferee . . . but does

---

[5] The Bank also asserted that it advanced subsequent new value in its pleadings but abandoned that argument following trial. *See* Record II at 1415 (noting that the Bank had "affirmatively disavowed" the defense). The Bank does not attempt to assert the defense on appeal.

not include an obligation substituted for an existing obligation." 11 U.S.C. § 547(a)(2). Accordingly, "[n]ew value does not consist of 'esoteric or intangible benefits' but instead 'must actually and in real terms enhance the worth of the debtor's estate so as to offset the reduction in the estate that the transfer caused.'" *Miller v. Bodek & Rhodes, Inc.* (In re *Adelphia Automatic Sprinkler Co.*), 184 B.R. 224, 228 (E.D. Pa. 1995) (quoting *Aero-Fastener, Inc. v. Sierracin Corp.* (In re *Aero-Fastener, Inc.*), 177 B.R. 120, 138 (Bankr. D. Mass. 1994)); *see also Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'rs, Inc.* (In re *Kroh Bros. Dev. Co.*), 930 F.2d 648, 651 n.3 (8th Cir. 1991) (construing 11 U.S.C. § 547(c)(4), noting that, "[b]ecause the estate has been enhanced by the new value . . . , the estate and the creditor are in the same relative positions as if the preference had not been made" and concluding that "[t]he availability of the defense, then, depends on the ultimate effect on the estate"). Because the focus of the inquiry is on the actual replenishment of the estate with some particular and discernible new value, merely "refraining from exercising a preexisting right is not new value for purposes of § 547(c)(1), even if forbearance of that right enables the debtor to continue operating." *Scully v. Ark. Dep't of Fin. & Admin.* (In re *Valley Food Servs., LLC*), 389 B.R. 685, 689 (Bankr. W.D. Mo. 2008) (citations omitted).

However, "[t]he critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." In re *Genmar Holdings, Inc.*, 776 F.3d at 964 (quoting *Official Plan Comm. v. Expeditors Int'l of Wash., Inc.* (In re *Gateway Pac. Corp.*), 153 F.3d 915, 918 (8th Cir. 1998)). Both the existence of contemporaneous intent and whether new value has been given are factual determinations, which the court reviews for clear error. *See* In re *Gateway Pac. Corp.*, 153 F.3d at 918; *Silverman Consulting, Inc. v. Canfor Wood Prods. Mktg.* (In re *Payless Cashways, Inc.*), 306 B.R. 243, 248 (B.A.P. 8th Cir. 2004), *aff'd*,

394 F.3d 1082 (8th Cir. 2005); *see also Creditors' Comm. v. Spada* (In re *Spada*), 903 F.2d 971, 975 (3d Cir. 1990) ("What constitutes new value is a question of fact.").

The Bankruptcy Court found that the Bank failed to establish either that it gave new value or that it and the Debtor intended a contemporaneous exchange. *See* Record II at 1421, 1424. Below, the Bank argued that its choice not to return checks as NSF and its continued willingness to allow Debtor to incur intraday overdrafts were the new value. The Bankruptcy Court rejected both arguments. The Bankruptcy Court held that "[t]he Bank's forbearance from dishonoring the overdraft checks is simply not new value." Record II at 1425. The Bankruptcy Court further noted that any such forbearance did not infuse Debtor's estate with anything of value to other creditors. *Id*. at 1426. The Bankruptcy Court also held that the Bank's continued honoring of the overdraft checks was not new value, stating that "[t]he Bank never even acknowledges that it agreed to allow true overdrafts, let alone that it intended to fund more true overdrafts in exchange for immediate repayments of the existing true overdrafts." *Id*. Instead, the Bank "simply received repayment of the largely inadvertent true overdraft and hoped it would not happen again." *Id*. Even assuming the Bank provided new value, the Bankruptcy Court found that the Bank "entirely fail[ed] to show . . . that the parties *intended* this to be new value and that they intended it to be linked to paying 'true overdrafts.'" *Id*. at 1421. The Bankruptcy Court focused on the fact that all overdrafts were "unplanned" and there was no evidence in the record to indicate that the Bank thought of its relationship with Debtor as exchanging its continued services for payments on the true overdrafts. *Id*. at 1422. Finally, the Bankruptcy Court noted that, even if there was some agreement to make an exchange, there was no evidence that such exchange was intended to be contemporaneous. The Bankruptcy Court looked to the testimony of Yomtov (Toby) Bensasson, one of Debtor's financial officers, and noted that the entire purpose of the system Debtor had in

place to take advantage of the deferred posting procedure was to "pick up another day," proving that Debtor did not intend to make a contemporaneous exchange. *Id.* at 1423.

On appeal, the Bank argues that the "new value" given was the continuous advancement of new provisional credit, allowing Debtor to continue its operations. The Bank argues that it "continued to permit the extension of provisional credit in exchange for regular, timely wire transfers, even following the 'true overdraft' days that did provide value to [Debtor]." Bank Brief at 19-20. The Bank further argues that the parties' intent that the arrangement be contemporaneous and for new value is evidenced by their course of dealings and the Bank's continued tolerance of provisional and true overdrafts. *Id.* at 19. The Trustee argues that the Bank cannot prove the requisite intent to invoke this defense because merely anticipating being repaid for an overdrawn account does not constitute intent to make a contemporaneous exchange. Trustee Reply at 11. The Trustee also argues that the Bank has "failed to offer evidence the parties intended to trade payments in exchange for honoring future overdrafts." *Id.* at 12.

After reviewing the record, the court agrees with the Bankruptcy Court's ruling on the Bank's contemporaneous exchange for new value defense. *See* In re *Bruess*, 539 B.R. at 564. There is ample evidence in the record to support the Bankruptcy Court's findings, and the court has identified no evidence that draws those findings into question. The Bankruptcy Court was correct in looking only at the transfers on account of the true overdrafts and determining whether those were intended to be a contemporaneous exchange for new value. The court has found that those transactions are the only potentially avoidable preferential transfers at issue and so will limit its analysis accordingly. The Bank is unable to demonstrate with any specificity that its purported new value was tied in any way to its payments of the true overdrafts, instead arguing that, as a general matter, it continued providing provisional credit every day.

As the Bankruptcy Court found, the parties' course of dealings provides evidence of the Bank's intent, not to provide some sort of new value in exchange for transfers on the true overdrafts, but merely to permit "a continuation of its 'long standing relationship' with Debtor." Record II at 1422. The Bankruptcy Court's findings regarding intent are supported by the record; in particular, they are supported by Schultz's testimony that any overdrafts were "unplanned" and his lack of testimony regarding whether "intraday overdrafts were part of an agreed contemporaneous exchange for payment of true overdraft." *Id.*; *see also id.* at 115 (Schultz's deposition testimony). The Bankruptcy Court's finding that the parties did not intend any sort of contemporaneous exchange is not clearly erroneous, and, therefore, the court affirms.

However, even if the Bankruptcy Court's finding of intent was incorrect, the court would affirm based on the Bankruptcy Court's finding that no new value was given. The court views the continued extension of provisional credit and the Bank's choice not to return the check as NSF as two sides of the same coin. Even though the Bank states that it "coupled the forebearance [of returning the checks as NSF] with continuous extension of new provisional credit," the court views these as essentially the same thing—especially considering the long-standing relationship between the Bank and Debtor allowing the provisional overdrafts in the 1430 Account. Refraining from exercising a preexisting right, such as returning the checks as NSF, does not constitute new value. *See* In re *Valley Food Servs., LLC*, 389 B.R. at 689. The court rejects the Bank's position that the continued provision of intraday overdrafts privileges somehow constitutes an extension of new credit or new value. Merely allowing the parties to maintain the status quo following a true overdraft day is exactly the sort of "esoteric or intangible benefit[]" that is excluded from the contemporaneous exchange for new value defense. In re *Adelphia Automatic Sprinkler Co.*, 184 B.R. at 228. The ability to run an intraday overdraft in the future provides no immediate, cognizable benefit to the estate. For example, if Debtor had never

again incurred an intraday overdraft after the first true overdraft day, the estate cannot truly be said to have been enriched by the continued opportunity to utilize provisional credit. The Bankruptcy Court's finding that no new value was given to the estate is not clearly erroneous. Accordingly, the court shall affirm the Bankruptcy Court's denial of the Bank's § 547(c)(1) defense.

## 2. *Ordinary course of business*

"The purpose of the ordinary course of business defense is 'to leave undisturbed normal financial relations.'" *Barrett Dodge Chrysler Plymouth, Inc. v. Cranshaw* (In re *Issac LeaseCo, Inc.*), 389 F.3d 1205, 1210 (11th Cir. 2004) (quoting *Marathon Oil Co. v. Flatau* (In re *Craig Oil Co.*), 785 F.2d 1563, 1566 (11th Cir. 1986)). The party seeking to invoke the ordinary course of business defense must establish, by a preponderance of the evidence, that the debt in question was incurred by the debtor in the ordinary course of business or financial affairs between the debtor and the creditor and: (1) the transfer was "made in the ordinary course of business or financial affairs" of the debtor and the creditor; or (2) the transfer was made in accordance with ordinary business terms. 11 U.S.C. § 547(c)(2). Therefore, such defense does not detract from the general policy underlying a preference action, which is to discourage abnormal behavior between creditor and debtor during the debtor's slide into bankruptcy. *See* In re *Cleveland Graphic Reproduction, Inc.*, 78 B.R. 819, 822-23 (Bankr. N.D. Ohio 1987).

Courts must construe the ordinary course of business defense narrowly, "because it places one creditor on better footing than all other creditors." *Harrah's Tunica Corp. v. Meeks* (In re *Armstrong*), 291 F.3d 517, 527 (8th Cir. 2002). The court also notes that "there is no precise legal test' to determine whether a preferential transfer was made in the ordinary course of business between the debtor and the creditor; 'rather, the court must engage in a peculiarly factual analysis.'" *Cox v. Momar, Inc.* (In re *Affiliated Foods S.W. Inc.*), 750 F.3d 714, 719 (8th Cir. 2014) (quoting *Lovett v. St. Johnsbury Trucking*, 931

F.2d 494, 497 (8th Cir. 1991)); *see also Official Plan Comm. v. Expeditors Int'l of Wash., Inc.* (In re *Gateway Pac. Corp.*), 214 B.R. 870, 873 (B.A.P. 8th Cir. 1997), *aff'd*, 153 F.3d 915 ("Whether payments are made in the ordinary course of business between the parties . . . [is a] question[] of fact."). Accordingly, the court will review the Bankruptcy Court's findings for clear error.

"[T]he cornerstone' of the inquiry is that the creditor must demonstrate 'some consistency with other business transactions between the debtor and the creditor.'" In re *Affiliated Foods S.W. Inc.*, 750 F.3d at 719 (8th Cir. 2014) (quoting *Lovett*, 931 F.2d at 497). Therefore, "[e]ven if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of § 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties." *Harder v. Columbia Glass & Mirror, Inc.* (In re *Graff*), 454 B.R. 745, 751 (Bankr. W.D. Mo. 2011). Where extraordinary circumstances do not exist in a particular case, a creditor's invocation of the ordinary course of business defense depends on the parties' course of dealings during the preference period and whether the disputed payments demonstrate "some consistency" with that course of dealings, not by strict reference to a written agreement between the parties. In re *Affiliated Foods S.W. Inc.*, 750 F.3d at 719-20.

The Bankruptcy Court found that the debts in question, true overdrafts, were not incurred in the ordinary course of business and, therefore, denied the Bank's § 547(c)(2) defense. In making its findings, the Bankruptcy Court looked to the Bank's repeated testimony that true overdrafts were exceptional, rather than ordinary. Record II at 1429. It also noted that true overdrafts occurred only nine times during the ninety day preference period and only four times in the nine months preceding the preference period—which "showe[d] the overdrafts were very unusual, not ordinary course debts, and started to happen only as Debtor slid toward bankruptcy." *Id.* at 1430. The Bankruptcy Court held that the frequency of intraday overdrafts is not determinative of the viability of the defense,

but that the proper focus is the true overdrafts.  *Id.* at 1431.  The Bankruptcy Court found that the system that Debtor and the Bank maintained was designed specifically to cover intraday overdrafts and *avoid* true overdrafts, making true overdrafts extraordinary.  *Id.* Accordingly, the Bankruptcy Court denied the defense.[6]

The Bank argues that it is entitled to the ordinary course of business defense regardless of whether the court looks at intraday or true overdrafts.  Bank Brief at 12.  It states that the test for the defense presents a low hurdle and carving an exception to "ordinary course of business" is demanding because only those transactions falling well outside "th[e] broad range of [acceptable transactions] should be deemed extraordinary and therefore outside the scope" of the defense.  *Id.* at 13 (quoting *Jones v. United Sav. & Loan Ass'n* (In re *U.S.A. Inns of Eureka Springs, Ark., Inc.*), 9 F.3d 680, 685 (8th Cir. 1993)).  The Bank maintains that the Bankruptcy Court's interpretation of what was within the ordinary course of business was inappropriately narrow because "[t]he arrangement between [the Bank] and [Debtor] was daily curing of overdrafts irrespective of their status."  *Id.* at 14.  The Bank emphasizes that the uptick in overdrafts was due to the uptick in the Debtor's use of the bank's services and, thus, it is misleading to look at the mere fact that more true overdrafts occurred as Debtor drew closer to bankruptcy.  *Id.* at 15.  The Bank argues that this is not sufficient to demonstrate a substantial departure from the ordinary course of business.

The Trustee argues that the Bank may not invoke the ordinary course of business defense because the debt in question arose due to Rubashkin's financial fraud.  Trustee Reply at 9.  Therefore, no transaction between Debtor and the Bank can be said to have occurred in the ordinary course of business.  He also argues that the increase in true

---

[6] The court notes that the Bankruptcy Court specifically declined to address § 547(c)(2)(B), which excepts otherwise avoidable transfers that were made according to ordinary business terms.  The Bank does not assert that the transfers were made pursuant to § 547(c)(2)(B) on appeal and, thus, abandons that defense.

overdrafts was not merely due to Debtor's increased use of the Bank's services, but rather due to a dramatic shift in the parties' relationship. *Id.* at 10.

Initially, the court rejects the Trustee's argument implicating the Bank in Rubashkin's fraud. The Trustee has advanced no argument that the Bank was aware of Rubashkin's fraud at the time it was transacting with him. To state that the Bank was acting outside of the ordinary course of business merely because it happened to innocently transact with a party perpetuating fraud would essentially result in the imposition of preference liability in every single case involving any illegal activity whatsoever. The court declines to sanction such a result. However, regardless of whether Rubashkin's fraud prevents the Bank from invoking the ordinary course of business defense, the court finds that the Bankruptcy Court did not err.

The Bankruptcy Court's determination that the debt in question did not arise in the ordinary course of business finds ample support in the record. As the Bankruptcy Court noted below, Schultz characterized even intraday overdrafts as "unplanned." *See* Record II at 115. Furthermore, the Bank's policy regarding overdrafts, as stated in its policy manual and as acknowledged by Schultz, is that they "are to be discouraged and accounts with abuse of overdraft privileges are to be remedied or closed." *Id.* at 137; *see also* Exhibit 3. The court also notes that the parties' relationship was designed to avoid true overdrafts, as the Bankruptcy Court found. Additionally, the sheer number of increases in true overdraft days supports the Bankruptcy Court's findings. Debtor incurred only four overdrafts in the nine months preceding the preference period and incurred nine true overdrafts during the preference period.

The Bank argues that this increase can be explained by reference to the increased use of the Bank's services. However, the court also finds that Exhibit 3, offered at trial, supports the Bankruptcy Court's finding and provides reason to reject the Bank's argument. *See* Exhibit 3. Exhibit 3 demonstrates that Debtor was running large overdrafts

during the preference period and that such overdrafts were well outside the established amount of overdrafts Debtor was running prior to the preference period. When considering the ordinary course of business defense, courts are instructed to compare the transactions in question to a historical baseline of operations. *See, e.g.*, *Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com)*, 504 F.3d 775, 790 (9th Cir. 2007) ("First, the creditor must show a baseline of past practices between itself and the debtor."). This baseline should be derived from a period of time "in the period before, preferably well before, the preference period," In re *Affiliated Foods S.W. Inc.*, 750 F.3d at 720 (quoting In re *Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993)), and "a time-frame when the debtor was financially healthy.'" *Id.* (quoting *Davis v. R.A. Brooks Trucking, Co. (In re Quebecor World (USA), Inc.)*, 491 B.R. 379, 387 (Bankr. S.D.N.Y. 2013)) (alteration in original). In looking at Exhibit 3, the court finds that the historical baseline is best represented by the period of time running from November 30, 2007 to around May 31, 2008. During this period, the balance in the 1430 Account hovered around zero. However, the overdrafts during the preference period do not conform with this historical baseline. Even comparing the time period from July 2008, when the 1430 Account became Debtor's primary checking account, and August 6, 2008, the start of the preference period, with the preference period shows a sharp departure from the previous account balances.

The court is also mindful that this inquiry is extremely fact-intensive and is reviewed for clear error. The Bankruptcy Court's decision should be reversed only if, after reviewing the entire record, the court is convinced the Bankruptcy Court has made a mistake. *See* In re *Bruess*, 539 B.R. at 564. The court is not convinced that the Bankruptcy Court erred. The Bankruptcy Court's findings on this issue are well-reasoned and supported by the record. Accordingly, the court finds that the Bankruptcy Court did

not clearly err in denying the Bank's § 547(c)(2) defense.  Therefore, the court shall affirm.

### C.  Damages Calculation

The court has found that transfers for true overdrafts constitute transfers on antecedent debt.  It has also found that the Bankruptcy Court did not err in denying the Bank's affirmative defenses.  Accordingly, the court must now determine whether the Bankruptcy Court erred in calculating the amount of avoidable transfers the Bank received from Debtor during the preference period.  This inquiry includes several ancillary issues: (1) the role of the 367788 Account in the calculation; (2) whether the Bankruptcy Court erred in declining to account for posting errors in the 1430 Account; (3) whether the Trustee is receiving an improper double recovery; and (4) whether the payments on the antecedent debt should be totaled together or the recovery should be limited to the "darkest day" of overdrafts; and (5) whether the Bank properly exercised a right of setoff.

#### 1.    The 367788 Account

The Trustee argues that the Bankruptcy Court erred in finding the existence of an informal "netting" agreement between the balances of the 1430 Account and the 367788 Account.  Trustee Brief at 11.  The Trustee states that the existence of a netting agreement would undermine and run contrary to the Bankruptcy Court's finding that the $1.4 million setoff on October 24, 2008 was improper.[7]  The Trustee maintains that the parties never reached an agreement to net the two accounts—whether written, oral, implicit or explicit. He states that even the Bank's expert "agreed [that] *considering* the $1.4 million in [the 367788 Account] was different than actually *applying* it to [the 1430 Account], and that while [the Bank] *could* have applied the amount anytime an overdraft occurred, it chose not to do so."  *Id*. at 13; *see also* Trustee Reply at 5 (arguing that the 1430 Account carried debt throughout the entire preference period because the 367788 Account funds

---

[7] The court addresses the allegedly improper setoff below.  *See* Part IV.C.5 *infra*.

were not applied until October 24, 2008). The Trustee further argues that, regardless of whether some sort of informal netting agreement existed, the existence of such agreement does not relieve the Bank of preference liability. He argues that both the 1430 Account and the 367788 Account were legally separate and the Bank had a right to pursue the overdrafts in the 1430 Account irrespective of any funds in the 367788 Account. Trustee Brief at 14. The Bank argues that there is sufficient evidence in the record to support the Bankruptcy Court's finding of an informal netting agreement. Bank Brief at 7. The Bank cites the trial testimony and exhibits offered at trial in support of its argument. *Id.*

In its trial order, the Bankruptcy Court noted that the parties agreed that the existence of a netting agreement was "essentially a fact question." Record II at 1402. Accordingly, the court will review this finding for clear error. The Bankruptcy Court noted that there was some conflicting testimony regarding the purpose of the 367788 Account and its role in the Bank's day-to-day dealings with Debtor, but ultimately found that "the totality of the evidence—and, in particular, the parties' course of conduct—shows they actually did net the accounts or consider them as one." *Id.* at 1405. The court agrees. Though conflicting at times, Bensasson's testimony revealed that the funds in the 367788 Account were "supposed to be a cushion against the account that [Debtor] wrote regular checks on." *Id.* at 830. He stated:

> I think what happened is if they felt that that's going to be like a cushion against if, let's assume for a second we did not come in with the wire fast enough with money, they will pull some money out of there and put it in there and then we have to replace it back once that happened . . . .

*Id.* The testimony of the Bank's Chief Financial Officer, Collin Cook, was similarly conflicting, but, ultimately, he repeatedly testified that the funds in the 367788 Account were actually used to determine the amount of covering funds the Bank would require from Debtor to cover the intraday overdrafts. *See* Record II at 917 ("[W]e knew the [367788] [A]ccount was there. We were using it in our computation. [Bensasson] was using it in

his computation. We had the hold on it so we just let it ride."); *id.* at 937 (testifying that there was never a time that the Bank did not consider the 367788 Account in its calculations and that "[the Bank] and [Debtor] considered it joint account [sic], or the two accounts a combined account I guess would be the better word"). Jolene Topinka, the Bank's expert witness, testified that considering the two account balances together is "acceptable in the banking industry." *Id.* at 972; *see also* Exhibit U. *But see* Record II at 1149-50 (the Trustee's expert witness George Watts III testifying that it is "improper practice" in the banking industry to net the accounts but that "there is no federal regulation that prohibits a banker and a depositor from netting two accounts if they can reach that agreement").

Having reviewed the record as a whole, the court concludes that the Bankruptcy Court did not clearly err in its findings. The Trustee's argument regarding the legal separation of the accounts mirrors those that it brought to the Bankruptcy Court below. *See id.* at 1405-06. The court agrees with the Bankruptcy Court that such arguments have "great logical and technical appeal," but ultimately affirms because of the Bankruptcy Court's reasoned finding that the parties not only reached an informal netting agreement but took actual steps to effectuate it. *Id.* at 1406. As the Bankruptcy Court found, instead of moving the money between the 367788 Account and the 1430 Account daily, the parties "functionally agreed to have the wired money from Debtor go right into [the 1430 Account]. The net effect was the same." *Id.* (citing *id.* at 826, 831). Accordingly, insofar as the Bankruptcy Court's decision rests on the existence of a netting agreement, the court shall affirm.

### 2. *The posting errors*

The Trustee argues that the Bankruptcy Court erred in excluding certain posting errors the Bank made in the 1430 Account during the preference period. The posting errors caused the 1430 Account's balance to show as higher than it really was. The

practical effect of excluding the errors reduces the size of the antecedent debt and, thus, the amount recoverable as a preference. The Bankruptcy Court declined to include the posting errors in its calculation due to the "significant evidence that the parties would in fact have acted different[ly] had the account balance been correct instead of containing the errors." *Id.* at 1408. The Bankruptcy Court held that "it would be inequitable to retroactively account for the posting errors." *Id.* The Trustee argues that not including the posting errors essentially ignores the reality of the actual situation of the parties and the actual amount of preference liability the Bank was and remains exposed to. Trustee Brief at 8-9. He states that "[a] resort to equitable principles to override the result dictated by the plain language of the Bankruptcy Code, even with the best of intentions, is never appropriate" and was clearly erroneous. *Id.* at 9. The Trustee argues that, even if equitable principles are at play, the equities in fact favor including the posting errors because to exclude them punishes Debtor's innocent creditors and benefits the Bank, the party who actually caused the errors. *Id.* at 10. Finally, he points out that the Bankruptcy Court's finding that the parties "closely tracked" the balance of the 1430 Account is at odds with its ultimate finding that the parties would have acted differently had they realized the posting errors had occurred. Trustee Reply at 4.

The Bank argues that bankruptcy courts are courts of equity and, therefore, are guided by equitable principles in their decision-making. Bank Brief at 5. The Bank argues that the Bankruptcy Court did not abuse its discretion when it included the posting errors on the basis that the parties may have acted differently had they known of the posting errors at the time. *Id.* at 5-6. It further argues that the Trustee has cited no authority that grants the court the power to "retroactively impose" the posting errors into the statements at issue. *Id.* at 5.

Initially, the court notes that the Trustee is correct that bankruptcy courts may not override the plain dictates of the Bankruptcy Code by invoking their equitable powers. *See*

Trustee Brief at 9 (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988); *Coleman v. Cmty. Trust Bank* (In re *Coleman*), 426 F.3d 719, 727 (4th Cir. 2005)). However, the Eighth Circuit has noted that "[e]ssential to any analysis of the meaning and policy behind any section of the bankruptcy code is the recognition that a bankruptcy court is a court of equity. Bankruptcy courts do not read statutory words with a computer's ease, but operate under overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." *Lend Lease v. Briggs Transp. Co.* (In re *Briggs Transp. Co.*), 78 F.2d 1339, 1343 (8th Cir. 1985); *see also Islamov v. Ungar* (In re *Ungar*), 633 F.3d 675, 680 (8th Cir. 2011) ("[ P]arties who voluntarily seek bankruptcy protection seek a remedy that is equitable in nature, and in entering the bankruptcy court, knowingly subject themselves to the broad equitable powers of the bankruptcy court.").

The Bank argues that the proper standard of review for the Bankruptcy Court's decision to exclude the posting errors from its calculations is abuse of discretion. Bank Brief at 6. At oral argument, the Trustee argued that the issue of posting errors is a mixed question of law and fact, to be reviewed de novo. *See also Neal v. The Kan. City Star* (In re *Neal*), 461 F.3d 1048, 1052 ("[W]e review de novo the bankruptcy court's legal conclusions, as well as its conclucions involving mixed questions of law and fact." (quoting *DeBold v. Case*, 452 F.3d 756, 761 (8th Cir. 2006))). In its decision, the Bankruptcy Court clearly drew on its equitable powers in choosing to exclude the posting errors from its damages calculation. *See* Record II at 1408 ("The [Bankruptcy] Court concludes it would be inequitable to retroactively account for the posting errors."). Because a bankruptcy court's exercise of its equitable powers is reviewed for abuse of discretion, the court shall apply that standard. *See Larson v. Foster* (In re *Foster*), 516 B.R. 537, 541 (B.A.P. 8th Cir. 2014), *aff'd*, 602 F. App'x 356 (8th Cir. 2015).

The court finds that the Bankruptcy Court did not abuse its discretion by choosing to exclude the posting errors in its calculation. The Bankruptcy Court's finding that the

parties would have acted differently had the posting errors been reflected in the account statements for the 1430 Account at the time is well-supported by the record. When asked about the posting errors, Cook testified that, if the posting errors had been found immediately and the Bank were to "carry that balance forward . . . it would've made a whole bunch of overdrafts." Record II at 896. He stated that "the reality is that if that hadn't happened . . . [Debtor] would've done something different. [The Bank] would've done something different. The first day there wouldn't have been enough money under this true overdraft so [Debtor] would've either sent us more or we would've returned some checks." *Id.*

The Trustee's argument regarding the phrase "closely tracked" misunderstands the the Bankruptcy Court's finding. When the Bankruptcy Court said that the parties "tracked the balance in [the 1430 Account] very closely" it was referring to the parties' reliance on the balance of the 1430 Account in conducting "transfers, withdrawals, and deposits." Record II at 1408. *See* Record II at 1408 ("[The parties'] actions . . . all show a careful thought process and actions *based on what they believed the balance in* [*the 1430 Account was*] *at the time*."). The Trustee's argument regarding the reality of the "[A]ccount as it actually stood" asks the court to impose a counterfactual that does not reflect the actual course of dealings between the parties. Simply looking to the daily course of business between the parties clearly shows an actual reliance on the 1430 Account balance's accuracy. The amount of covering funds the Bank required and the amount of covering funds Debtor ultimately sent were based on the provisionally-overdrafted balance of the 1430 Account, as reflected in the Bank's records with the posting errors. The Trustee argues that equities actually favor including the posting errors, to account for the "true" balance of the 1430 Account. However, as the Bankruptcy Court found, "it is impossible to know the exact effect of these after the fact corrections on an account that the parties followed so closely, [and] it is impossible to truly 'correct' the whole case." Record II at

1409.  In any event, the court finds that the Bankruptcy Court did not abuse its discretion in declining to include the posting errors in its damages calculation.  Insofar as the Bankruptcy Court's damages calculation rests on these grounds, the court shall affirm.

### 3.    *Double recovery*

The Bankruptcy Court rejected the Bank's argument that making it return the preferential transfers would constitute an improper double recovery for the Trustee. Record II at 1432.  It did so because the Bank "did not establish which checks drawn on [the 1430 Account] had a relationship to the true overdraft repayments the Trustee seeks to avoid here." *Id*.  The Bank argues that the Bankruptcy Court erred in finding that the Bank owed the Trustee any amount of preferential transfers because the Trustee would obtain an improper double recovery of those funds because it already recovered funds from the third parties.  Bank Brief at 21-22; *see also* Exhibits O & P.  The Bank argues that the Bankruptcy Court was incorrect in finding that there was no proof that the Trustee received a double recovery on the transfers into the 1430 Account, stating that all the separate claims that the Bank pointed to at trial and in post-trial briefing demonstrate sufficient evidence of double recovery.  *Id*.  The Trustee argues that the Bankruptcy Court was correct in finding that the Bank did not prove a sufficient link between the recoveries in other cases and the funds sought in the instant action.  Trustee Reply at 13.  The Trustee further argues that the Bank's argument is "wrong-headed." *Id*.  He states that the other actions cited by the Bank involve checks drawn on the 1430 Account and paid to third parties but the funds at issue in the instant action are funds that Debtor paid to the Bank. "While still property of [Debtor], this recovery is separate and distinct." *Id*.  The Bank argues that its approach is not "wrong-headed" because, regardless of whether the Trustee recovers the funds from the third-party payees of the check or the Bank, "[i]t is ultimately the same money."  Bank Reply at 7.

Pursuant to 11 U.S.C. § 550(d), a trustee is entitled only to a "single satisfaction" of the transfers avoided under the Bankruptcy Code. "[I]n order to sustain a defense based upon section 550's prohibition of double recovery by the trustee, the burden is on the defendant to show clearly that the trustee partially recovered the debt from another party." *Williams v. E.A. Martin Mach. Co.* (In re *Newman*), 64 B.R. 125, 127 (Bankr. W.D. Mo. 1986) (citing 18 Am. Jur. 2d *Contribution* § 99). Regardless of whether or not the Bank's argument is "wrong-headed," the court finds that the Bankruptcy Court did not err in finding that the Bank has failed to "show clearly" that the Trustee's recovery in other preference actions have any logical link to the funds he seeks to recover here. The Bank's arguments on appeal essentially mirror those following trial. *See* Record II at 1279-81. The Bankruptcy Court rejected the Bank's argument because the Bank failed to "establish which checks drawn on [the 1430 Account] had a relationship to the true overdraft repayments the Trustee seeks to avoid here" and the Bank merely proved that the other recoveries the Trustee has received were "related to checks drawn on" the 1430 Account. *Id.* at 1433. The Bankruptcy Court relied on Cook's testimony, which indicated that he was unaware of how much the Trustee collected on the other preference actions at issue and "had no proof at all that the Trustee was attempting to collect any of these debts from the Bank." *Id.* at 1433-34.

The court finds that the Bankruptcy Court's findings regarding Cook's knowledge are supported by the record. When asked whether he knew how much money the Trustee, in actuality, recovered from various other preference actions, Cook testified that he did not know and he "just ha[d] the information off of what was filed with the court." *Id.* at 1049. Furthermore, the Bank's inability to tie the recovery in other cases to the preferential transfers at issue in the instant action is evidenced by the Trustee's cross examination of Cook:

> Q. Sir, my question is how do you make that into double
> dipping as your counsel has referred to it?

44

| A. | Because you made a claim against a check drawn on us and you're making a claim against us for the deposits that came in to clear those checks. |
| --- | --- |
| Q. | Well, do you know if that was a true overdraft day as your expert has defined it? |
| A. | Not without looking at the dates. |
| Q. | You didn't check, did you? |
| A. | No. |

*Id.* at 1050. Had the Bank been able to demonstrate that the Trustee actually received the funds it recovered in the other preference actions and had it been able to match specific checks causing true overdrafts in the 1430 Account to the checks drawn on the 1430 Account and recovered as preferential transfers in the other preference actions, the Bankruptcy Court would have clearly erred in denying the Bank's defense. However, the Bank has not done so, and, regardless of whether *some* of the money recovered in the other preference actions that the Bank points to came from checks written on the 1430 Account, the Bank's inability to tie that recovery to the transfers on account of intraday overdrafts here is fatal to the Bank's claim. The Bankruptcy Court's finding is not clearly erroneous. Accordingly, the court will affirm.

### 4. The Bank's "darkest day" theory

The Bank argues that the Bankruptcy Court erred in adding each preferential transfer together in arriving at a final damages amount. It cites In re *Sophisticated Comm'ns, Inc.*, 369 B.R. at 695, and argues that the Bankruptcy Court erred in combining all of the true overdrafts in calculating the preference amount. Bank Brief at 23. The court in In re *Sophisticated Commc'ns, Inc.* found, at the summary judgment stage, that the trustee's recovery for allegedly preferential transfers "would be limited to deposits curing the largest ledger balance overdraft during the [preference period]." 369 B.R. at 685 (citing *Emerson v. Fed. Sav. Bank* (In re *Brown*), 209 B.R. 874 (Bankr. W.D. Tenn.

1997)).  The summary judgment order from In re *Sophisticated Commc'ns, Inc.* is currently under restricted viewing in the Bankruptcy Court for the Southern District of Florida.  However, the court has reviewed the order and its treatment of this issue.  The summary judgement order cites In re *Brown* with little further analysis.  In In re *Brown*, the Bankruptcy Court for the Western District of Tennessee dealt with a check kiting scheme.  In In re *Brown*, the appropriate measure of recoverable damages was not simply the sum of all of the checks implicated in the inter-bank kiting scheme during the preference period, as the trustee in that case argued, but rather "the total amount of overdrafts in the absence of the kite, an approach that would determine the extent of the debtor's benefit from his kiting scheme."  209 B.R. at 881.  The concern with the former method of calculation was that it "falsely assume[d] that every check so written and deposited was unsupported by debtor's legitimate funds" and that there were "no facts, no testimony, and no expert[s] to support the [trustee's] bare argument."  *Id.* at 883.

For his part, the Trustee argues that, under the plain terms of the Bankruptcy Code, "he is entitled . . . to avoid all preferential transfers not subject to a valid defense, not only the single largest one.  To do otherwise would be a windfall for preference defendants and totally contrary to preference law."  Trustee Reply at 14.  The court agrees.  The Bankruptcy Code provides that "the trustee may avoid *any transfer*" constituting a preferential transfer under that statutory provision.  11 U.S.C. § 547(b) (emphasis added).  The plain terms of the statute do not readily give rise to an interpretation supporting the Bank's darkest day theory.  Given that one of the purposes of the preference statute is to "equalize the playing field when a debtor is in trouble by preventing the strongest and fastest creditors from getting all the money," the darkest day theory would also seem to run contrary to the spirit of the statute.  In re *LGI Energy Sols., Inc.*, 460 B.R. at 732.  To allow a preference defendant to retain the benefit of all but the single largest preferential transfer could lead to unintended results.  Say, for example, a creditor receives

sporadic preferential transfers of roughly the same amount over the entire preference period for which no affirmative defenses exist. The single largest preferential transfer may be but a small portion of the total amount of otherwise avoidable transfers made and perhaps only a few dollars more than any other transfer. This would eviscerate the Bankruptcy Code's dedication to the equal treatment of all creditors. The Trustee's approach may seem draconian, but it is draconian for good reason. Only if each and every preferential transfer is avoidable can the Bankruptcy Code fully address the harm it seeks to prevent.

Additionally, the situation in In re *Brown* is dissimilar to the instant action and is readily distinguishable. The In re *Brown* court was concerned that the trustee's theory did not accurately capture the correct amount of avoidable transfers because simply adding up every check written on the accounts implicated in the debtor's kiting scheme failed to account for the possibility that some of those checks could have been legitimate. 209 B.R. at 881. The court does not have the same concerns in the instant case. Initially, the court notes that the check kiting scheme in In re *Brown* and the practice of allowing intraday overdrafts in the instant action are so dissimilar as to make the cases immediately distinguishable. Furthermore, this is not a case in which a transfer's status as preferential depends on an unsupported factual assumption as in In re *Brown*. The court has made a legal determination that any transfer for a true overdraft is a preferential payment. Therefore, *all* transfers paying down a true overdraft during the preference period are preferential—it is simply not the case, as it was in In re *Brown*, that some such transfers are preferential and others may not be. In short, the uncertainty in In re *Brown*—the possibility that some of the checks written on the accounts were legitimate—has no analogue in this case. Therefore, the court finds that In re *Brown* is distinguishable and declines to rely on it or its reasoning. Accordingly, the court shall reject the Bank's

darkest day theory and instead find that the Bankruptcy Court did not clearly err in calculating damages.[8]

### 5. Setoff

The parties dispute whether the Bank's application of the funds in the 367788 Account to the deficit in the 1430 Account on October 24, 2008 constituted an avoidable preferential transfer or a setoff under the Bankruptcy Code. Setoffs are not "transfers" under the Bankruptcy Code and, therefore, are not avoidable as preferences. *See* 11 U.S.C. § 101(54) (listing the manners in which a "transfer" can occur under the Bankruptcy Code); *Damas v. United States* (In re *Damas*), 504 B.R. 290, 296 (Bankr. D. Mass. 2014) ("[I]t is well-settled that setoffs are not transfers and therefore are not avoidable under 11 U.S.C. § 547(b)."); *Braunstein v. Branch Grp., Inc.* (In re *Mass. Gas & Elec. Supply Co.*), 200 B.R. 471, 473 (Bankr. D. Mass. 1996) (examining the legislative history behind § 101(54) and noting that, while setoffs were once included in the definition of "transfer," they were ultimately omitted). The Bankruptcy Code does not create any general federal right of setoff. However, it does protect any other setoff rights the creditor may have so long as the setoff meets the additional requirements of 11 U.S.C. § 553(a). In order for its setoff to be proper, the Bank must demonstrate that: (1) it owed Debtor a debt which arose prior to the commencement of the bankruptcy case; (2) Debtor owed a debt to the Bank which arose prior to the commencement of the bankruptcy case; and (3) the debts were mutual. *See* 11 U.S.C. § 553(a)(2); *see also United States v. Gerth*,

---

[8] The court notes that neither party has argued what the proper standard of review of this issue is. Because the calculation of damages is generally reviewed for clear error, the court has applied this standard. *Cf. Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 818 (8th Cir. 2015) ("[T]he amount of damages in a nonjury case is within the discretion of the trial court and cannot be overturned unless clearly erroneous." (alteration in original) (quoting *Taylor v. Pre-Fab Transit Co.*, 616 F.2d 374, 375 (8th Cir. 1980)). However, even if the court were deciding this issue de novo, it would arrive at the same conclusion.

991 F.2d 1428, 1431 (8th Cir. 1993) (listing the three elements necessary to establish proper setoff).

Certainly, Debtor owed the Bank a prepetition debt. At the time of the setoff, Debtor owed the Bank $840,534.89, the amount of the true overdraft in the 1430 Account. Because "[a] bank account balance constitutes a debt owed by the bank to the depositor," the $1.4 million in the 367788 Account constituted a prepetition debt owed by the Bank to Debtor. *Cain v. Mappa* (In re *Pineview Care Ctr., Inc.*), 152 B.R. 703, 707 (D.N.J. 1993); *see also Farmers Bank of Clinton Mo. v. Julian*, 383 F.3d 314, 324 (8th Cir. 1967) ("A bank account at the time of filing the petition in bankruptcy is a debt due to the bankrupt from the bank . . . ."). The parties do not dispute these facts. Accordingly, the only issue on appeal is whether the Bankruptcy Court erred in finding the debts were not mutual, and therefore finding the setoff to be improper.

To be considered "mutual" debts that make setoff proper, the court must determine that: (1) the debts are in the same right; (2) the debts are between the same parties; and (3) the parties stand in the same capacity. In re *Cullen*, 329 B.R. 52, 57 (Bankr. N.D. Iowa 2005). "The mutuality requirement is strictly construed . . . . The right to setoff under § 553 is permissive, not mandatory." *Id.* (quoting *Farrell v. Wurm* (In re *Donnay*), 184 B.R. 767, 787 (Bankr. D. Minn. 1995)) (alteration in original). "[M]utual means each party must own its claim and the right to collect against the other." *R.M. Taylor, Inc. v. H.M. White, Inc.* (In re *R.M. Taylor, Inc.*), 257 B.R. 289, 294 (Bankr. W.D. Mo. 2000); *see also Hanssen v. DDP/AAFES* (In re *Hanssen*), 203 B.R. 149, 150 (Bankr. E.D. Ark. 1996) ("Mutuality means that parties have the right, in their own name, to collect against the others, in their own right.").

The Bankruptcy Court relied on *Savig v. Americana State Bank of Danube* (In re *Savig*), 50 B.R. 1003 (D. Minn. 1985), in finding that the debts Debtor and the Bank owed

each other were not mutual.  Record II at 1413-14.  In In re *Savig*, the United States District Court of the District of Minnesota recognized that

> [t]he classic case of setoff on a mutual debt arises when a creditor bank applies funds held in a debtor's general deposit account to the depositor's indebtedness to the bank.  Such an account is a mutual debt *to the extent that the funds are held by the bank subject to withdrawal by the depositor, and subject to the bank's obligation to honor checks drawn upon it.*  The essential element of mutuality inheres in the tension between the debtor-depositor's right to the use of the money on the one hand, and the creditor-bank's right to repayment on the other.

50 B.R. at 1005 (emphasis added).  In re *Savig* involved the use of an account with funds held specifically as proceeds of the bank's perfected security interest in certain collateral, but the District of Minnesota focused on the debtor's access to the funds.  *See id.* (noting that the funds in question "were not subject to withdrawal at the will of the debtor, nor could the Savigs write checks against that account" and that "the Loan Agreement . . . makes clear that the Savigs retained no discretion in the use of the funds deposited in the collateral account"); *see also Bank of Am. v. Lehman Bros. Holdings Inc.* (In re *Lehman Bros. Holdings Inc.*), 439 B.R. 811, 823-24 (Bankr. S.D.N.Y. 2010) (finding that an account being held for a "special purpose" was not available for the bank to set off).  The Bankruptcy Court relied on Debtor's inability to access the funds in the 367788 Account as evidence that the debts were not mutual in this case.  Record II at 1415.

The Trustee argues that the Bankruptcy Court was correct in finding that the debts were not mutual due to Debtor's inability to access the funds.  Trustee Brief at 15.  However, the Trustee argues that the Bankruptcy Court erred in declining to add at least $1,057,282.38 to its recovery, the negative balance that existed on the date of the setoff.  *Id.*  The Bankruptcy Court did not add any of the allegedly improper setoff to the Trustee's recovery because it "ha[d] already been accounted for in its analysis" of the role of the 367788 Account in the parties' relationship.  Record II at 1415.  The Bank argues that it

did, in fact, have a right of setoff, which the Bankruptcy Code protects. The Bank argues that its hold on the account does not preclude setoff rights—it states that the informal netting agreement between the parties, as recognized by the Bankruptcy Court, meant that "both parties essentially considered [the] 367788 and 1430 [Accounts] as one account for accounting of funds purposes." Bank Reply at 5. "The evidence is clear that in determining whether [Debtor] was in NSF position the $1,400,000.00 balance of [the] 367788 [Account] was included in the calculation. That means [Debtor] was essentially using the account daily even though there was a hold on it." *Id.*; *see also* IBA Brief at 10 ("Debtor had virtually unrestricted access to and the ability to use the funds in [the] 367788 [Account] by simply writing checks on [the] 1430 [Account] up to the total amount in . . . [the 1430 and 367788 Accounts].").

As an initial matter, the court agrees with the Trustee that a finding that the parties had an informal netting agreement between the accounts is in tension with its finding that the setoff was improper. Trustee Brief at 11. However, the facts weighing in favor of the netting agreement also weigh in favor of accepting the Bank's argument that Debtor effectively had access to the funds in the 367788 Account. The Bankruptcy Court found that "[t]he Bank and Debtor had what the [Bankruptcy Court] has referred to [as] a 'small town banking relationship,'" which provided not only the flexibility to create an informal netting agreement but also an informal agreement allowing the Bank to setoff the funds in the 367788 Account. This position is strongly supported by the Bankruptcy Court's finding that,

> [i]nstead of having the Bank transfer funds to cover from [the] 367788 [Account] to [the] 1430 [Account], and then having Debtor replenish [the] 367788 [Account] each day, the Bank and Debtor just left [the] 367788 [Account] alone most days. They functionally agreed to have the wired money from Debtor go right into [the] 1430 [Account]. The net effect was the same. . . . It really did not matter. It was six of one or half-dozen of the other. The net result was the same.

Record II at 1406. The Trustee's argument that the Bank's hold on the 367788 Account precludes a finding of mutuality has technical appeal, but it is at odds with the weight of the evidence as found by the Bankruptcy Court. Instead, the great weight of the evidence supports the Bank's argument that Debtor had functional access to the funds in the 1430 Account every day that it was writing checks. On other issues, the Bankruptcy Court and this court have been willing to look past the rigid technical labels assigned by the parties to examine the reality of the relationship beneath them. The court does so again here. While Debtor may not have been writing checks directly out of the 367788 Account, it was doing so in practice, as evidenced by the parties' course of dealings and the Bankruptcy Court's findings below.

The Bank cites *First Nat'l Bank of Clinton v. Julian* and argues that the circumstances in that case are factually similar and, thus, it should control in the instant action. 383 F.2d 329 (8th Cir. 1967). In *Julian*, the bank in question set off certain loans it made to the debtor with funds from a checking account the debtor maintained at the bank, which was designated as its "Reserve Account." *Id.* at 332. "The purpose of the 'Reserve Account,' according to the [b]ank, was to provide additional security to the [b]ank on [the debtor's] actual and contingent indebtedness, and [debtor] had to receive approval of a bank official before any checks could be drawn against this account." *Id.* at 332-33. The Eighth Circuit found that,

> as a matter of law, the account was a general checking account created for the purpose of securing the [b]ank against losses of some kind. . . . There was no agreement that the account was to be kept separate and isolated from the other checking accounts in the [b]ank. That is, the [b]ank did not and was not under any obligation to hold this money separate and apart from its other funds and to refrain from using the funds in its business. This type of reserve account constitutes a general deposit for a special purpose which creates a general deposit

> that the [b]ank may use in its regular business operations, the
> [b]ank becoming a debtor in the amount of the deposit.

*Id.* at 337 (citing 3 Scott on Trusts §§ 526, 530).

The Trustee cites a string of cases from the Second Circuit to argue that the ability to withdraw funds is dispositive of this issue. Trustee Reply at 14; *see also id.* at 15 (citing In re *Ben Franklin Retail Store, Inc.*, 202 B.R. 955 (Bankr. N.D. Ill. 1996)). However, the Second Circuit, in *Official Comm. of Unsecured Creditors v. Mfgs. & Traders Trust Co.* (In re *Bennett Funding Grp., Inc.*), cited *Julian* with approval and stated that "the proper test of mutuality with respect to bank accounts is not a bright line test based on the existence of withdrawal restrictions, but rather an examination of the total circumstances of the establishment and maintenance of the account." 146 F.3d 136, 139 (2d Cir. 1998). The Second Circuit stated the test succinctly: "Essentially, determining whether mutuality exists involves consideration of a range of circumstances and finally a factual determination as to whether the account is sufficiently general to be considered available for a simple adjustment of accounts, such as a setoff." *Id.* at 140.

Initially, the court notes that neither party cited *Julian* before the Bankruptcy Court and the Bankruptcy Court did not explicitly consider *Julian* in rendering its decision. However, after examining the entire range of circumstances surrounding the 367788 Account, the court finds that *Julian* is more analogous to the situation before the court than In re *Savig*. In In re *Savig*, the account in question was a "collateral account," meant to hold the proceeds of certain inventory and receivables which the bank held a security interest in. 50 B.R. at 1004. The bank in In re *Savig* could, but was not required to, apply the funds in the collateral account to the debtors' outstanding debt. *Id.* The collateral account at issue "simply made it easier for the [b]ank to protect and enforce its security interest by ensuring that the proceeds from inventory and receivables would not be deflected to other purposes or creditors of the [debtors]." *Id.* at 1006. On the other hand, in *Julian*, the account in question was specifically set up to provide security on the

debtor's indebtedness to the Bank. 383 F.2d at 333. The Eighth Circuit noted that this type of account, where not held separate and apart from the debtor's other funds, is merely a general checking account created for a special purpose—namely, to insulate the bank against potential losses due to its extension of credit to the debtor. *Id.* In the instant action, as in *Julian*, the 367788 Account was created with the specific purpose of insulating the Bank against losses due to the specter of excessive overdrafts. While Debtor did not have the ability to directly draw on the funds in the 367788 Account, there is no evidence in the record that the Bank was legally bound to hold the funds in the 367788 Account separate and apart from Debtor's other funds. This conclusion is further bolstered by the court's finding above that Debtor in fact enjoyed access to the funds in the 367788 Account.[9]

The court finds that the Bankruptcy Court erred in finding that the setoff of the funds in the 367788 Account was improper. However, the Bankruptcy Court expressly disclaimed any reliance on the improper setoff amount in calculating damages in this case. *See* Record II at 1415 ("The Court, however, does not add any of the improper setoff amount to its analysis here because that amount—the funds in [the] 367788 [Account]—has already been account for in its analysis . . . ."). As such, even though the court finds that the October 24, 2008 setoff was not a "transfer" and was therefore not avoidable, the court need not reverse on these grounds.

Accordingly, because the court has found the Bankruptcy Court did not err as to its calculation of total avoidable transfers, it shall affirm the Bankruptcy Court's order in whole.

_____

[9] Furthermore, were the court to find that the setoff was improper, this would lead to the somewhat absurd result that the Bank would not be able to utilize the funds in the 367788 Account for their understood purpose. However narrowly the mutuality requirement must be read, the court is skeptical of any reading which would so completely rob the parties of their own expectations for the use of the funds.

## V. CONCLUSION

In light of the foregoing, the Bankruptcy Court's April 20, 2015 Order is **AFFIRMED**.

**IT IS SO ORDERED**.

**DATED** this 15th day of March, 2016.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA